UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

        -against-

UZAIR PARACHA,

                       Defendant.

03-Cr-1197 (SHS)

OPINION & ORDER

SIDNEY H. STEIN, U.S. District Judge.

Defendant Uzair Paracha ("Paracha") was convicted after a jury trial of conspiracy and substantive charges of providing material support and resources to al Qaeda; making or receiving a contribution of funds, goods, or services on behalf of al Qaeda; and committing identification document fraud with the intent of providing material support to al Qaeda in order to facilitate a terrorist act. Paracha has moved for a new trial pursuant to Fed. R. Crim. P. 33 on the grounds of newly discovered evidence. For the reasons set forth below, the Court concludes in light of that new evidence that allowing defendant's conviction to stand would be a manifest injustice, and therefore grants the motion for a new trial.

## **Table of Contents**

I. Background ........................................................................................................................ 2

    A. The Prosecution's Case at Trial ......................................................................... 4

        1. Paracha's Pretrial Statements ............................................................. 4

        2. Expert Testimony and Corroborating Evidence .......................................... 9

    B. Defendant's Case at Trial ................................................................................. 11

    C. Conviction, Sentence, and Appeal .................................................................. 16

II. Defendant's Motion for New Trial ........................................................................ 16

    A. Legal Standard .................................................................................................. 17

    B. Defendant's Proffered Evidence Was Newly Discovered After Trial, Was Obtained Through the Exercise of Due Diligence, and Is Material. ............................................... 19

    C. Defendant's Newly Discovered Evidence is Not Merely Cumulative or Impeaching, with a Single Exception. ...................................................................... 20

1. Most of the Material Portions of the Newly Discovered Evidence Are Not Cumulative............................................................................................................21

2. To the Extent that Al Baluchi's Newly Discovered Statements Directly Assert Defendant's Innocence, They Are Cumulative of His Stipulated Trial Testimony. ..............................................................................................................................25

D. There Is a Significant Chance that the Introduction of Defendant's Newly Discovered Evidence Would Have Induced a Reasonable Doubt in the Minds of Enough Jurors to Prevent a Conviction. .......................................................................26

III. Conclusion .........................................................................................................................33

## I. <u>Background</u>

The Court assumes familiarity with the underlying facts and pretrial proceedings in this case, which are set forth more fully in *United States v. Paracha*, No. 03-CR-1197, 2004 WL 1900336 (S.D.N.Y. Aug. 24, 2004), and *United States v. Paracha*, No. 03-CR-1197, 2006 WL 12768 (S.D.N.Y. Jan. 3, 2006), *aff'd*, 313 F. App'x 347 (2d Cir. 2008).  In brief, Uzair Paracha is a Pakistani citizen with permanent resident status in the United States, where he spent significant periods of his life and where several members of his extended family resided. (Trial Transcript ("Tr."), Docs. 78–80 at 219, 258, 648–51, 914, 1186–88.)  Paracha received his education in Pakistan, culminating in his graduation from a business college with an MBA in December 2002.  (*Id.* at 817, 914–15, 1062–63, 1075–77.)  Defendant then came to New York in February 2003, at the age of twenty-three, in order to help market apartments owned by his father Saifullah Paracha, while living in his aunt and uncle's apartment in Brooklyn.  (Tr. at 201–02, 210–11, 230, 358, 648–59, 816, 851–52, 1065–66, 1143.)

As described in more detail below, defendant was arrested on a material witness warrant on March 31, 2003, after being interviewed for three days by agents of the Joint Terrorism Taskforce ("Joint Taskforce"), a collaborative effort between the Federal Bureau of Investigation and the New York Police Department, among other agencies.  A federal grand jury charged defendant in October 2003 with five felony counts: conspiracy and substantive

charges of providing material support or resources to al Qaeda, a designated foreign terrorist organization; conspiracy and substantive charges of making or receiving a contribution of funds, goods, or services on behalf of al Qaeda; and committing identification document fraud with the intent to provide material support to al Qaeda in order to facilitate a terrorist act. (Indictment, Doc. 6.)

Prior to trial, defendant sought depositions and writs of habeas corpus *ad testificandum* in order to access four prospective defense witnesses detained by the United States government at Guantanamo Bay, Cuba: Saifullah Paracha, Majid Khan, Ammar al Baluchi,[1] and Khalid Sheikh Mohammed ("KSM"). In adjudicating these requests, the Court followed the United States Court of Appeals for the Fourth Circuit in *United States v. Moussaoui*, 382 F.3d 453 (4th Cir. 2004). First, in fulfillment of its *Brady* obligations in accordance with the Classified Information Procedures Act (CIPA), the government submitted *ex parte* and under seal proposed unclassified summaries of relevant statements taken from these men, along with the underlying classified materials, for the Court's review. After the Court analyzed these materials and directed the government to make certain additions, revised versions of these unclassified summaries were provided to defendant. (Order, Doc. 48.)

On the basis of the statements in those summaries, the Court denied Paracha's request for access to KSM himself on the ground that Paracha had failed to make the necessary showing that KSM would provide material testimony. This was because the only statement by KSM that was then available to defendant – that KSM "did not recognize a photograph of Saifullah Paracha taken in the early 1970's" – was "simply too remote and isolated to support a claim that [KSM] would provide material or favorable testimony in Paracha's defense." *Paracha*, 2006 WL 12768, at *12. As to Saifullah Paracha – defendant's father – the government conceded the materiality of his anticipated testimony, and the Court granted defendant the right to depose him, but defendant ultimately chose not do so. *Id.* at *3.

---

[1] Ammar al Baluchi is also known as Ali Abdul Aziz Ali, among other names. (*See, e.g.*, Tr. at 15.)

Finally, in order to balance government concerns of national security with Paracha's legitimate pursuit of potentially material testimony from Khan and al Baluchi, the Court ruled that defendant was able to present Khan and al Baluchi's testimony by stipulation, in the form of the unclassified summaries of statements made by the two men during their custody, presented to the jury accompanied by instructions along the lines laid out by the Fourth Circuit in *Moussaoui*. Defendant agreed at the time that the stipulations constituted an "adequate substitution" for live testimony by Khan and al Baluchi. *Id.* at *13.

## A.  The Prosecution's Case at Trial

At Paracha's jury trial in 2005, the parties stipulated to the fact that Khan and al Baluchi were members of al Qaeda. (Tr. at 227.) The government presented evidence tending to show that Paracha and his father met with these two men in Pakistan and that defendant knowingly agreed to aid al Qaeda by fraudulently assisting Khan's reentry into the United States in order for Khan to carry out a terrorist attack, in return for an investment in one of Saifullah Paracha's businesses of $180,000–200,000 in al Qaeda funds from al Baluchi.

### 1.  Paracha's Pretrial Statements

The government's case relied heavily on statements made by defendant himself to government agents before trial. When agents of the Joint Taskforce first approached Paracha at his workplace in Manhattan on the evening of March 28, 2003, he agreed to speak with them at his office and then voluntarily accompanied them to FBI offices, where he was interviewed until approximately 4:00 a.m. the next day. (Tr. at 208–16, 645–50.) In response to the agents' questions, Paracha initially denied that he knew either Khan or al Baluchi, and told the agents instead about a person named Adnan who had asked defendant's assistance in arranging travel from Pakistan to the United States. (*Id.* at 221–23, 351–53, 358–60, 658–60, 783–88.) Shortly thereafter, however, defendant admitted that "Adnan" was actually Majid Khan, whom Paracha knew and had agreed to help reenter the United States. Specifically, when asked directly if he currently possessed Khan's driver's license, Paracha replied that he did and that he had agreed to help Khan procure a travel document that would allow Khan

to return to the United States from Pakistan. (*Id.* at 224–29, 236, 660–67, 772–73, 788–95.) Along with Khan, Paracha also reported that he had met with Ammar al Baluchi, though he knew him only by other names. (*Id.* at 226–29, 662–64.)

Though he admitted relatively quickly that he knew Khan, Paracha maintained for some time that he lacked any knowledge of or connection to al Qaeda. In response to repeated questioning by the Joint Taskforce, Paracha told agents that he did not know whether Khan was a member of al Qaeda and further denied involvement by either himself or his father in any terrorist operation. (*Id.* at 237, 662, 761, 815.) Toward the end of his first day of being interviewed, however, around 4:00 a.m., Paracha changed his story and told agents that he "suspected his father of being al-Qaeda, but that he didn't want to think about it," and that he "wouldn't be surprised" to learn that his father was involved in a terrorist plot, because "his father had met Usama bin Laden" and had expressed admiration for bin Laden as a "very humble guy." (*Id.* at 237–38; *see also id.* at 673–74, 818–19, 830.) The agents then ended the interview, approximately nine hours after they first approached defendant. (*Id.* at 216, 238.) At their suggestion, Paracha agreed to sleep in a hotel room, accompanied by FBI agents, in order to facilitate their continued interview of him the next day. (*Id.* at 239–41, 425, 674–76, 839–41, 950–58.)

Defendant was advised of his *Miranda* rights at the beginning of the second day of his questioning. (*Id.* at 261–64, 677–79, 836–38.) In continued non-custodial interviews over the next two days, defendant initially reiterated his denial of any knowledge of Khan's al Qaeda affiliation, and stated that his father "did not discuss al-Qaeda matters with him." (*Id.* at 266; *see also id.* at 681.) But defendant soon contradicted these statements as well, stating that he "learned . . . through his father" that Khan and al Baluchi were al Qaeda members, that "he and his father . . . discuss[ed] al-Qaeda matters at home," and that "he knew his father was dealing with al-Qaeda." (*Id.* at 270, 280; *see also id.* at 271–83, 682–83, 728, 743, 821–22, 848–50, 893–95, 929.) Paracha told the agents that "the relationship between his father and al-Qaeda began . . . approximately nine months before [defendant] came here to the [S]tates,"

(*id.* at 693): "it all began in the summer of 2002," when his father was approached by men whom defendant suspected were al Qaeda members, (*id.* at 279; *see also id.* at 429, 886). Defendant stated that the men asked his father for "financial support" to purchase weapons for the war in Afghanistan against the United States, but that defendant "did not know" whether his father actually gave them any money. (*Id.* at 279; *see also id.* at 429–30, 693–94, 765–66, 886–96.) Paracha also said that when he and Khan met in Pakistan in early 2003, Khan told him that "[w]e need brothers like you to help us out," which defendant interpreted as Khan attempting to recruit him to join al Qaeda, and that Khan added that "different people provide various levels of assistance to al-Qaeda." (*Id.* at 273; *see also id.* at 686–87, 728–29, 861–64, 929–30.)

Paracha elaborated on the "four tasks" Khan had asked defendant to perform in order to make it appear as if Khan had never left the United States and help him obtain travel documents allowing his return to the United States from Pakistan: (1) looking into Khan's immigration paperwork, (2) depositing money into Khan's U.S. bank account, (3) using Khan's credit cards in the United States, and (4) closing Khan's post office box in Maryland. Upon Paracha's own return to the United States in February 2003, defendant stated, he made some minimal efforts toward completing the first of these tasks – performing basic internet research on immigration procedures and calling the Immigration and Naturalization Service ("INS") once or twice posing as Khan, without success. He added that he "didn't get the chance" to close Khan's post office box before the end of March 2003.[2] (*Id.* at 273–75; *see also id.* at 685–86, 725–28, 864–70, 880–82.)

---

[2] One of the two Joint Taskforce agents who testified to the substance of the March 2003 interviews added on redirect examination by the government that Paracha said he took the further step of contacting Khan's bank in order to confirm that the bank account was still active. (*Id.* at 932.) This testimony contradicted previous statements by both agents at trial that the INS inquiry was "the only thing" Paracha told them he had done, (*id.* at 881–82), and that defendant stated at the time that he "had not done any of the other things that K[ha]n had asked him" to do, (*id.* at 685; *see also id.* at 274).

At this point, after being "asked about all the stuff that he had just gone through with [the Joint Taskforce agents] for the last couple days, and . . . asked his thoughts on what he had just told" them, Paracha stated that "he thought there was a terrorist plot being planned" – possibly "a plot to set off chemical weapons" – although "he did not know what the plot was." (*Id.* at 281–82; *see also id.* at 902.) Defendant added that he "knew he was part of the plot and that he was helping Al-Qaeda out" by agreeing to help Khan reenter the United States. (*Id.* at 282; *see also id.* at 879–80, 906.)

On March 31, after three days of interviews, Paracha was served with a material witness warrant and arrested. Over the next two months, he continued to cooperate and answer the questions of the Joint Taskforce agents in a series of proffer sessions at the U.S. Attorney's Office, at which he was accompanied by defense counsel. (*Id.* at 283–88, 296, 697–98, 713–14, 936–37.)

In these sessions, defendant elaborated on – but also contradicted portions of – his incriminating pre-arrest statements. (*See, e.g.*, *id.* at 946 ("There were times that Mr. Paracha contradicted himself, proving certain things to be false.").) Paracha did not, in the course of these meetings, ever disavow his admissions to knowing that Khan and al Baluchi were al Qaeda members, that by assisting Khan he was helping al Qaeda, and that his father had business dealings with the terrorist group. (*Id.* at 312, 528, 745.)

Defendant's description of those dealings, however, deviated significantly from his initial pre-arrest account to the agents. Notwithstanding his previous statement to the agents that the relationship between his father and al Qaeda began with a request for money by the group in the summer of 2002, Paracha now described an earlier interaction, at some

unspecified point "prior to 9/11," when his father "was approached by people from al-Qaeda, who were looking to give him money."[3]  (*Id.* at 723–24 (emphasis added).)

Defendant also offered a nebulous and inconsistent description of yet a third transaction, reporting that at some point he observed his father carrying a bag containing $200,000 in cash, which defendant later learned was money from al Qaeda that was then temporarily deposited by Saifullah Paracha in defendant's own bank account, without his knowledge, at the Metropolitan Bank in Pakistan.  According to Paracha's various statements as introduced at trial, this bag of money was most likely delivered in the summer of 2002, (*id.* at 288, 490, 496, 531–32, 739) – either before the request for weapons funding previously described as the beginning of the relationship, (*id.* at 494), or afterward, (*id.* at 511–12) – or possibly at some other time altogether, (*id.* at 511).  Paracha stated that the money was then withdrawn from his bank account by his father and returned to al Qaeda, again without defendant's knowledge at the time.  But he offered two conflicting accounts of the timeline for that withdrawal, supported by mutually contradictory explanations.  Paracha first asserted that the money was withdrawn almost immediately, a "couple days" after the deposit by his father.  (*Id.* at 289.)  He remembered that fact distinctly, he claimed, because the size of the rapid withdrawal from his account had prompted the bank president to call him directly; this "out of the blue" phone call was the first time that Paracha learned of the deposit, after the fact.  (*Id.* at 491–92; *see also id.* at 737–39.)  Later, however, Paracha told his interviewers that the money had actually remained in his bank account for "a couple months" – an alternative timeline he explained was designed to allow his father to earn interest on the money before its return to al Qaeda, (*id.* at 290, 494).

Throughout his pretrial statements, Paracha gave inconsistent explanations of his reasons for agreeing to assist Khan.  He stated at times that al Baluchi and Khan offered to

---

[3] In addition, despite stating before his arrest that he did not know whether his father actually gave al Qaeda the funds requested in the summer of 2002, Paracha later said definitely in a proffer session that "[n]o money was given to al-Qaeda" at this time.  (*Id.* at 512.)

"invest" between $180,000 and $200,000 in one of defendant's father's businesses, and that "he thought it was implied that he do the task for Majid Khan in order for he and his father to receive the money from al-Qaeda." (*Id.* at 270–76; *see also id.* at 683, 689, 722, 819–20, 850–51.) Thus, when asked his motive, Paracha said first that "it was for the money." (*Id.* at 282; *see also id.* at 444–46.) But Paracha alternately described the proffered funds from al Baluchi as "money [that] was supposed to be kept liquid . . . in order for them, al-Qaeda, to get it back at a moment's notice." (*Id.* at 271; *see also id.* at 777–79, 854, 927–28.[4]) And defendant backtracked from his first explanation of his motivation, stating that he and his father "still would have helped al-Qaeda out even without the money so actually they were doing it as a favor." (*Id.* at 282; *see also id.* at 540–41, 689–96, 744, 908–09.) Later still, defendant offered yet another explanation, stating that he called INS because he "[j]ust wanted to get Majid Khan off his back." (*Id.* at 299; *see also id.* at 520, 744–45.)

##    2.    Expert Testimony and Corroborating Evidence

In addition to the testimony from Joint Taskforce agents, the government presented testimony by an expert witness, Evan Kohlmann, on the history of al Qaeda and its "amorphous" structure, consisting – below the senior hierarchy then led by Usama bin Laden and operational planners, prominently including KSM – of independent cells with specialized roles for different individuals, who often had "very limited information" about the organization as a whole. (Tr. at 103, 116; *see also id.* at 98–128, 146–50, 166–71, 181–85, 196–97.)

The government also presented evidence corroborating various aspects of Paracha's confessions: the results of a forensic computer investigation verifying Paracha's limited INS-related internet research, (*id.* at 47–65); and property recovered from defendant's personal

---

[4] Both the Joint Taskforce agents who testified about interviewing Paracha noted this inconsistency: "I said to [Paracha] that that doesn't make any sense, why would al-Qaeda want to keep the money liquid but then invest it in the company? Those are actually two different things," (*id.* at 271); "I agree with you [that they are two different things], but he said both," (*id.* at 777).

possessions as well as a consensual search of his aunt and uncle's Brooklyn apartment, including Khan's identification documents, handwritten instructions detailing the tasks described by defendant, and the key to a Maryland post office box that had earlier been opened in Khan's name by Aafia Siddiqui, (*see id.* at 230–34, 242–60, 545–66, 589–635, 667–70, 698–702).

The government additionally introduced bank records purporting to corroborate Paracha's accounts of transactions between his father and al Qaeda, but these records only loosely matched the chronology and details of defendant's pretrial statements. Though defendant had described deposits of funds into his own Metropolitan Bank account – such that *he* was the one to receive a call from the bank president when a suspicious transaction was registered – the only records introduced by the government pertained to an account at that bank in the names of defendant's mother Farhat Paracha and a "Shamin Shafiuddin," whom the Joint Taskforce was unable to identify. (*Id.* at 302–04, 313–17.[5]) These records showed cash deposits in July 2002 of Pakistani rupees amounting in value to more than $500,000, followed by withdrawals of nearly that entire amount by November 2002, and then an additional cash deposit in May 2003 of rupees worth approximately $270,000. (*Id.* at 304–06.)

Other portions of Paracha's pretrial statements were not corroborated at all. Though Paracha stated consistently that he did not know Aafia Siddiqui beyond being told by Khan that "she was a good sister who wanted to help them out," (*id.* at 275),[6] the agents asked him "if Ms. Siddiq[u]i was asked to participate in transporting anthrax to conduct an anthrax attack here in the U.S., is that something she would get involved in," and defendant answered

---

[5] As adduced on cross-examination, it appears that Joint Taskforce agents also investigated and received bank statements from two personal accounts of defendant's – one of them at the Metropolitan Bank – which apparently showed no large cash withdrawals. (*See id.* at 465–67.)

[6] Indeed, Paracha told the agents that he had to "wr[ite] down Ms. Siddiq[u]i's name so that he could remember it" after hearing it from Khan. (*Id.* at 735–36.)

that he thought she probably would, (*id.* at 688; *see also id.* at 417–20, 874–79).  Similarly, Paracha gratuitously speculated to the agents that Khan might be involved in "a plot to set off chemical weapons."  (*Id.* at 281; *see also id.* at 442–44, 695–96, 901–08.)  Defendant also recounted meeting in early 2003 with an octogenarian Pakistani scientist "recruited, by al-Qaeda, to develop chemical and biological weapons."  (*Id.* at 720–21; *see also id.* at 280, 298, 421–22, 440–42, 488–89, 518–19, 694–96, 896–902.)  But no evidence was ever introduced to substantiate any of these supposed, hypothetical plots – or even the existence of the alleged scientist – and the primary interviewing agent testified at trial that the information leading the Joint Taskforce to approach Paracha on March 28, 2003, did not relate to any chemical or biological weapons plot.  (*Id.* at 340.[7])

## B. Defendant's Case at Trial

At trial, Paracha acknowledged making the self-incriminating statements detailed above, but maintained that key portions of them constituted false confessions made out of a combination of fear, intimidation, and exhaustion.  (Tr. at 1058–59, 1067–74, 1093–95, 1106–09, 1168–1208, 1229–36, 1258–91, 1310, 1325–39.)  Testifying in his own defense, Paracha admitted that he had indeed met with Khan and al Baluchi as described, and that he had taken some small steps toward fulfilling his agreement to help Khan enter the United States.[8] But he maintained that he never had any knowledge that these men were members of al Qaeda, that he never knowingly aided a terrorist group or knew about any plot, and that "if I had known these people were al Qaeda, I would not have helped them out."  (*Id.* at 1072; *see also id.* at 1290, 1306–07, 1333.)  Instead, Paracha said he had agreed at his father's request

---

[7] The government confirmed to the Court at sidebar during trial that "Mr. Paracha, of course, is not charged with a chemical weapons plot of any kind."  (*Id.* at 344.)

[8] Specifically, Paracha admitted that he did basic internet research into Khan's immigration issues and contacted INS, (*id.* at 1063–65, 1159–63, 1188–90, 1279–81, 1300–01, 1332–33), but denied ever checking the status of Khan's bank account, (*id.* at 1281).

to help Khan "[a]s a fellow Pakistani [M]uslim." (*Id.* at 1061.[9]) Though he felt uncomfortable helping Khan, and "did not know" why his father "put [him] into this situation," (*id.* at 1175), Paracha nonetheless made some halfhearted efforts toward completing the tasks he had been given, "out of respect" for his father, (*id.* at 1263).

Paracha testified at trial that on the night of March 28, 2003, he had "panicked initially" when "asked . . . out of the blue if I knew a Majid Khan," (*id.* at 1241) – denying that he did, and going so far as to make up the "Adnan" story – because he knew that he had "done something wrong" by calling the INS for Khan, (*id.* at 1147–48; *see also id.* at 1131–36). When confronted with an indication that the agents already possessed specific information to the contrary, in the form of the question about Khan's driver's license, Paracha soon told them the truth: that he did know Khan and had agreed to help him but did not know that Khan was an al Qaeda member. Later that night, however, after "I had already told them the truth and I did not go home . . . [t]hat is when I started lying" by falsely suggesting he had suspicions that his father was involved with al Qaeda. (*Id.* at 1233.) Throughout his remaining interviews and proffer sessions, Paracha testified, he continued to lie to the Joint Taskforce agents – and to his own lawyer, (*id.* at 1231–32) – "because I thought that is what they wanted to hear," and because he hoped that by cooperating he would be allowed to return home to Pakistan, (*id.* at 1059; *see also id.* at 1072).

Thus, Paracha testified at trial that the al Qaeda scientist he described to agents before trial "does not exist," (*id.* at 1244; *see also id.* at 1270, 1308–09), and that he had "[a]bsolutely no[]" basis for the suggestion that Siddiqui would accept anthrax from Pakistan, which he offered to agents only because "that was what I thought they wanted to hear," (*id.* at 1327; *see also id.* at 1191–93). The supposed transactions and meetings between al Qaeda and his father "did not happen," (*id.* at 1272; *see also id.* at 1271–78, 1307–08, 1325–30), and in fact Paracha

---

[9] Paracha also said several times that he acted in part to help Khan support or care for his child, although the connection between this motive and defendant's INS-related tasks is unclear. (*See id.* at 1252–54, 1268, 1336.)

altered these false narratives on the fly in response to objections from the agents that significant details in his initial statements "didn't make any sense," (*id.* at 1277 (number and timing of transactions); *see also id.* at 1274 (length of time money left in bank account)).

According to Paracha's testimony, although Khan told Paracha that "we need more brothers like you" when defendant agreed to help Khan, Khan did not say anything about al Qaeda, (*id.* at 1257–58); Paracha later falsely described that conversation to the agents and claimed he knew that Khan and al Baluchi were al Qaeda members only because he felt "pressured" to say so, (*id.* at 1073). To substantiate his claim of feeling pressured during the March 2003 interviews, Paracha testified that his cell phone was taken away on the first night he was interviewed in order to prevent him from contacting his family, (*id.* at 1104–05, 1116–18), that he was subjected to a strip search in the hotel room, (*id.* at 1126–27, 1148–50), and that he was threatened with arrest or jail if he invoked his right to counsel, (*id.* at 1311–13) – all of which the government strenuously denied, (*see id.* at 393–94, 526, 706–08, 832–35, 1343–45, 1352–61).

Pursuant to the Court's prior rulings, Paracha's trial defense counsel read into the record stipulated testimony by Khan and al Baluchi, based on unclassified summaries of their statements given while in custody as provided by the government. (*Id.* at 1043–49; *see also* al Baluchi Stip., Doc. 101 Ex. 3; Khan Stip., Doc. 101 Ex. 4.) In relevant part, the parties stipulated that Khan would have given the following testimony as to the culpability of defendant and his father:

> No compensation was given to Saifullah Paracha in return for Saifullah Paracha arranging for Uzair Paracha to assist Majid Khan with Majid Khan's immigration matters.
>
> Majid Khan had no Al Qaeda contacts in the United States.
>
> None of Majid Khan's contacts were aware of his gas station attack plan or any other actions he might have taken on behalf of Al Qaeda.
>
> Majid Khan assessed Uzair Paracha as being willing to help a fellow [M]uslim at his father's request. Majid Khan knew of no other motivation for Uzair Paracha's assistance. Majid Khan did not assess Uzair Paracha as being

suitable for any other assistance to Al Qaeda besides helping with Majid Khan's documents at the time. Uzair Paracha volunteered to Majid Khan that he (Paracha) wanted to spread Islam through media.

Majid Khan thought Uzair Paracha was a good person who was willing to help. Majid Khan might have been interested in recruiting Uzair Paracha once Majid Khan returned to the United States and had time to assess Uzair Paracha. Majid Khan would only give Uzair Paracha a 5–10% suitability assessment, citing the fact that Uzair Paracha had no extremist views and was not really a practicing [M]uslim.

(Khan Stipulation at 1–3.) Khan also corroborated the details of the tasks given to defendant to assist Khan in obtaining travel documents. (*Id.*)

The stipulation of the parties regarding al Baluchi's testimony contained the following statements relevant to defendant:

Uzair Paracha was totally unwitting of Al-Baluchi's Al Qaeda affiliation, or of Al-Baluchi's intention to use Saifullah Paracha for the broader operational plan involving Majid Khan. Uzair Paracha knows nothing about operations. Neither Al-Baluchi nor Majid Khan indicated to Uzair Paracha at any time that they were mujahidin or Al Qaeda. Uzair Paracha did not complete the task involving Majid Khan.

(Al Baluchi Stipulation at 1–2.) Al Baluchi also offered exculpatory statements as to defendant's father, stating that "Saifullah Paracha was only a businessman who was sympathetic to the mujahidin," who was "unwittingly being used to assist in Al-Baluchi's broader plans with Al Qaeda operative Majid Khan." "Because Saifullah had never been properly vetted," according to al Baluchi, "he was never tasked by Al Qaeda (i.e., KSM or Al-Baluchi) to do anything for them." On the other hand, al Baluchi believed that Saifullah Paracha "probably knew of al-Baluchi's al Qaeda affiliation" at least by the time of KSM's arrest on March 1, 2003, and even earlier defendant's father "likely knew that Al-Baluchi and KSM were associated with mujahidin and could be associated with the Taliban or al Qaeda." (*Id.* at 2–3.)

Following the procedure adopted by the Fourth Circuit in *United States v. Moussaoui*, 382 F.3d 453, 480–81 (4th Cir. 2004), and this Court, these stipulations were presented to the jury

with instructions "designed to give the jury a basis for evaluating the statements, but to leave to the jury the function of determining their credibility and what weight, if any, they are to be given." *United States v. Paracha*, No. 03-CR-1197, 2006 WL 12768, at *15 (S.D.N.Y. Jan. 3, 2006):

> You will hear testimony from the written statements of two witnesses – Majid Khan and Ammar al Baluchi – who will not appear at this trial. Those statements were made while the witnesses were in custody. For the purposes of this trial only, you may assume that the United States government has custody of these two witnesses and control over the conditions of their confinement.

> The witnesses were questioned on multiple occasions over some period of time. The witnesses were questioned in relation to their relationship with the defendant.

> None of the attorneys in this action has had access to the two witnesses. The witnesses are segregated from each other and are not able to coordinate their statements. The witnesses have had no contact with the defendant since his arrest.

> The witnesses' statements were obtained under circumstances that were designed to elicit truthful and accurate information from the witnesses because the statements are relied upon by United States officials responsible for making national security decisions. The failure to provide truthful information would be detrimental to any relationship to the United States government by the witnesses.

> Those who questioned the witnesses have a profound interest in obtaining accurate information from the witnesses and in reporting that information accurately to those who can use it to prevent acts of terrorism and to capture other al Qaeda operatives.

> It is your decision, after reviewing all the evidence, whether to accept the testimony of these two witnesses just as it is with every other witness and to give that testimony whatever weight that you find it deserves.

*Id.* The Court read these instructions to the jury immediately before defense counsel read the stipulations into the record and then again at the close of the trial in the charge to the jury. (Tr. at 1042–43, 1504–06.)

## C. <u>Conviction, Sentence, and Appeal</u>

The jury convicted Paracha on all five counts on November 23, 2005. (Tr. at 1577–80.) In July 2006, the Court sentenced defendant to thirty years' imprisonment followed by five years of supervised release. (Judgment & Conviction, Doc. 88.)

Defendant appealed his conviction on various grounds, including this Court's failure to suppress his statements to law enforcement and the fruits of the search of his apartment, the sufficiency of the evidence, the admission of Kohlmann's testimony regarding al Qaeda, and Paracha's Sixth Amendment right to confront the witnesses against him. The United States Court of Appeals for the Second Circuit rejected each of those arguments and affirmed the judgment on June 19, 2008. *United States v. Paracha*, 313 F. App'x 347 (2d Cir. 2008).

## II. <u>Defendant's Motion for New Trial</u>

In November 2008, defendant moved for a new trial pursuant to Fed. R. Crim. P. 33 on the basis of newly discovered evidence. Paracha's proffered evidence consisted of post-trial statements made by Khan, al Baluchi, and KSM in the course of Combatant Status Review Tribunals ("CSRTs") and other interviews with government agents at Guantanamo Bay, where those individuals were detained.[10] Some of these statements were disclosed to Paracha by the government after trial, while others were obtained from public sources. (Def.'s Mem., Doc. 94 at 13; Gov't's Mem., Doc. 98 at 19; *see also* Gov't's Letters, Doc. 101 Exs. 5 & 6.) In two subsequent letters in 2009 and 2018, defendant submitted additional evidence in the form of a report by the International Committee of the Red Cross along with newly declassified portions of transcripts from the CSRTs of Khan, KSM, and other detainees. (4/20/09 Letter; 4/2/18 Letter.)

---

[10] CSRTs are proceedings in which the U.S. government affords Guantanamo detainees "an opportunity for review of their status as enemy combatants." *United States v. Ghailani*, 733 F.3d 29, 39 n.7 (2d Cir. 2013).

Defendant contends that the collective weight of this new evidence merits a new trial or at least a hearing to determine whether the government possesses any further exculpatory information.

### A. Legal Standard

Fed. R. Crim. P. 33(a) authorizes the Court to "vacate any judgment and grant a new trial if the interest of justice so requires." "By its terms, Rule 33 confers broad discretion upon a trial court to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice." *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992). The authority to grant such relief is "broader . . . than [the discretion] to grant a motion for a judgment of acquittal pursuant to Fed. R. Crim. P. 29, where the truth of the prosecution's evidence must be assumed." *Id.* at 1414. On a Rule 33 motion, by contrast, the Court is not only "entitled to weigh the evidence and in so doing evaluate for itself the credibility of the witnesses," *United States v. Triumph Capital Grp., Inc.*, 544 F.3d 149, 159 (2d Cir. 2008) (internal quotation omitted), but it is also obligated to do so: "the court must examine the entire case, take into account all facts and circumstances, and make an objective evaluation." *United States v. Aguiar*, 737 F.3d 251, 264 (2d Cir. 2013) (internal quotation omitted). Of course, in the interest of finality, the Court is constrained to exercise its Rule 33 authority "sparingly and in the most extraordinary circumstances" – which is to say, only when the Court concludes after reviewing the case that "letting a guilty verdict stand would be a manifest injustice." *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001) (internal quotation omitted).

As particularly relevant here, the text of Rule 33 "specifically contemplates that such motions may be made based on newly-discovered evidence," *United States v. Siddiqi*, 959 F.2d 1167, 1173 (2d Cir. 1992), and grants this category of motions the special solicitude of a three-year filing period extending beyond the general fourteen-day deadline. Though in all cases the avoidance of manifest injustice remains the "ultimate" criterion, *United States v. Romano*, 794 F.3d 317, 332 (2d Cir. 2015), in this context, the courts have developed that directive into a five-part test authorizing a new trial when

> (1) the evidence [was] newly discovered after trial;
>
> (2) facts are alleged from which the court can infer due diligence on the part of the movant to obtain the evidence;
>
> (3) the evidence is material;
>
> (4) the evidence is not merely cumulative or impeaching; and
>
> (5) the evidence would likely result in an acquittal.

*United States v. Forbes*, 790 F.3d 403, 406–07 (2d Cir. 2015) (alteration in original) (internal quotation omitted).

Another way to articulate the fifth prong of this test is that the Court "must weigh whether or not there is in reality a 'significant chance' that the disclosure would have induced a reasonable doubt in the minds of enough jurors to prevent a conviction." *United States v. Zagari*, 111 F.3d 307, 322 (2d Cir. 1997) (quoting *United States v. Rosner*, 516 F.2d 269, 273 (2d Cir. 1975)); *see also United States v. Spencer*, 4 F.3d 115, 118–19 (2d Cir. 1993); *United States v. Wolfson*, No. 00-CR-628, 2008 WL 1969730, at *1 (S.D.N.Y. May 5, 2008), *aff'd*, 642 F.3d 293 (2d Cir. 2011) (per curiam). Of the test's five elements, this "probability-of-acquittal" requirement is "the most difficult for the defendant to meet, and the most difficult for a court to evaluate," because "[i]t requires looking backwards and forwards." *Alvarez v. United States*, 808 F. Supp. 1066, 1094 (S.D.N.Y. 1992). That is, "the court must evaluate the new evidence, not just in and of itself, but in the light of the entire record made at the trial and on the motion"; "[t]he strength of the evidence presented at the trial is an important consideration" in this analysis. 3 C. Wright & A. Miller, Federal Practice and Procedure § 584 (4th ed. 2018). For these reasons, the crucial inquiry into the likely effect of newly discovered evidence "is committed to the sound discretion of the district court" that presided over the trial. *United States v. Aponte-Vega*, 230 F.3d 522, 525 (2d Cir. 2000) (per curiam); *see also United States v. Gambino*, 59 F.3d 353, 364 (2d Cir. 1995).

**B.** **Defendant's Proffered Evidence Was Newly Discovered After Trial, Was Obtained Through the Exercise of Due Diligence, and Is Material.**

The government does not dispute defendant's satisfaction of the first three requirements for the grant of a new trial. Because the statements at issue were made more than a year after Paracha's conviction they are plainly "newly discovered after trial."[11] Defendant diligently sought to secure testimony from Khan, al Baluchi, and KSM as prospective witnesses at trial, within the constraints imposed by the Court. *See United States v. Paracha*, No. 03-CR-1197, 2006 WL 12768, at *1–18 (S.D.N.Y. Jan. 3, 2006). Nor can it be denied that the statements are material, concerning as they do the key question of whether defendant knowingly aided al Qaeda – the "heart of this case" and the "one thing that is seriously at issue," in the words of

---

[11] In adjudicating this motion, the Court rests its decision on the witness statements raised in Paracha's Rule 33 motion as originally made. The Court agrees with the government that the supplemental submissions attached to defendant's subsequent 2009 and 2018 letters do not present material evidence independently warranting a new trial. These supplemental documents focus on alleged mistreatment of Guantanamo detainees and bear only a remote relationship to the issues in Paracha's case.

Defendant also asserts in passing that the indictment must be dismissed because the evidence against him is tainted by its origin in the "outrageous government conduct" of the alleged torture of Khan and KSM, as suggested by the supplemental documents submitted in 2018. (4/2/18 Letter at 6–11.) Even assuming that the allegations of abuse are true and that the argument is properly raised at this juncture – *see United States v. Umeh*, 646 F. App'x 96, 98 n.1 (2d Cir. 2016) (declining to decide "whether Rule 33 is the proper vehicle for a post-conviction motion to dismiss the indictment") – it nonetheless fails on the merits. A due process claim based on outrageous government conduct generally requires "either coercion or violation of *the defendant's* person," *United States v. Bout*, 731 F.3d 233, 238 (2d Cir. 2013) (emphasis added) (quoting *United States v. Al Kassar*, 660 F.3d 108, 121 (2d Cir. 2011)), and Paracha concedes that even in such circumstances dismissal is "exceedingly rare," (4/2/18 Letter at 8). "[D]ismissal of an indictment following a conviction is an 'extraordinary' remedy," *United States v. Lombardozzi*, 491 F.3d 61, 79 (2d Cir. 2007) (alteration in original) (quoting *United States v. Casamento*, 887 F.2d 1141, 1182 (2d Cir. 1989)), and Paracha cites no case extending such relief to a defendant on the basis of government mistreatment of a *third party* and not the defendant.

Last, defendant argues in his 2018 submissions that the supplemental evidence entitles him to suppression of "any government evidence that may have been derived from the torture to which KSM and Mr. Khan were subjected." (4/2/18 Letter at 5.) Insofar as the grant of a new trial will already necessitate further evidentiary rulings, as noted below, the Court declines to resolve that issue at this time.

both the prosecution's summation and its rebuttal summation at trial.[12]  (Tr. at 1378, 1472.)
*See United States v. Diaz*, 176 F.3d 52, 106 (2d Cir. 1999) (evidence is "material" for Rule 33
purposes if "relevant to the merits of the case").  That leaves only the final two hurdles to
defendant's Rule 33 motion.

### C.  Defendant's Newly Discovered Evidence is Not Merely Cumulative or Impeaching, with a Single Exception.

The material portions of the new evidence "directly contradict the government's case"
that defendant knowingly aided al Qaeda, rather than simply "discredit[ing] a government
witness."  *United States v. Spencer*, 4 F.3d 115, 119 (2d Cir. 1993) (quoting *United States v.
Sposato*, 446 F.2d 779, 781 (2d Cir. 1971)).  Indeed, none of the newly discovered evidence may
be dismissed as mere impeachment material, of the sort that "will not ordinarily justify a new
trial."  *United States v. Reyes*, 49 F.3d 63, 68 (2d Cir. 1995); *see also, e.g.*, *United States v.
Middlemiss*, 217 F.3d 112, 122–23 (2d Cir. 2000).

The government nonetheless urges that "any arguably exculpatory portions" of the new
evidence "are cumulative of the [al Baluchi] and Khan statements admitted at Paracha's trial"
by the stipulation of the parties.  (Gov't Mem. at 25.)  That is not a correct characterization
of the majority of the new evidence presented by defendant.

---

[12] The Court made that point in its evidentiary rulings regarding defendant's access to Khan and al Baluchi.
*See Paracha*, 2006 WL 12768, at *11 ("An essential element of the government's burden of proof on all counts
of the indictment is Paracha's knowledge of Khan and al Baluchi's association with al Qaeda and his
knowledge that his actions would or could support the al Qaeda organization and not simply its individual
members.  Accordingly, testimony tending to undermine the government's assertion that Paracha knew or
had reason to believe that his alleged co-conspirators were al Qaeda associates is vital to Paracha's
defense."); *id*. at *13 (Khan and al Baluchi's stipulated statements at trial "directly touch on the question at
the crux of this case – whether Paracha was aware of Khan and al Baluchi's al Qaeda affiliation when he
agreed to assist them").  Though the Court ruled otherwise with respect to the likely materiality of KSM's
testimony, as described, that finding was based on the paucity of specific statements from KSM then
available to Paracha.  *Id*. at *12.  Those statements did not include anything even remotely approaching
KSM's newly discovered statements in depth, in detail, or in relevance.

1. **Most of the Material Portions of the Newly Discovered Evidence Are Not Cumulative.**

The great majority of the newly discovered material statements fall into three categories, none of which can be deemed merely cumulative.

*First*, Majid Khan's new statements diverge substantially from his previously stipulated testimony as adapted from the government's unclassified summaries. Khan, recall, was the direct beneficiary of the alleged material support in this case: the prosecution argued that al Qaeda plotted to get Khan back into the United States. It was thus particularly significant that the stipulation offered at trial in place of Khan's live testimony contained *no* unambiguous assertion by Khan of Paracha's innocence. Instead, the jury heard Khan's decidedly equivocal testimony that "Khan assessed Uzair Paracha as being willing to help a fellow [M]uslim at his father's request," that "Khan thought Uzair Paracha was a good person who was willing to help," and that although "Khan might have been interested in recruiting Uzair Paracha" for al Qaeda, "Khan would only give Uzair Paracha a 5–10% suitability assessment" to join the terrorist group, owing to defendant's moderate views. (Khan Stip. at 2.) Indeed, far from wholeheartedly exonerating Paracha, some passages of Khan's stipulated testimony – such as the assertion that "Majid Khan did not assess Uzair Paracha as being suitable for any *other* assistance to al Qaeda *besides helping with Majid Khan's documents* at the time" – could even be read as *incriminating* defendant. (*Id.* (emphases

added).[13])  Thus, though Khan's stipulation was nominally offered on defendant's behalf, in reality it seems likely to have done little to help build his case at trial.[14]

The newly discovered statements from Khan paint an altogether different picture.  In his 2007 CSRT, Khan made the explicit assertions that "UZAIR PARACHA is innocent; he is not a criminal," and that Khan "never told [Paracha] that I was al Qaeda."  (Khan CSRT Tr., Doc. 101 Ex. 14 at 18–19.)  Similarly, in a June 2007 interview in Guantanamo Bay with government agents, "Khan commented that he thought Uzair Paracha was innocent, but got 30 years" and that "Uzair Paracha did not do anything, went to trial and got 30 years."[15]  (Khan June 2007 Interview, Doc. 101 Ex. 7 at 4, 6.)  Especially given Khan's central importance to the charges in this case, his new, repeated, and unambiguous assertions of defendant's innocence are not simply cumulative of the stipulated testimony offered at trial.[16]

---

[13] The closest Khan's testimony came to asserting that defendant did not know he was being asked to help al Qaeda was the general statement that "Khan had no Al Qaeda contacts in the United States" and that "[n]one of Majid Khan's contacts were aware of his gas station attack plan or any other actions he might have taken on behalf of Al Qaeda."  (*Id.* at 2.)  But there is no indication in the record whether Khan's reference to his "contacts in the United States" included Paracha, who had only ever met with Khan in Pakistan.  Moreover, the gratuitous reference to a "gas station attack plan" was not attested to by any other witness or document at trial.  (*See* Tr. at 1416 (prosecution admitting in summation that "Uzair Paracha didn't know" about any gas station plot).)

[14] Indeed, the possibility that Khan's lukewarm exculpation of Paracha could backfire against defendant may even have been perversely exacerbated by the Court's accompanying instruction exhorting the jury that these statements "were obtained under circumstances that were designed to elicit truthful and accurate information from the witnesses because the statements are relied upon by United States officials responsible for making national security decisions," that "[t]he failure to provide truthful information would be detrimental to any relationship to the United States government by the witnesses," and that "[t]hose who questioned the witnesses have a profound interest in obtaining accurate information from the witnesses and in reporting that information accurately to those who can use it to prevent acts of terrorism and to capture other al-Qaeda operatives."  (Tr. at 1042–43.)

[15] Khan's February 2007 interview does not mention the Parachas.  (*See* Doc. 101 Ex. 13.)

[16] Nor could Khan's exculpatory statements necessarily be dismissed as the product of ignorance, or at least not so easily as the government argued at trial.  The CSRT transcript indicates that Khan reviewed portions of the testimony from Paracha's trial and "d[idn't] agree with everything UZAIR said," finding that "[e]verything is very contradicting in the transcript."  (Khan CSRT Tr. at 20; *see also id.* at 5–7, 19, 33.)

*Second*, Paracha points to the "glaring absence" of references to defendant or his father from KSM's newly discovered statements. (Def.'s Reply Mem., Doc. 100 at 6.) In his 2007 CSRT and other interviews at Guantanamo Bay, the admitted "operational director" for al Qaeda openly confessed his responsibility for dozens of heinous crimes and terrorist plots, including Khan's gas station plot in which Paracha's expected support was allegedly designed to play a role. (KSM CSRT Tr., Doc. 101 Ex. 8 at 17–19; KSM Interviews, Doc. 101 Ex. 9 at 18–20.) In the course of these statements, KSM freely named al Qaeda members, including Majid Khan and his brother Mansour, and discussed at length the logistical difficulties involved in secreting an operative into the United States, "especially after 9/11." (KSM Interviews at 18–19.) Likewise, in a witness statement presented at al Baluchi's CSRT, KSM further discussed how he "moved money" to named al Qaeda operatives in order to support the group's attacks. (Al Baluchi CSRT Tr., Doc. 101 Ex. 11 at 30.)

These statements by KSM bear directly on issues of central relevance to the charges against defendant, both in general – securing passage to the United States for al Qaeda operatives, and financial transactions in support of the group's terrorist activity – and in particular – the gas station plot involving Majid Khan and the effort to facilitate Khan's return to the United States. Crucially, KSM nowhere mentions defendant or his father. From this new evidence, defendant could credibly ask the jury to infer Paracha's innocence and lack of involvement in the operations discussed.

As described above, the jury did hear some evidence – of varying degrees of persuasiveness – tending to exculpate defendant of knowing involvement with al Qaeda operations. But the absence of any reference to the Parachas in KSM's newly discovered statements, "[r]ather than being merely cumulative, [is] evidence of a different kind" from the testimony of Khan, al Baluchi, and defendant himself. *United States v. Siddiqi*, 959 F.2d

1167, 1173 (2d Cir. 1992).[17]  At trial, the prosecution was able to sap the probative force of that exculpatory testimony by reference to the testimony of its expert, Evan Kohlmann, on the insular "cell" structure of al Qaeda.  It was entirely consistent with Paracha's guilt, the prosecution argued, for other low-level operatives like Khan and al Baluchi to remain in the dark as to the extent of defendant's knowledge.  (*See, e.g.*, Tr. at 1414–16.)  But KSM's statements would not have been susceptible to this counterargument, given his central role in al Qaeda, his confessed direct participation in the planning of the specific operations at issue in this trial, and his familiarity with the specific al Qaeda members involved.  Had defendant been able to introduce this evidence in the form of stipulated testimony from KSM, the government would have been forced to abandon its attempt, throughout the trial and in its final words to the jury, to "embrace" the stipulations offered by Paracha, on the theory that "those stipulations, as a whole, . . . do not help the defense in any way."  (*Id.* at 1473.)  Defendant's argument on the basis of KSM's newly discovered statements is emphatically not cumulative of the evidence presented at trial.

*Third*, the newly discovered evidence contains statements by all three men professing that, contrary to the factual assumptions upon which this trial proceeded, Khan and al Baluchi are themselves not members of al Qaeda.[18]  If that is so, then defendant would be able

---

[17] In support of the defendant's motion for new trial, the *Siddiqi* court also relied on the fact that the newly discovered evidence at issue, besides its distinct nature, "came from an impartial source."  *Id.*  Though KSM is hardly that, it remains true, as the stipulated instruction read at trial, that his statements "were obtained under circumstances that were designed to elicit truthful and accurate information from the witnesses because the statements are relied upon by United States officials responsible for making national security decisions."  (Tr. at 1042–43.)  The distinction here, as in *Siddiqi*, is not that the new evidence is unassailable but that "it is certainly much less impeachable than the defendant's own, self-interested testimony," and is therefore not merely cumulative.  959 F.2d at 1173.

[18] (*See, e.g.*, Khan June 2007 Interview at 1–2 (disputing the government's "label[ing] Khan al Qaida"); al Baluchi CSRT Tr. at 18 ("I do not belong to al Qaida, the Taliban or associated organizations."); *id.* at 30 (KSM: "To my knowledge [al Baluchi] has never had association with Al Qaida, Taliban or associated organizations."); Khan CSRT Tr. at 18 ("I am not al Qaida.").)

to argue on retrial not only that he never *knowingly* aided the terrorist group, but that he never aided al Qaeda *at all*.

Regardless of whether that theory would prevail at trial, the several new statements asserting Khan and al Baluchi's non-membership in al Qaeda most certainly are not cumulative of trial testimony, because the parties stipulated to the opposite conclusion – that they were members of al Qaeda – at trial. (Tr. at 227.) *See, e.g., United States v. Spencer*, 4 F.3d 115, 119 (2d Cir. 1993) ("because the new evidence was the only evidence" on a certain point, "it was non-cumulative"); *Siddiqi*, 959 F.2d at 1173 (same).

## 2. To the Extent that Al Baluchi's Newly Discovered Statements Directly Assert Defendant's Innocence, They Are Cumulative of His Stipulated Trial Testimony.

One limited aspect of the newly proffered evidence is cumulative. Al Baluchi's stipulated trial testimony spoke directly to the question of defendant's knowledge with the statement that "Uzair Paracha was totally unwitting of Al-Baluchi's Al Qaeda affiliation, or of Al-Baluchi's intention to use Saifullah Paracha for the broader operational plan involving Majid Khan." (Al Baluchi Stip. at 1–2.) Al Baluchi's testimony went on to assert that "Uzair Paracha knows nothing about operations," that "[n]either Al-Baluchi nor Majid Khan indicated to Uzair Paracha at any time that they were mujahidin or Al Qaeda," and that defendant's father remained similarly ignorant during the time period in which defendant was charged to have conspired to aid the terrorist group. (*Id.* at 2.[19])

---

[19] According to al Baluchi's stipulated testimony at trial:

> Saifullah Paracha was unwittingly being used to assist in Al-Baluchi's broader plans with Al Qaeda operative Majid Khan. Saifullah Paracha was someone Al-Baluchi used for information, but from whom he kept his Al Qaeda connections hidden. There were no operations discussions between Al-Baluchi and Saifullah Paracha. Al-Baluchi intentionally used cover stories and distorted truths to mask his particular interests with Saifullah Paracha during their discussions.

Al Baluchi's newly discovered 2007 statements add little on this topic. His CSRT testimony does not even mention any member of the Paracha family, let alone address their culpability or lack thereof.[20] In his 2007 interviews, al Baluchi only corroborated the assertions of the Parachas' innocence made in his trial stipulation – and never in language so forceful as the characterization of defendant as "totally unwitting" that was read to the jury. (Al-Baluchi Interviews, Doc. 101 Ex. 12 at 39–40, 49, 54–55.) *See, e.g.*, *United States v. Petrillo*, 821 F.2d 85, 90 (2d Cir. 1987) (new statement's "value is purely cumulative" where "ample evidence was introduced" on the same point at trial).

**D. <u>There Is a Significant Chance that the Introduction of Defendant's Newly Discovered Evidence Would Have Induced a Reasonable Doubt in the Minds of Enough Jurors to Prevent a Conviction.</u>**

The combined weight of the newly discovered, material, non-cumulative statements, considered in conjunction with the quality of the proof at trial, leads the Court to the conclusion that defendants' new evidence would very likely "create a reasonable doubt that did not otherwise exist." *United States v. Diaz*, 922 F.2d 998, 1006 (2d Cir. 1990) (internal quotation omitted); *see also United States v. Zagari*, 111 F.3d 307, 322 (2d Cir. 1997) (the "court must weigh whether or not there is in reality a significant chance that the disclosure would

---

> Although Saifullah Paracha had a long-standing relationship with [KSM,] Saifullah Paracha did not know KSM's true identity, or any other name for KSM. Al-Baluchi did not believe that Saifullah Paracha was aware that he and KSM were Al Qaeda . . . . Saifullah Paracha did not know that KSM was affiliated with Al Qaeda until the worldwide publicity of KSM's arrest.
>
> . . .
>
> Because Saifullah Paracha had never been properly vetted, he was never tasked by Al Qaeda (i.e., KSM or Al-Baluchi) to do anything for them. Saifullah Paracha was only a businessman who was sympathetic to the mujahidin. Saifullah Paracha has no relation to this business, i.e., Al Qaeda.

(*Id.* at 2–3.)

[20] The name "Paracha" only appears in this CSRT transcript when al Baluchi decides not to submit a statement from Saifullah Paracha on al Baluchi's behalf at the CSRT. (Al Baluchi CSRT Tr. at 8–10.)

have induced a reasonable doubt in the minds of enough jurors to prevent a conviction" (internal quotation omitted)). That is, mindful of the Rule 33 standards set forth above, and "despite the abstract sufficiency of the evidence to sustain the verdict," the Court finds that "the evidence preponderates sufficiently heavily against the verdict [such] that a serious miscarriage of justice may have occurred." *United States v. Ferguson*, 49 F. Supp. 2d 321, 323 (S.D.N.Y. 1999) (alteration in original) (internal quotation omitted), *aff'd*, 246 F.3d 129 (2d Cir. 2001).

This is so because the new evidence bears directly on "the central question" at trial, *United States v. Parkes*, 497 F.3d 220, 233 (2d Cir. 2007) – whether defendant knowingly assisted al Qaeda – and strikes at "the core of the government's case," *United States v. Williams*, No. 10-CR-622, 2017 WL 5483744, at *6 (E.D.N.Y. Nov. 15, 2017), by undermining the three stipulations that set the stage for the government's presentation of its case to the jury. The prosecution's explicitly stated strategy at trial was to "embrace" the stipulations of testimony by Khan and al Baluchi – technically offered as part of defendant's case, although the unclassified summaries were themselves prepared and disclosed by the government after review by the Court pursuant to CIPA. (Tr. at 1473.) The reason the government was able to take this tack was that defendant stipulated, on the basis of the evidence available to him at that time, that Khan and al Baluchi were in fact members of al Qaeda and that the summaries offered by the government were accurate representations of what they would testify to if given the opportunity to appear at trial.

By extracting these concessions, the government was able to narrow considerably the field of dispute, and to focus the jury on the parallels between these stipulated statements and Paracha's pretrial confession – a confession that was "[t]he single most important fact you will learn during the course of this trial," according to the prosecution's opening

statement.  (*Id.* at 16.[21])  Indeed, the government relied heavily in its rebuttal summation on defendant's stipulations to bolster and corroborate its own case on grounds defendant was powerless to dispute – marveling, for instance, that "Uzair Paracha's confession happens to match up in the important respects with the testimony of Majid K[ha]n and Ammar al Baluchi that you heard today," (*id.* at 1477–78), and that Khan's stipulation "fits perfectly with the defendant's confession," (*id.* at 1474).[22])  But extensive newly discovered evidence now erodes the foundational assumptions underlying all three of the pivotal stipulations that shaped Paracha's trial.

The grant of a new trial in *United States v. Brodwin*, 292 F. Supp. 2d 484 (S.D.N.Y. 2003), is instructive.  In that case, the court weighed newly discovered evidence and found that it would probably result in an acquittal, reasoning as follows:

> This is not a situation where the new evidence discovered after trial would merely be another factor in the jury's calculus.  Rather, the evidence . . . would have substantially changed the defendants' trial, because it would very likely require the exclusion of important evidence admitted at trial and because it would require the Government to change the theory of prosecution it presented to the jury.

*Id.* at 495.

These two distinctions militating in favor of retrial apply equally to Paracha's case.  If the newly discovered statements from KSM, Khan, and al Baluchi were introduced by the defense at a retrial, significant portions of the stipulated testimony introduced at trial would likely have be excluded or altered, and the government would be precluded from adopting

---

[21] *See also United States v. Paracha*, No. 03-CR-1197, 2006 WL 12768, at *18 (S.D.N.Y. Jan. 3, 2006) ("The government indicated that the bulk of its proof on each of the five different counts charging Paracha with aiding al Qaeda will consist of statements made by Paracha himself to government agents . . . .").

[22] (*See also id.* at 1413 ("[E]ven if you want to credit what these two terrorists said, their statements do not undermine the government's proof in the slightest."); *id.* at 1417 ("The bottom line, ladies and gentlemen, is that none of the statements by Majid K[ha]n or Ammar al Baluchi offered by the defense change anything about what I know happened here, and what Uzair Paracha knew when he did it.").)

its admitted trial strategy of hugging itself closely to Khan and al Baluchi's statements and interpreting those stipulations of testimony against Paracha. In the absence of the original stipulations, the trial would be substantially changed, because the government would be put to its proof – to show that these three men, and KSM in particular, were not just ignorant but actively deceptive in their newly discovered testimony, given at Guantanamo Bay, as to defendant's mens rea. The task of that wholesale impeachment would present a fine line indeed for the government to walk, inasmuch as its case at trial relied on the same witnesses' testimony to corroborate the factual basis of the government's allegations against Paracha. And if Paracha chose to contest the al Qaeda membership of Khan and al Baluchi themselves, that decision would impose an even more revolutionary change onto the shape of the trial – though fraught, of course, with the factual and evidentiary issues posed by conflicting evidence of their guilt, which the government would surely contest, and on which the Court would likely need to conduct an analysis pursuant to CIPA. *See United States v. Moussaoui*, 382 F.3d 453, 480–82 (4th Cir. 2004) ("the compiling of substitutions [must] be an interactive process among the parties and the district court," in part because "the defense's ability to propose substitutions based on the language of the [. . .] summaries [of the unavailable witnesses' testimony] is not a license to mislead the jury").

In the context of one or more of these broader factual disputes, unencumbered by the limitations and strictures on the stipulated testimony at trial, the jury might very well place greater significance on certain existing deficiencies in the prosecution's case. In particular, the Court is troubled by a series of inconsistencies between the bank records offered by the prosecution and the aspects of Paracha's confession they were meant to validate. The government placed substantial weight on this evidence in summation, pronouncing it "completely ridiculous" to believe that Paracha "ma[d]e up an additional story about his father receiving al Qaeda money in 2002, a story that just happens to match the bank records found by the agents." (Tr. at 1410.) But in fact, as scrutinized above, the record evidence only very loosely tracked Paracha's pretrial narrative – matching neither the amounts of the

purported transactions nor the details of their description.[23] The bank records did show large transactions roughly consistent with the timing in at least one version of the story Paracha told the Joint Taskforce agents. But the probative value of this tenuous correspondence must be discounted to acknowledge that that version was only one of many in the inchoate and contradictory chronology of the purported transactions described by Paracha before trial. Moreover, the complexity of Paracha's shifting pretrial statements on this topic yielded dense and difficult testimony at trial, with even the government's witnesses appearing at times to confuse aspects of the timeline or to conflate supposedly separate transactions.[24] As in *United States v. Siddiqi*, 959 F.2d 1167, 1173 (2d Cir. 1992), the "fluid" way in which this testimony was presented to the jury bolsters the Court's conclusion that Paracha's newly discovered evidence would probably result in an acquittal.

In context, the money is no small matter. Besides fulfilling a necessary element of the first and third counts of Paracha's indictment, the alleged transactions purportedly verified in the bank records constituted essentially the only independent evidence supporting defendant's pretrial confessions in key areas. Although the prosecution presented ample evidence of the *tasks* Paracha intended to undertake to assist Khan – the vast majority of

---

[23] E.g., the bank records showed deposits of more than $500,000 in the summer of 2002 and $270,000 in May 2003 – not, as Paracha's pretrial statements suggested, $200,000 and $180,000–200,000, respectively; the deposits were made to a joint account held by defendant's mother and an unknown person, instead of Paracha's personal account; the May 2003 payment was characterized as the expected "investment" reward for Paracha's aiding Khan, even though it was made after Paracha was arrested without completing the tasks, and after he told the agents in March that "he didn't think that if he did not perform those tasks . . . he would receive the money," (*id.* at 276); no evidence was ever introduced of separate payments *to* al Qaeda in either 2001 or the summer of 2002; and so on.

[24] For instance, one agent twice appeared to confuse the expected reward of $180,000–200,000 for assisting Khan with the already-completed "bag" transaction from the year before. (*See id.* at 415, 446.) Similarly, on cross-examination, the agent reversed the order of the two 2002 transactions, without clarifying whether that inconsistency reflected Paracha's own statements, rather than the agent's misremembering. (*Compare id.* at 494 (deposit of cash preceded request for funds), *with id.* at 511 (request for money came first).)

which he did not contest at trial – it possessed but little proof beyond his own words that he acted with the requisite *knowledge* and motive to help al Qaeda.[25]

If defendant did not so broadly stipulate to major portions of the now-questionable case against him – including the notably tepid statement by the crucial witness Khan – then the jury would of necessity focus more closely on the strength of the prosecution's independent evidence.[26]  And with that shift of emphasis, significant gaps in the corroborative evidence lend support to defendant's theory that the incriminating portions of his pretrial statements were fictions concocted in what was apparently a desperate and misconceived effort to secure his freedom by ardent cooperation.

Defendant's theory of the case would certainly better explain various outlandish and uncorroborated details of his statements, including speculation about anthrax and chemical weapons that appears untethered to any real-world plot[27]; an unidentified eighty-year-old al Qaeda scientist first mentioned by Paracha on his third day of questioning, when the Joint Taskforce agents, by their own testimony, "pressed him" for more detailed information about the terrorist group, (*id.* at 422); and throwaway and confusing allusions to Chinese military support for the Taliban war effort, (*id.* at 890–91).  Indeed, Paracha may have taken encouragement from the fact that his misbegotten strategy initially appeared to be working, up to a point – as a Joint Taskforce agent herself testified that the agents refrained from placing him under arrest for the first three days of interviews "[b]ecause he was cooperating,"

---

[25] This critical distinction undercuts the prosecution's citation in summation of "a veritable mountain of evidence that corroborates" Paracha's pretrial confessions.  (Tr. at 1398.)

[26] The jury asked to examine the Metropolitan Bank records during their deliberations, indicating their interest in this topic.  (*See* Tr. at 1571; Court's Ex. 3.)

[27] In particular, the Court notes that Paracha somewhat implausibly based his speculation that Khan would be involved in a chemical attack on the fact that Khan "had an IT degree."  (*Id.* at 696; *see also id.* at 901–08.)

(*id.* at 267[28]), and as he then avoided criminal charges for an additional two months after his arrest, (*id.* at 913–14).[29] Paracha's present account of his state of mind while being interviewed would also explain his evident Hamlet-like indecision on everything from whether to call a lawyer[30] to his attempted revocation of consent to a search of his aunt and uncle's apartment,[31] among other odd behavior tending to show he may not have fully grasped the nature of the situation he was in.[32]

The Court is also mindful of the unique aspects of the record in this case, in which Khan and al Baluchi's testimony assumed an unusually weighty significance pursuant to the evidentiary compromise laid out in *United States v. Moussaoui*, 382 F.3d 453, where a court was to navigate between the Scylla of requiring the "government to produce witnesses where doing so threatens our national security" and the Charybdis of allowing "a trial to go forward where doing so would deprive Paracha of his right to present a meaningful defense." *United States v. Paracha*, No. 03-CR-1197, 2006 WL 12768, at *31 (S.D.N.Y. Jan. 3, 2006). Paracha made a reasonable choice, based on the information then available to him, to present the agreed-upon unclassified summaries of statements in his case at trial. However, the newly

---

[28] Unbeknownst to Paracha, of course, the Joint Taskforce agents had obtained a material witness warrant for him as early as the evening of March 29, despite not arresting him until March 31. (*Id.* at 408–10, 681–82, 843–47, 883–84.)

[29] (*See also, e.g., id.* at 428 (agent to Paracha: "You have to get over this hump. And once you do that, we'll be able to tell and you'll actually feel better. . . . You have the information, we believe you have more information, and you need to think about it and you need to see if you can get yourself over that hump.").)

[30] (*See id.* at 223–24, 238–39, 325–27, 527–28, 671–72, 838, 1068–69, 1100–02, 1119–22, 1312–13, 1354–59.) Though this Court ruled and the Second Circuit affirmed that none of Paracha's remarks unambiguously invoked his right to counsel, *United States v. Paracha*, No. 03-CR-1197, 2004 WL 1900336, at *5 (S.D.N.Y. Aug. 24, 2004), *aff'd*, 313 F. App'x 347, 349 n.1 (2d Cir. 2008), as required by the United States Supreme Court, *see Davis v. United States*, 512 U.S. 452, 459 (1994), his statements on the topic remain probative of his thinking at the time.

[31] (*See* Tr. at 235–36, 386–87, 392–98, 670–71, 836.)

[32] (*See, e.g., id.* at 214, 651–52 (joking with the agents about liking Puerto Rican women); *id.* at 571–72 (lying down on the floor at FBI offices).)

discovered evidence shows that at least some of those stipulations did not reflect the extent of the exculpatory evidence that would ultimately be made known to him.

In sum, the newly discovered evidence of exculpatory statements from Khan, al Baluchi, and KSM would yield a very different trial for Uzair Paracha. In conjunction with the unique importance of the less favorable stipulations offered at trial and key weaknesses in the remaining corroborating evidence, the Court finds a "significant chance that the disclosure" of the new evidence "would have induced a reasonable doubt in the minds of enough jurors to prevent a conviction." *United States v. Zagari*, 111 F.3d 307, 322 (2d Cir. 1997) (internal quotation omitted).

Because the Court grants a new trial, defendant's alternative request for an evidentiary hearing on the motion is dismissed as moot. *See, e.g.*, *United States v. Stewart*, 433 F.3d 273, 302 (2d Cir. 2006) (decision whether to hold a hearing on Rule 33 motion is committed to discretion of the district court).

## III. <u>Conclusion</u>

The critical question in this case is now and has always been whether Paracha acted with knowledge that he was helping al Qaeda. The factfinder's burden is to judge the truth between the jumble of incriminating stories Paracha offered government agents in 2003, and defendant's theory of the case – that he knew Majid Khan but remained ignorant of Khan's al Qaeda affiliations, and that his contrary pretrial statements to the government were lies told out of fear and a misguided hope of cooperation.

Exercising the Court's "broad discretion to decide Rule 33 motions based upon its evaluation of the proof produced," *United States v. Gambino*, 59 F.3d 353, 364 (2d Cir. 1995), in fealty to the judicial duty independently to "examine the entire case, take into account all facts and circumstances, and make an objective evaluation" of both the newly discovered evidence and the trial record, *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001), the Court concludes that the newly discovered material evidence would yield a fundamentally different trial and likely create a reasonable doubt favoring Paracha's theory of the case over

the government's. In such circumstances, "when it appears that an injustice has been done," Rule 33 commands "that there is a need for a new trial in the interest of justice." *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992) (internal quotation omitted).

For the foregoing reasons, defendant's motion for a new trial is GRANTED.

Dated: New York, New York
       July 3, 2018

Sidney H. Stein, U.S.D.J.