UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
                                                    :
UNITED STATES OF AMERICA,            :
                                                    :        03 Cr. 1197 (SHS)
          – against –                               :
                                                    :        ~~FILED UNDER SEAL~~  SHS 3/17/2020
UZAIR PARACHA,                              :
                              Defendant.      :
                                                    :        USDC SDNY
                                                    :        DOCUMENT
                                                    :        ELECTRONICALLY FILED
------------------------------------------------------------x        DOC# _____
                                                             DATE FILED:  3/18/2020

MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR
A NEW TRIAL PURSUANT TO RULE 33, FED.R.CRIM.P.

*– Of Counsel –*

Joshua L. Dratel
Aaron J. Mysliwiec

Joshua L. Dratel, Esq.
Aaron J. Mysliwiec
Law Offices of Joshua L. Dratel, P.C.
2 Wall Street - 3rd Floor
New York, New York 10005
Tel:  (212) 732-0707
Fax:  (212) 571-3792
jdratel@joshuadratel.com
amysliwiec@joshuadratel.com

*Attorneys for Defendant*
*Uzair Paracha*

TABLE OF CONTENTS

Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE FACTS

A.    *The Charges Against Mr. Paracha In the Indictment* . . . . . . . . . . . . . . . . . . . . . . . . . 4

B.    *The Government's Evidence At Trial* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

C.    *Mr. Paracha's Testimony At Trial* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

D.    *Mr. Paracha's Motion to Depose and Produce Unavailable Witnesses for Trial* . . . . . . . 6

      1.    *The Disposition of Mr. Paracha's Claim With Respect to KSM* . . . . . . . . . . . . . 8

      2.    *The Disposition of Mr. Paracha's Claim With Respect to Mr. al-Baluchi* . . . . . . 8

      3.    *The Disposition of Mr. Paracha's Claim With Respect to Mr. Khan* . . . . . . . . . 9

E.    *The Substitution of Mr. Khan's and Mr. al-Baluchi's Declassified
      Summaries Provided By the Government and Introduced at Trial* . . . . . . . . . . . . . . . . 10

F.    *The Jury Instructions Regarding the Stipulated Substitutions* . . . . . . . . . . . . . . . . . . 11

G.    *The Verdict and Sentence* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

H.    *The Newly Discovered Evidence* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

      1.    *KSM's Newly Discovered Statements* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

      2.    *Mr. al-Baluchi's Newly Discovered Statements* . . . . . . . . . . . . . . . . . . . . . . 17

      3.    *Mr. Khan's Newly Discovered Statements* . . . . . . . . . . . . . . . . . . . . . . . . . . 19

I.    *Potential Material Exculpatory Evidence That Remains Undisclosed* . . . . . . . . . . . . . 21

ARGUMENT

POINT I

MR. PARACHA'S RULE 33 MOTION FOR A
NEW TRIAL SHOULD BE GRANTED BECAUSE
THE NEWLY DISCOVERED STATEMENTS BY
KSM, AL-BALUCHI, AND KHAN ARE MATERIAL
TO MR. PARACHA'S DEFENSE, AND WOULD
PROBABLY HAVE LED TO HIS ACQUITTAL  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

A.      *The Legal Standards Generally Relevant to Rule 33
        Motions Based On "Newly Discovered Evidence"*  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

B.      *The Statements Produced to Defense Counsel Post-Trial
        Constitute "Newly Discovered Evidence" Under Rule 33*  . . . . . . . . . . . . . . . . . . . . . 26

        1.      *Mr. Paracha Exercised Due Diligence In Attempting to Obtain
                Before Trial the Three Witnsses' Testimony and Statements* . . . . . . . . . . . . . . . . 26

C.      *The Newly Discovered Evidence, In the Form of the Statements by KSM,
        al-Baluchi, and Khan, Is Exculpatory, Material, and Is Not Cumulative*  . . . . . . . . . . . 29

POINT II

IN LIGHT OF PUBLIC REVELATIONS ABOUT
THE FAILURE OF GOVERNMENT AGENCIES
TO PRODUCE OR RETAIN CERTAIN
EVIDENCE OF DETAINEE INTERROGATIONS,
A HEARING SHOULD BE CONDUCTED TO
DETERMINE WHETHER ANY ADDITIONAL
EXCULPATORY STATEMENTS OR INFORMATION
EXISTS IN THE GOVERNMENT'S POSSESSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Conclusion  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

## INTRODUCTION

This Memorandum of Law is submitted under seal in support of Uzair Paracha's motion for a new trial pursuant to Rule 33, Fed.R.Crim.P.[1]  As set forth below, this Motion is based on "newly discovered evidence" produced post-trial by the government and consisting of post-trial statements of Khalid Sheikh Mohammed (hereinafter "KSM"), Majid Khan, and Ammar al-Baluchi, made to government agents in custodial interviews, that materially undermine the very core of the government's theory of prosecution – that Mr. Paracha provided material support to *al Qaeda*.  As detailed below, analysis of those statements in the context of the evidence at Mr. Paracha's trial compels the conclusion that such newly discovered evidence, if it had been available to Mr. Paracha at trial, would probably have led to his acquittal.  Accordingly, it is respectfully submitted that Mr. Paracha's convictions should be vacated, and that he should be granted a new trial.

Despite Mr. Paracha's diligent pre-trial litigation efforts to obtain access to these three witnesses and/or to these witnesses' full statements made while they were in U.S. custody, both were unavailable to Mr. Paracha before and during trial.  Citing "national security concerns," the government refused to allow Mr. Paracha or his counsel access to these three witnesses for either pre-trial depositions or for trial testimony.  Instead, the government provided limited, declassified, government-crafted summaries of the relevant information that each witness possessed.  Indeed, the government provided almost no information at all with respect to KSM,

---

[1]  The basis for sealing is that this motion is based in large part on materials disclosed by the government to defense counsel pursuant to a protective order.  *See* Exhibit 1 to the accompanying November 21, 2008, Declaration of Joshua L. Dratel, Esq. (hereinafter "Dratel Decl.")

-1-

one of *al Qaeda's* leaders.

Recognizing that prohibiting such access would violate Mr. Paracha's Fifth and Sixth Amendment rights, this Court permitted Mr. Paracha to introduce stipulated substitutions for the testimony of two of these men, Mr. Khan and Mr. al-Baluchi, based on the information contained in the government-crafted summaries.  This Court denied Mr. Paracha's attempt to gain access to KSM because Mr. Paracha could not establish, from the extremely limited information the government disclosed to him, that KSM's testimony would be material and favorable to Mr. Paracha's defense at trial.

In September 2007, nearly two years after Mr. Paracha was convicted after trial, the government provided defense counsel statements from KSM, Mr. Khan, and Mr. al-Baluchi, made earlier that year while they were in U.S. custody at the U.S. Naval Station, Guantanamo Bay, Cuba (hereinafter "Guantanamo Bay"), to U.S. law enforcement personnel.  Those statements, as well as additional, similar statements that were produced later, are material and favorable to Mr. Paracha's defense, convincingly supporting his defense that he did not knowingly or intentionally assist *al Qaeda*.

Perhaps most striking are KSM's newly discovered statements, as he was a major *al Qaeda* leader in a position to know any incriminating information relating to Mr. al-Baluchi, Mr. Khan, or Mr. Paracha.   KSM's newly disclosed statements both directly and indirectly confirm that Mr. Paracha did not knowingly or intentionally assist *al Qaeda*.

For example, as discussed below, KSM admitted involvement with numerous, high-profile terrorist attacks and that he knew Mr. Khan and Mr. al-Baluchi, yet he did not indicate that Mr. Paracha as part of any *al Qaeda* operation.  In addition, based on his personal involvement with

-2-

Mr. Khan, KSM characterizes Mr. Khan as a "somewhat useless" person who, instead of working on any terrorism plot, "spent all of his time dealing with his family issues and never did any of the required research" relating to blowing up gas stations. Further, it appears from KSM's statements that Mr. Khan did not complete any *al Qaeda* tasks, was not a member of *al Qaeda*, and was not authorized to speak on behalf of *al Qaeda* or recruit others to join *al Qaeda* plots.

In addition, the newly discovered statements by Mr. Khan and Mr. al-Baluchi amplify the short summaries (of their statements) that were admitted at trial, and provide the kind of detail and narrative that would buttress their credibility and support Mr. Paracha's defense. Thus, the newly discovered evidence satisfies the legal standard for a Rule 33 motion: it would probably lead to Mr. Paracha's acquittal at a retrial.

Nor can it be disputed that because Mr. Paracha was denied access to the witnesses on the basis of "national security concerns" cited by the government, he was unable to obtain the information, in this detail and from these sources, before and during the trial. Permitting Mr. Paracha's guilty verdict to stand in the face of such material and favorable newly disclosed evidence would be a "manifest injustice." Accordingly, it is respectfully submitted that Mr. Paracha's convictions should be vacated, and that he should be granted a new trial. In the alternative, Mr. Paracha requests an evidentiary hearing on this motion.

## STATEMENT OF FACTS

While the Court is certainly familiar with the facts of this case, the passage of time warrants a detailed review of those facts in order to place the newly discovered evidence in its proper context.

**A.**     *The Charges Against Mr. Paracha In the Indictment*

The Indictment charged that in or about January 2003, up to and including on or about

March 28, 2003 Mr. Paracha agreed with others, namely, Mr. Khan and Mr. al-Baluchi (a/k/a

"Ali Abdul Aziz Ali"), to further *al Qaeda* operations in the United States by posing as Mr.

Khan, whom he allegedly knew to be an *al Qaeda* operative, and by accepting $200,000 from

Mr. al-Baluchi, whom he allegedly also knew to be an *al Qaeda* associate. *See* Indictment at 1-2

(attached as Exhibit 2 , Dratel Decl.).

The Indictment accused Mr. Paracha of knowingly taking possession of Mr. Khan's

identification documents, such as his driver's license, Social Security card, bank card, and health

insurance card, with the express purpose of assuming Mr. Khan's identity in the United States in

order to obtain information about the status of Mr. Khan's pending immigration and asylum

paperwork. *Id.* In furtherance of that objective, Mr. Paracha allegedly made two phone calls to

the Immigration and Nationalization Service, T. 229,[2] and conducted one internet search. T. 61-

65.

Regarding the $200,000 from Mr. al-Baluchi, that money, provided during a meeting in

Pakistan, was allegedly to be held as a "liquid" investment in a business owned by Mr. Paracha's

father, Saifullah, until such funds were needed by *al Qaeda*. Indictment at 3, T. 301-306.

Moreover, Mr. Paracha was alleged to have been in possession of Mr. Khan's bank card with the

intent to conduct financial transactions on behalf of *al Qaeda*. Indictment at 3.

Based on these factual allegations, the Indictment charged the following five counts:

---

[2] "T." refers to the trial transcript.  Excerpts cited herein have not been included as
Exhibits.  However, if the Court needs a copy of the trial transcript or any part thereof, counsel
can provide it.

| Count 1: | Conspiracy to Provide Material Support or Resources to a Foreign Terrorist Organization (Al Qaeda) (18 U.S.C. §2339B); |
|---|---|
| Count 2: | Providing and Attempting to Provide Material Support or Resources to a Foreign Terrorist Organization (Al Qaeda) (18 U.S.C. §2339B); |
| Count 3: | Conspiracy to Make or Receive a Contribution of Funds, Goods, or Services to, and for the Benefit of, Al Qaeda (50 U.S.C. §1705(b); 31 C.F.R. §§595.204, 595.205); |
| Count 4: | Making or Receiving a Contribution of Funds, Goods, or Services to, and for the Benefit of, Al Qaeda (50 U.S.C. §1705(b); 31 C.F.R. §§595.204, 595.205; 18 U.S.C. §2); and, |
| Count 5: | Identification Document Fraud (18 U.S.C. §§§1028(a)(7), 1028(b)(4), and 2). |

**B.**     *The Government's Evidence At Trial*

The government's evidence against Mr. Paracha included his statements to law enforcement from March 28-30, 2003, during which time Mr. Paracha was interviewed by law enforcement agents, kept at a hotel and the FBI's offices, and ultimately arrested March 31, 2003. *United States v. Paracha*, 2004 WL 1900336, at *3. The government's evidence at trial also included the contents of Mr. Paracha's eight post-arrest proffer sessions that were conducted while he was represented by counsel. T. 1056-1212, 1229-1342.

In addition, government witnesses testified regarding the following subjects: (1) the results of a forensic investigation of a computer allegedly used by Mr. Paracha at his place of employment (T. 40-75); (2) Mr. Khan's political asylum status and travel conditions related to that status; (3) property seized from Mr. Paracha's residence (May 10, 2004 Suppression Hearing Transcript 26, 148); and (5) a post office box in Maryland that was registered to Mr. Khan (T. 587-636). The government also presented expert testimony regarding the origins,

-5-

organization and leadership of *al Qaeda*.  T. 75-198.

**C.**     *Mr. Paracha's Testimony At Trial*

Mr. Paracha testified in his own defense and disputed the allegations in the Indictment

and to the extent that he acknowledged that he knew, met with, or acted for the benefit of either

Mr. Khan or Mr. al-Baluchi, he contested knowing that these men were part of *al Qaeda*, or that

he intended to support or contribute to *al Qaeda* through any action that he undertook on behalf

of either man.  *See*, *e.g.,* T. 1333.  Mr. Paracha testified he received documents from Mr. Khan

via a Mr. Mahmud, placed either one or two phone calls to the Immigration and Naturalization

Service (he did not recall the number), and conducted one internet search on "INS processing

time."  T. 1056-1212, 1229-1342.  Mr. Paracha further testified, however, that he did not know

Mr. Khan was in *al Qaeda* and that he did not place the phone calls or conduct the internet search

with any intent to support or contribute to *al Qaeda*.  T. 1333.

Mr. Paracha also testified that the reason he provided false information to law

enforcement officers who detained him was because he was frightened.  He stated that he

continued to provide false statements to the government during the proffer sessions, where he

was represented by counsel, because he believed that providing information, albeit false, that the

government believed him to know and wanted him to reveal would lead to his release (since, at

that time, he had not been arrested on criminal charges, but, rather, remained in custody pursuant

to a material witness warrant).  T. 1056-1212, 1229-1342.

**D.**     *Mr. Paracha's Motion to Depose and Produce Unavailable Witnesses for Trial*

Mr. Paracha moved pretrial pursuant to Rule 15(a)(1), Fed.R.Crim.P., for pretrial

depositions to preserve for trial the testimony of three prospective defense witnesses:  (1)  KSM;

(2) Mr. Khan; and (3) Mr. al-Baluchi.[3] *See United States v. Paracha*, 2006 WL 12768 (S.D.N.Y.), at \*2. Mr. Paracha also petitioned for writs of habeas corpus *ad testificandum* to compel their presence at trial. *Id.* All three were presumed *al Qaeda* associates. *Id.* at \*5. Mr. Paracha asserted that on information and belief these men were being held in U.S. custody somewhere. *Id.* The government refused to confirm or deny that it had access to or custody of the trio. *Id.* Assuming for purposes of Mr. Paracha's motion and petition, however, that it did, the government cited national security concerns in opposing Mr. Paracha or his counsel meeting with any of the witnesses or to produce them at trial. *Id.* Thus, Mr. Paracha did not have any access to any of the three potential witnesses, who remained unavailable to him at trial.

After considering Mr. Paracha's application, this Court determined that the three prospective witnesses were within the Court's compulsory process power. *Id.* at \*5-\*8. This Court proceeded to consider whether Mr. Paracha could demonstrate that each of these three witnesses' testimony would be material and favorable to his defense, thereby implicating his Sixth Amendment compulsory process right to present witnesses in his defense. *Id.*

As part of its analysis, this Court recognized that such testimony could be material and favorable to Mr. Paracha:

> [a]n essential element of the government's burden of proof
> on all counts of the indictment is Paracha's knowledge of
> Khan and al Baluchi's association with al Qaeda and his
> knowledge that his actions would or could support the al

---

[3] Mr. Paracha made a similar motion and petition regarding his father, Saifullah Paracha. This Court granted Mr. Paracha's motion to depose his father and a deposition was scheduled to occur at the United States Naval Base at Guantanamo Bay. Before the deposition occurred, however, Mr. Paracha decided not to proceed with it. This Court denied Mr. Paracha's petition to compel the production of his father as a witness at trial. *Paracha*, 2006 WL 12768 (S.D.N.Y.) at \*16-\*18.

> Qaeda organization and not simply its individual members.
> Accordingly, testimony tending to undermine the
> government's assertion that Paracha knew or had reason to
> believe that his alleged co-conspirators were al Qaeda
> associates is ***vital*** to Paracha's defense.

*Id.* at *11 (emphasis added).

### 1.    *The Disposition of Mr. Paracha's Claim With Respect to KSM*

This Court denied Mr. Paracha's application to depose or compel trial testimony from

KSM.  *Id.* at *12.  Unlike the government's disclosure of Mr. al-Baluchi's and Mr. Khan's

statements, the government's disclosure regarding KSM involved only one statement:  that KSM

did not recognize a photograph of Saifullah Paracha taken in the early 1970's.  *Id.*

As a result, this Court concluded that

> [t]his statement is simply too remote and isolated to support
> a claim that Mohammad would provide material or
> favorable testimony in Paracha's defense.  Paracha has
> come forward with no other support for his claim that
> Mohammad's testimony would meet such criteria.  Thus,
> Paracha has not demonstrated the materiality of
> Mohammad's testimony and is accordingly not entitled to
> an order compelling Mohammad's production at trial.

*Id.*

### 2.    *The Disposition of Mr. Paracha's Claim With Respect to Mr. al-Baluchi*

This Court summarized the potential benefit of Mr. al-Baluchi's testimony to Mr. Paracha

as follows:

> According to the unclassified summary of statements
> attributed to Ammar al Baluchi, al Baluchi has stated that
> neither Paracha nor his father had knowledge of al
> Baluchi's affiliation with al Qaeda or of al Baluchi's intent
> to use Saifullah Paracha for a larger operation involving
> Majid Khan; that al Baluchi 'kept his al Qaeda connections

-8-

hidden' from Saifullah Paracha and that he 'intentionally used cover stories and distorted truths to mask his particular interests with Saifullah Paracha during their discussions.' (*See* Uncassified (sic) Summaries, at 1). Al Baluchi also is reported to have stated that '[n]either [he] nor Majid Khan indicated to Uzair Paracha at any time that they were mujahidin [sic] or Al Qaeda' and that Saifullah Paracha was unaware of the true identity of the person known to him as 'Uzair'-now understood to be Khalid Sheik Mohammed-until the worldwide publicity of Khalid Sheik Mohammed's arrest. (*Id.*).

In statements that could undermine the government's allegation that the $200,000 investment given to Saifullah and Uzair Paracha was to be held for al Qaeda rather than as an unrelated personal investment in a legitimate business venture, al Baluchi denied that Saifullah Paracha had ever been 'tasked by al Qaeda' to do anything for them and stated that Saifullah Paracha had 'no relation to' al Qaeda. (*Id.*). Al Baluchi's testimony could also cast doubt on the government's theory that the money was intended as compensation for Uzair Paracha's assistance because the unclassified material states that 'Uzair Paracha was totally unwitting' of al Baluchi's 'intention to use Saifullah Paracha for the broader operational plan involving Majid Khan.' (*Id.*). It is clear, therefore, that testimony from al Baluchi could be material and favorable to Paracha's defense.

*Id.* at *11.

### 3.   *The Disposition of Mr. Paracha's Claim With Respect to Mr. Khan*

This Court summarized the potential benefit of Mr. Khan's testimony to Mr. Paracha's

defense as follows:

According to the unclassified summaries, Majid Khan denied that Uzair Paracha was motivated to help Khan out [of] (sic) a desire to help al Qaeda. Khan stated that he believed Paracha was disinterested in extremism and that '[h]e did not assess Uzair Paracha as being suitable for any other assistance to Al Qaeda besides helping with Majid

Khan's documents at the time.' (Unclassified Summaries, at 2).

Khan denied any knowledge of any funding or investments given to Saifullah Paracha by al Baluchi and stated that he was unaware of Saifullah Paracha's company or any knowledge of a plan to smuggle chemicals or explosives to the United States through the Parachas.  Khan stated that '[n]o compensation was given to Saifullah Paracha in return for Saifullah Paracha arranging for Uzair Paracha to assist Majid Khan with Majid Khan's immigration matters.' (*Id.*).  Khan stated that to his knowledge, Paracha did none of the things he was asked to do with respect to making the immigration authorities believe Khan was in the United States.  (*Id.*).

Based on these statements, it is evident that Khan, like al Baluchi, could provide material and favorable testimony for the defense that could raise a doubt as to whether Paracha was aware that his assistance to Khan would assist al Qaeda.  Khan's testimony also could raise doubt as to whether Paracha was aware of and intended to facilitate any act of international terrorism as alleged in Count Five of the indictment.  Finally, Khan's testimony could be helpful and material, and not merely cumulative, in demonstrating that there was no agreement between Khan, al Baluchi, Saifullah Paracha and Uzair Paracha regarding the alleged temporary investment of $200,000 in al Qaeda funds in the Parachas' business ventures.

*Id.* at *12.

### E.    *The Substitution of Mr. Khan's and Mr. al-Baluchi's Declassified Summaries Provided By the Government and Introduced at Trial*

While this Court held that Mr. Paracha was entitled to have Mr. Khan and Mr. al-Baluchi produced at trial, or access to them for Rule 15 depositions, it concluded that this would pose "significant risks to national security" and that an alternative means of presenting the witnesses' testimony to the jury would satisfy Mr. Paracha's Sixth and Fifth Amendment rights.  *Id.* at *10-

*13.

As a result, instead of testimony from Mr. Khan and Mr. al-Baluchi, Mr. Paracha was

permitted to present stipulated substitutions that summarized the classified statements Mr. Khan

and Mr. al-Baluchi had previously made to government agents. *Id.* at *13. Mr. al-Baluchi's

stipulated substitution, admitted at trial as Defense Trial Exhibit I (attached as Exhibit 3, Dratel

Decl.), supported Mr. Paracha's defense that he did not know that Mr. al-Baluchi was an *al*

*Qaeda* member when he (Mr. Paracha) agreed to assist Mr. Khan.

Similarly, Mr. Khan's stipulated substitution, admitted at trial as Defense Trial Exhibit J

(attached as Exhibit 4, Dratel Decl.), supported Mr. Paracha claim that did not know that Mr.

Khan was an *al Qaeda* member when he (Mr. Paracha) agreed to assist him. The government did

not provide any other statements from al-Baluchi, Mr. Khan, or KSM before or during trial.

**F.**     ***The Jury Instructions Regarding the Stipulated Substitutions***

In an effort "to give the jury a basis for evaluating [Mr. Khan's and Mr. al-Baluchi's]

statements" while still leaving to the jury "the function of determining their credibility and what

weight, if any, they are to be given," this Court instructed the jury as follows:

> You will hear testimony from the written statements of two
> witnesses . . . who will not appear at this trial. Those statements
> were made while the witnesses were in custody. For the purposes
> of this trial only, you may assume that the United States
> government has custody of these two witnesses and control over
> the conditions of their confinement.
>
> The witnesses were questioned on multiple occasions over some
> period of time. The witnesses were questioned in relation to their
> relationship with the defendant.
>
> None of the attorneys in this action has had access to the two
> witnesses. The witnesses are segregated from each other and are

not able to coordinate their statements.  The witnesses have had no
contact with the defendant since his arrest.

The witnesses' statements were obtained under circumstances that
were designed to elicit truthful and accurate information from the
witnesses because the statements are relied upon by the United
States officials responsible for making national security decisions.
The failure to provide truthful information would be detrimental to
any relationship to the United States government by the witnesses.

Those who questioned the witnesses have a profound interest in
obtaining accurate information from the witnesses and in reporting
that information accurately to those who can use it to prevent acts
of terrorism and to capture other *al Qaeda* operatives.

It is your decision, after reviewing all the evidence, whether to
accept the testimony of these two witnesses just as it is with every
other witness and to give that testimony whatever weight that you
find it deserves.

*Id.* at *15.

### G.    *The Verdict and Sentence*

After trial, the jury convicted Mr. Paracha November 23, 2005, on all counts.

This Court issued a Judgment and Sentencing Order July 21, 2006, sentencing Mr. Paracha to

360 months imprisonment and a 60-month term of supervised release.  A timely Notice of

Appeal was filed July 28, 2006.  On June 19, 2008, the United States Court of Appeals for the

Second Circuit denied Mr. Paracha's appeal.  *United States v. Paracha*, Doc. No. 06-3599-Cr,

2008 WL 2477392 (2d Cir. 2008) (summary order).  Mr. Paracha filed a Petition for Rehearing

*En Banc* July 3, 2008, which was denied November 10, 2008.

### H.    *The Newly Discovered Evidence*

-12-

In September 2007, almost two years after the jury's verdict, the government produced new evidence in the form of additional statements made by KSM, Mr. Khan, and Mr. al-Baluchi to U.S. law enforcement personnel sometime after the trio was transferred (in late 2006) to the detention facilities at Guantanamo Bay. *See* September 6, 2007, Letter of Assistant United States Attorney Karl Metzner (attached as Exhibit 5, Dratel Decl.).

The statements were in the form of law enforcement reports of interviews conducted at Guantanamo by FBI and NCIS/CITF[4] personnel during the first half of 2007 (hereinafter "Interview Reports"). Those Interview Reports are attached as Exhibits 7, 9, 12, 13 to the November 21, 2008, Declaration of Joshua L. Dratel, Esq. Relatedly, defense counsel also obtained from public sources the declassified portions of KSM's, Mr. Khan's, and Mr. al-Baluchi's separate Combatant Status Review Tribunal ("CSRT") Hearings, which occurred in early 2007, well after Mr. Paracha's trial, and which included statements by them. *See* CSRT Hearing Transcripts (attached as Exhibits 8, 11, 14, Dratel Decl.).[5]

All the interviews and the CSRT Hearings were conducted at Guantanamo Bay. *See id.*; *and see* Exhibits 7, 9, 12, 13 to the November 21, 2008, Declaration of Joshua L. Dratel, Esq. Subsequently, April 21, 2008 (Letter of AUSA Karl Metzner, attached as Exhibit 6, Dratel Decl.), the government also produced additional statements Mr. Khan made during a June 20,

---

[4] NCIS is the Naval Criminal Investigative Service, and CITF is the multi-agency Criminal Investigation Task Force created in February 2002 to conduct interrogations at Guantanamo Bay.

[5] A CSRT is the proceeding at which it is determined whether a Guantanamo detainee is an "enemy combatant." CSRT's are not governed by the Rules of Evidence, and the detainee is not entitled to a lawyer, or to certain other due process or constitutional protections (*i.e.*, certain evidence against the detainee may be submitted *ex parte*).

2007, Guantanamo Bay interview with law enforcement personnel.  *See*  Khan Interview Reports,

6/20/2007, at 1 (attached as Exhibit 7, Dratel Decl.).[6]  Many of the statements made by KSM,

Mr. Khan, and Mr. al-Baluchi reflected in the Interview Reports and CSRT Hearing Transcripts

bear directly on Mr. Paracha's defense at trial, including new information as well as detail and

narrative that amplify the prior statements contained in the substitutions introduced at Mr.

Paracha's trial.

The Interview Reports and CSRT Hearing Transcripts indicate that the interviews and

CSRT Hearings were conducted on the following dates:

| Witness | Date | |
|---------|------|---|
| Khalid Sheik Mohammed | January 12-14, 16, 2007 | (Interview Reports) |
| | March 10, 2007 | (CSRT Hearing) |
| | March 30, 2007 | (statement entered in evidence at Mr. al-Baluchi's CSRT Hearing) |
| Ammar al-Baluchi | January 17 - 19, 30, 2007 | (Interview Reports) |
| | March 30, 2007 | (CSRT Hearing) |
| Majid Khan | February 5, 2007 | (Interview Reports) |
| | April 15, 2007 | (CSRT Hearing) |
| | June 20, 2007 | (Interview Reports) |

### 1.    *KSM's Newly Discovered Statements*

Unlike the government's pre-trial disclosure of one statement by KSM regarding a

photograph of Saifullah Paracha dating from the 1970's, its post-trial disclosures contain

numerous statements by KSM that relate to Mr. Paracha's defense.  Those newly disclosed

statements include information regarding:  (1)  KSM's role in *al Qaeda*;  (2)  his involvement in

---

[6]  KSM, Mr. Khan, and Mr. al-Baluchi are still confined at Guantanamo Bay, and remain inaccessible to Mr. Paracha or his counsel.

activity that was connected to the Mujahadeen,[7] rather than to *al Qaeda*; and (3) Mr. Khan and the extent of his relationship with *al Qaeda*.

Also, during his CSRT, KSM admitted he was a high-level *al Qaeda* leader with intimate knowledge of the organization and its global operations. *See Khalid Sheik Mohammad CSRT Transcript* at 17-20 (attached as Exhibit 8, Dratel Decl.). Specifically, he was the "Operational Director for Sheikh Usama Bin Laden for organizing, planning, follow-up, and execution of the 9/11 Operation[.]" *Id.* at 17. He was also the "Military Operational Commander for *all* foreign operations around the world under the direction of Sheikh Usama Bin Laden and Dr. Ayman Al-Zawahiri." *Id.* (emphasis added). He also confessed to being a key planner and participant in operations such as:

(1)     managing a "cell" for producing biological weapons and for following up on "dirty bomb" operations in the U.S.;

(2)     operations in Afghanistan relating to the 9/11 hijackers;

(3)     the 1993 World Trade Center bombing;

(4)     Daniel Pearl's decapitation;

(5)     an operation in Kuwait that killed two American soldiers;

(6)     the bombing of a nightclub in Bali, Indonesia;

(7)     contemplated attacks on four skyscrapers in the United States, including destroying the Sears Tower by burning oil tanker trucks beneath it; and,

(8)     a contemplated attack on the New York Stock Exchange.

---

[7] The term "Mujahadeen" may refer generally to Muslim "holy warriors" or "strugglers" and the best known Mujahadeen involved a collection of Afghan groups that fought the Soviet Union in Afghanistan. *Al Qaeda*'s roots have been traced to the Mujahadeen, but *al Qaeda* is a separate and distinct organization. *See, generally, The Looming Tower: Al-Qaeda and the Road to 9/11* (Lawrence Right, Alfred A. Knopf 2006).

*Id.* at 17-18.

KSM also stated that some of the operations he was involved with were related to the Mujahadeen, not to *al Qaeda*. *Id.* at 20. In KSM's CSRT testimony, he makes no mention of any operations with either Mr. Khan, Mr. al-Baluchi or Paracha. In KSM's Interview Reports, he explains his relationship with and assessment of Mr. Khan. KSM met Mr. Khan through Mr. Khan's brother Mansour. KSM Interview Reports, at 18 (attached as Exhibit 9, Dratel Decl.). When KSM and Mr. Khan met, they discussed the possibility of setting explosives to ignite simultaneously at a number of gas stations. *Id.*

According to KSM, however, despite these initial conversations, Mr. Khan failed to renew his United States Visa, and KSM described him as "somewhat useless." *Id.* at 19. KSM added that Mr. al-Baluchi "stayed in contact" with Mr. Khan. *Id.* KSM also researched the viability of igniting gas stations on his own, and concluded that "getting gasoline to explode wasn't easy." *Id.* KSM met with Mr. Khan in Pakistan and determined that Mr. Khan, instead of working on a terrorism plot, had "spent all his time dealing with his family issues and never did any of the required research, because he returned without any real useful information." *Id.*[8]

A statement from KSM was also presented as evidence at Mr. al-Baluchi's CSRT Hearing. Mr. al-Baluchi CSRT Hearing Transcript, at 30-31 (attached as Exhibit 11, Dratel

---

[8] KSM's newly discovered statements characterize Mr. Khan and his limited involvement with *al Qaeda* in a similar way to KSM's statements about Salim Ahmed Hamdan. *See* William Glaberson, *bin Laden's Former Driver Is Convicted in Split Verdict*, N.Y. Times Aug. 6, 2008 (attached as Exhibit 10, Dratel Decl.). In Mr. Hamdan's Summer 2008 military commission trial at Guantanamo Bay, Hamdan's attorneys had access to and introduced KSM's description of Mr. Hamdan as a "'primitive' [Bedouin] who was fit only for such tasks as changing tires and washing cars" and that he was "'not fit to plan or execute[.]'" *Id.* Mr. Hamdan was acquitted of a conspiracy charge, but convicted of material support for terrorism. *Id.*

Decl.).  In that statement, KSM  explained that:

- to his knowledge, Mr. al-Baluchi "never had association with Al Qaida, Taliban or associated organizations" (*Id.* at 30);

- he used Mr. al-Baluchi for "business dealings" (*Id.*); and,

- any "dealings" Mr. al-Baluchi had with *al Qaeda* were through KSM, but that Mr. al-Baluchi had "no knowledge of any al Qaida links."  *Id.*

**2.     *Mr. al-Baluchi's Newly Discovered Statements***

The newly discovered statements by Mr. al-Baluchi's made in the Interview Reports and during his CSRT hearing Guantanamo Bay interviews demonstrate that he possessed significant *additional* information beyond that contained in his statements disclosed prior to and at trial. While the newly disclosed statements include some conflicting information, on balance they nevertheless clearly contain information material and helpful to Mr. Paracha's defense.  In addition, Mr. al-Baluchi's Interview Reports and CSRT Hearing provide specifics and additional information that make the exculpatory but decidedly spare substitutions introduced at trial herein more credible, and serve as well to corroborate Mr. Paracha's trial testimony.

During Mr. al-Baluchi's CSRT Hearing, he described his personal background, his relationship to KSM (KSM is his uncle; *id.* at 17), and whether he knew KSM or his associates were connected to *al Qaeda*.  *Id.* at 16-17.  According to Mr. al-Baluchi's statement at the CSRT, read by his "Personal Representative,"[9] he was "an entrepreneur with many personal contacts in different companies around the world."  *Id.*

---

[9] A "Personal Representative" at a CSRT is a military officer who need not be (and most often is not) a lawyer.  Assigned by the tribunal to the detainee's case, the Personal Representative does not have any relationship of privilege (attorney-client or otherwise) with the detainee.  A detainee is not permitted to have a lawyer or other representative of his own choosing appear on his behalf at a CSRT.

When Mr. al-Baluchi worked with KSM in a honey company, he "did not see any presence or membership" of *al Qaeda*. *Id.* KSM introduced him to many people who were "businessmen interested in trade, education and travel," *id.*, and KSM never introduced anyone by saying the person was from *al Qaeda*. *Id.* at 26. KSM never asked Mr. al-Baluchi to assist with any *al Qaeda* operations, and Mr. al-Baluchi lacked any knowledge that KSM was involved with *al Qaeda*. *Id.* at 21, 28.

According to Mr. al-Baluchi's statement at his CSRT Hearing, he also did not "know anything about smuggling explosives or shipping explosives in the United States or any where [sic] else in the world." *Id.* at 17, 21. Mr. al-Baluchi's CSRT statement added that he did "not belong to al Qaida, the Taliban or associated organizations" and that he "never received any military training in Afghanistan." *Id.* at 18. Regarding Mr. Khan specifically, Mr. al-Baluchi had the following exchange with a Tribunal member:

> MEMBER:              Okay. Did you help Majid Khan get into [sic] United States or do
>                      you help him with any business matters or loans or anything like
>                      that?
>
> [AL-BALUCHI]:        No. But, ah, he was from the States. So, he doesn't need any help
>                      going to the States.

*Id.* at 23.

Mr. al-Baluchi also denied knowing that Mr. Khan was a member of *al Qaeda*. *Id.* at 24. While there is some conflict between some of Mr. al-Baluchi's statements in the Interview Reports (from his January 2007 interviews at Guantanamo Bay) and his March 2007 CSRT Hearing statements, the Interview Reports demonstrate that even where he provided potentially incriminating information about himself and Mr. Khan, his statements were exculpatory with

respect to Mr. Paracha.  During three days of interviews, Mr. al-Baluchi said that Mr. Khan was a

"'fresh guy'" from the United States who came up with the "'gas station plot' on his own."  Al-

Baluchi Interview Reports at 38 (attached as Exhibit 12, Dratel Decl.).  According to the

Interview Reports, Mr. al-Baluchi also said that Mr. Khan "knew about" KSM.  *Id.*

  Regarding the relationship between Mr. Paracha and Mr. Khan, Mr. al-Baluchi said that

Mr. Paracha's father told Mr. al-Baluchi that his son (Uzair) was going to the U.S. for business

purposes and that perhaps he could help Mr. al-Baluchi.  *Id.* at 39.  Mr. al-Baluchi thought Mr.

Paracha "could help Mr. Khan with INS forms."  *Id.*  Mr. al-Baluchi arranged a meeting between

Mr. Paracha and Mr. Khan.  *Id.* Significantly, according to Mr. al-Baluchi, Mr. Paracha's

assistance to Mr. Khan regarding the latter's INS forms "were a favor for Majid Khan and were

not a tasking by Al-Qaida."  *Id.* at 40.  Indeed, according to Mr. al-Baluchi, KSM "had a strict

rule to never consider [Saifullah] Paracha or his family for an operation."  *Id.*  The reason for the

rule was that KSM "had money with [Saifullah] Paracha and it was important to keep money and

operations separated."  *Id.*

### 3. *Mr. Khan's Newly Discovered Statements.*

  Majid Khan's "newly discovered" statements in the Interview Reports and from his

CSRT hearing also contain substantial additional information relevant and helpful to Mr.

Paracha's defense.  In addition, as with Mr. al-Baluchi's (discussed above), Mr. Khan's Interview

Reports and CSRT Hearings flesh out the detail that is missing from the substitutions admitted at

Mr. Paracha's trial, thereby making Mr. Khan's statements exculpating Mr. Paracha far more

credible.

  FBI and NCIS/CITF agents interviewed Mr. Khan at Guantanamo Bay February 5, 2007.

Khan Interview Reports, 2/5/2007, at 1 (attached as Exhibit 13, Dratel Decl.).  Mr. Khan

answered questions about his intentions to travel to the United States, traveling in Thailand, and

a gas station plot, yet  made no mention of Uzair Paracha.  *Id.* at 6, 10.  Mr. Khan also stated that

he had told his family in September 2002 that he would not be returning to the United States.  *Id.*

at 6.  Mr. Khan added  that there was "no proof" of a gas station plot and that there were "only

'intentions.'"  *Id.* at 10.

A little more than two months later, Mr. Khan participated in his April 15, 2007, CSRT

Hearing.  Khan CSRT Hearing Transcript at 1 (attached as Exhibit 14, Dratel Decl.).  Mr. Khan

submitted written and oral "statements of torture" as exhibits at the hearing.  *Id.* at 5.  He also

denied being a member of *al Qaeda*.  *Id.* at 18.  Mr. Khan stated that while visiting his new wife

and family in Pakistan, his travel documents for return to the U.S. expired.  *Id.*  Mr. Khan

explained that Mr. Paracha agreed to help with the travel documents  "as a fellow Pakistani" and

as "one ordinary citizen helping another ordinary citizen."  *Id.*  Mr. Khan did not say that Mr.

Paracha knowingly acted as a part of a criminal endeavor or to assist *al Qaeda*.  During the

hearing, the recording officer told Mr. Khan that Mr. Paracha had been found guilty of providing

material support to *al Qaeda*.  *Id.* at 39.

Subsequently, the same members of FBI and NCIS/CITF who had conducted the initial

Guantanamo Bay interview questioned Mr. Khan again June 20, 2007, at Guantanamo Bay.

Khan Interview Reports, 6/20/2007, at 1 (attached as Exhibit 7, Dratel Decl.).  During that

interview, Mr. Khan was provided food, was allowed to take breaks, and voluntarily submitted to

the interview.  *Id.*  Mr. Khan referred to his CSRT hearing and that "it was mentioned that Uzair

Paracha was charged because Paracha was helping al [Qaeda]."  *Id.*

In response to a question from Mr. Khan, the interviewers informed him that Mr. Paracha received a sentence of 30 years' imprisonment. *Id.* at 2. Mr. Khan "commented that he thought [Paracha] was innocent," *id.*, at 4, and also that Mr. Paracha "did not do anything, went to trial and got 30 years." *Id.* at 6.

Mr. Khan also stated that he had met with Mr. Paracha "in an attempt to get a passport"and that during the meeting he "only talked with Sayf Paracha, Uzair's father, for 10 minutes." *Id.* at 8. Mr. Khan said that the passport was not for himself, but was for someone else. *Id.* at 8. He denied wanting to travel back to the U.S. *Id.*. He also denied attempting to give Paracha $200,000.00 for *al Qaeda,* and stated he just sat at a table with Mr. Paracha while Mr. al-Baluchi sat at a different table with Paracha's father "having another conversation." *Id.*

Mr. Khan also refuted allegations about his own activity, including that he was an *al Qaeda* member, *see id.* at 1-2, explaining that the government "labeled" him al Qaeda and "that just because someone helps al [Qaeda] doesn't mean they are al [Qaeda] members." In addition, Mr. Khan denied he had written potentially incriminating e-mails relating to alleged conduct in Thailand. *Id.*, at 3. He further stated that "if he had known KSM was al [Qaeda] and was worth $25 million USD, he 'would have sold him out.'" *Id.* at 8. Mr. Khan also made statements regarding what the Interview Reports described as "possible allegations of mistreatment" that were not included in the information provided to defense counsel. *Id.* at 9.

**I.**     ***Potential Material Exculpatory Evidence That Remains Undisclosed***

Given the critically relevant information contained in the government's post-trial disclosures, it seems extremely unlikely that KSM, Mr. al-Baluchi and Mr. Khan did not provide other relevant statements to the U.S. government before the verdict in Mr. Paracha's trial. Public

information indicates that before September 6, 2006, 14 "high value" detainees – including KSM, Mr. al-Baluchi, and Mr. Khan – were held in secret C.I.A. prisons around the world.  *See* Jeffrey Toobin, *Camp Justice*, The New Yorker, April 14, 2008, (hereinafter "Toobin") (attached as Exhibit 15, Dratel Decl.) (quoting President Bush regarding the transfer of the 14 alleged terrorists to Guantanamo Bay).

In addition, given the failure of government agencies to disclose evidence fully to courts and to the U.S. Congress regarding detainee interrogations and statements, it remains an open question whether all prior relevant statements of KSM, Mr. Khan and Mr. al-Baluchi have been produced.  Indeed, as recently as April 21, 2008, the government disclosed a statement that Mr. Khan made June 20, 2007, almost a year earlier (and before the earlier September 2007, production of the other Interview Reports).  Indeed, Judge Leonie M. Brinkema, in the wake of discovering that government agencies misrepresented whether videotapes of interrogations existed (only to find out they had been destroyed after Judge Brinkema had been told they did *not* exist), has confessed her diminishing confidence in the government's representations with respect to detainee interrogation issues.  Transcript, *United States v. al-Timimi*, No. 04-Cr.-385 (LMB) (E.D. Va. Nov. 20, 2007) (attached as Exhibit 16, Dratel Decl.); Order, *United States v. al-Timimi*, No. 04-Cr.-385 (LMB) (E.D. Va. Nov. 20, 2007) (attached as Exhibit 17, Dratel Decl.).

Also, the existence of other undisclosed statements is even more likely because KSM, Mr. Khan and Mr. al-Baluchi are among the small percentage of detainees who were even willing

-22-

to participate in their respective CSRT's.[10]  Their participation demonstrates that they have been

willing to make statements to U.S. government personnel.

In addition to the likely existence of further undisclosed evidence, it is also possible that

previously existing evidence has been destroyed.  In December 2007, *The New York Times*

reported that current and former government officials acknowledged that at least two videotapes

documenting the interrogation of *al Qaeda* operatives in the C.I.A.'s custody had been destroyed.

*See* Mark Mazzetti, "C.I.A. Destroyed 2 Tapes Showing Interrogations," *The New York Times*,

December 7, 2007 (attached as Exhibit 18, Dratel Decl.).

## ARGUMENT

## POINT I

### MR. PARACHA'S RULE 33 MOTION FOR A NEW TRIAL SHOULD BE GRANTED BECAUSE THE NEWLY DISCOVERED STATEMENTS BY KSM, AL-BALUCHI, AND KHAN ARE MATERIAL TO MR. PARACHA'S DEFENSE, AND WOULD PROBABLY HAVE LED TO HIS ACQUITTAL

The post-trial discovery of KSM's, Mr. Khan's and Mr. al-Baluchi's statements requires a

new trial for Mr. Paracha.  Despite Mr. Paracha's diligent efforts before trial, he was denied

access to those three witnesses, which prevented him from obtaining the information that has

ultimately been disclosed.   Rather than evidence that merely impeaches the credibility of a

witness or demonstrates perjury, the newly disclosed evidence both directly and indirectly

contradicts the government's theory of prosecution:  that Mr. Paracha knew that Mr. al-Baluchi

---

[10] According to Ken Garber, a Navy Captain supervising the CSRT's, in 2007 only 13 per cent of the detainees agreed to participate in or attend their own annual review hearings.  Toobin, at 4 (attached as Exhibit 15, Dratel Decl.).

or Mr. Khan were members of *al Qaeda,* and that any assistance Mr. Paracha lent Mr. Khan was performed with the knowledge or intent to support *al Qaeda.*

Thus, the new discovered statements contain evidence that would have been relevant, material and non-cumulative to Mr. Paracha's defense and satisfy the standard for a new trial under Rule 33, Fed.R.Crim.P.: that the newly discovered evidence would probably have led to Mr. Paracha's acquittal at trial.

**A.     *The Legal Standards Generally Relevant to Rule 33 Motions Based On "Newly Discovered Evidence"***

Rule 33, Fed.R.Crim.P., provides that upon a defendant's motion a court may vacate "any judgment and grant a new trial if the interest of justice so requires." The Rule further states that

> [a]ny motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict or finding of guilty. If an appeal is pending, the court may not grant a motion for a new trial until the appellate court remands the case.

*Id.*

A trial court has "broad discretion . . . to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice." *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992). *See, e.g., United States v. Diaz*, 922 F.2d 998, 1006 (2d Cir. 1990). A court should grant relief under Rule 33 "if the defendant makes a showing that the evidence is in fact 'new', *i.e.*, it could not have been discovered, exercising due diligence, before or during trial, and that the evidence is so material and non-cumulative that its admission 'would probably lead to an acquittal.'" *United States v. Siddiqui*, 959 F.2d 1167, 1173 (2d Cir. 1992) (quoting *United States v. Alessi*, 638 F.2d 466, 479 (2d Cir. 1980) (other citations omitted)). *See also United States v.*

*Ferguson*, 246 F.3d 129 (2d Cir. 2001).

A new trial is appropriate when newly discovered evidence directly contradicts the government's case. *See United States v. Aguillar*, 387 F.2d 625, 626 (2d Cir. 1967) (discovery of new evidence which merely discredits a government witness, rather than directly contradicts the government's case, does not justify new trial); *see United States v. Sposato*, 446 F.2d 779, 781 (2d Cir. 1971); *United States v. Spencer*, 4 F.3d 115, 119 (2d Cir. 1983).

Also, the analysis is *not* a sufficiency test, as "[t]he Court is not required to view the evidence in the light most favorable to the Government." *United States v. Ferguson*, 49 F. Supp.2d 321, 323 (S.D.N.Y. 1999) (citing *United States v. Lincoln*, 630 F.2d 1313, 1319 (8th Cir. 1980)), *aff'd,* 246 F.3d 129 (2d Cir. 2001).

In deciding a Rule 33 motion, a trial court may evaluate the newly discovered evidence in light of the evidence produced at trial, and determine the probable impact of the new evidence on a jury, *see Gambino*, 59 F.3d 353, 364 (2d Cir. 1995), including by conducting an evidentiary hearing. *See, e.g., United States v. Camacho*, 163 F.Supp.2d 287, 313 (S.D.N.Y. 2001) ("[w]hether a district court should hold an evidentiary hearing before deciding a motion for a new trial rests in the discretion of the court . . . . The particular grounds urged by a defendant on a motion for a new trial may affect the necessity of a hearing."), *vacated on other grounds*, 353 F. Supp.2d 524 (S.D.N.Y. 2005).

A court must exercise its authority to grant a new trial "'sparingly' and in 'the most extraordinary circumstances.'" *United States v. Ferguson*, 246 F.3d. 129, 134 (2d Cir. 2001) (quoting *Sanchez*, 969 F.2d at 1414 (2d Cir. 1992)). As the Second Circuit has explained, "[t]he ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be manifest

injustice." *Id.* at 134 (2d Cir. 2001) (citing *Sanchez*, 969 F.2d at 1414).

This case also presents an additional wrinkle that makes it unique.  At trial, due to the national security considerations invoked by the government, Mr. Paracha had very limited access to information from KSM, Mr. al-Baluchi, and Mr. Khan.  Thus, while Mr. Paracha was able to present rather short and vague summarized substitutions, that evidence must be viewed in the context of what the more expansive and detailed statements available now from those persons would have contributed to Mr. Paracha's defense at trial had he not been deprived of their testimony – particularly since their unavailability at trial was not due to any failure of diligence on Mr. Paracha's part.

**B.**  ***The Statements Produced to Defense Counsel Post-Trial Constitute "Newly Discovered Evidence" Under Rule 33***

    **1.**  ***Mr. Paracha Exercised Due Diligence In Attempting to Obtain Before Trial the Three Witnesses' Testimony and Statements***

Newly discovered statements, presented post-trial, that exculpate a defendant constitute "newly discovered evidence" provided "the defendant makes a showing that the evidence could not have been discovered, in the exercise of due diligence, before or during trial." *United States v. Spencer*, 4 F.3d 115, 118 (2d Cir. 1993).  *See United States v. Stewart*, 323 F.Supp.2d 606, 614-15 (S.D.N.Y. 2004), *aff'd by United States v. Stewart*, 433 F.3d 273, 297 (2d Cir. 2006) ("[i]n most situations, therefore, 'relief is justified under Rule 33 only if the newly discovered evidence could not have been discovered, exercising due diligence, before or during trial, and that [the] evidence is so material and non-cumulative that its admission would probably lead to an acquittal.'") (*quoting United States v. Gallego*, 191 F.3d 156, 161 (2d Cir. 1999);  *United States v. Torres*, 128 F.3d 38, 48-49 (2d Cir. 1997);  *United States v. Locascio*, 6 F.3d 924, 949

(2d Cir. 1993).

Rule 33's "due diligence" requirement is satisified by a motion based on "newly

discovered evidence" when the new evidence relates to events occurring after trial and, thus, it is

clear that due diligence would not have helped the defendant discover the evidence before or

during trial. *See also Alvarez v. United States*, 808 F.Supp. 1066, 1092 (S.D.N.Y. 1992) (holding

that "due diligence" requirement met where each piece of new evidence concerned events

occurring after trial); *see also United States v. Fulcher*, 250 F.3d 244, 249-50 (4th Cir. 2001)

(holding that defendant was diligent where counsel attempted to discover exculpatory evidence

from witness during pre-trial hearing and there was no indication of facts that "came to light

following the trial").

Here, Mr. Paracha moved before trial to depose and to compel testimony from KSM, Mr.

Khan, and Mr. al-Baluchi. The government opposed these motions and this Court denied them.

Certainly, Mr. Paracha exercised "due diligence" in trying to obtain the witnesses' testimony and

the information that they possessed. Thus, the witnesses' statements were not available to Mr.

Paracha until *after* trial.

Here, all of the newly disclosed statements were made in 2007 after Mr. Paracha's

November 23, 2005, conviction. As a result, it would have been impossible for Mr. Paracha to

discover them before or during trial. However, certainly Mr. Paracha could have obtained

similar statements or the information in the statements, if he had been able to gain access to the

three witnesses. In fact, Mr. Paracha attempted as much before the trial began when he moved to

depose these witnesses and to produce them to testify at trial.

Citing national security concerns, the government opposed Mr. Paracha's motions to

depose KSM, Mr. Khan, and Mr. al-Baluchi and to produce each of the men at trial to testify. Eventually, the government acknowledged that the three were indeed in U.S. custody (and were publicly identified as such when they were transferred to Guantanamo Bay in late 2006). Consequently, Mr. Paracha was as diligent as he could have been under the highly unusual circumstances that existed.

Accordingly, this case is completely distinguishable from those in which a defendant failed to investigate sufficiently whether a document or critical witness existed, or those in which the defendant knew or was aware of the specific statements before trial. *See, e.g., United States v. Owen*, 500 F.3d 83, 90 (2d Cir. 2007) (reversing trial court's granting of new trial motion where defendant "knew or should have known" before trial that his codefendant could offer material testimony as to his role in the charged crime).

Rather, Mr. Paracha attempted to gain access to these witnesses to determine what, if any, information they possessed and he moved to compel such testimony at trial. There cannot be a serious claim that Mr. Paracha should or could have acted more diligently to discover and use the evidence that is the basis for this Rule 33 motion. *See United States v. Ouimette*, 798 F.2d 47, 51-52 (2d Cir. 1986) (new evidence that government interfered with exculpatory witness testifying at trial entitled defendant to hearing on his motion for new trial).[11] *See also United*

---

[11] In *Ouimette*, the Second Circuit, while not granting the Rule 33 motion outright, noted that the defendant was entitled to a hearing on the motion for a new trial based on newly-discovered evidence. Defendant contended that he was denied the exculpatory testimony of an eyewitness to relevant events because police officers intimidated the witness into recanting his proposed testimony and fleeing. *Id.* at 51. The Court in *Ouimette* held that even though appellant's attorney knew about the proposed testimony before trial, he did not know about the police officers' conduct, which qualified as "newly discovered evidence." *Id.* The Second Circuit could not determine, however, whether defense counsel had acted with due diligence to discover the evidence pre-trial, or whether such evidence would have resulted in an acquittal. *Id.*

*States v. Brodwin*, 292 F.Supp.2d 484, 492-95 (S.D.N.Y. 2003) (defendants could not, through the exercise of due diligence, have discovered their coconspirator's insanity before trial because it would have required either his consent to a psychiatric examination or a court order, neither of which they could reasonably have expected to be obtainable).[12]

**C.   *The Newly Discovered Evidence, In the Form of the Statements by KSM, al-Baluchi, and Khan, Is Exculpatory, Material, and Is Not Cumulative***

The newly discovered evidence, in the form of the post-trial statements of KSM, Mr. al-Baluchi, and Mr. Khan, is exculpatory, material, and non-cumulative to Mr. Paracha's defense because it squarely contradicts the government's case at trial.   The statements directly undermine the government's theory that Mr. Paracha knew that Mr. Khan and/or Mr. al-Baluchi were *al Qaeda* members.   Further, these statements are helpful, material and non-cumulative to Mr. Paracha's defense that any actions he may have taken to assist Mr. Khan were not performed with the  intent to support *al Qaeda*.

That the newly discovered statements at issue here go directly to the heart of the case – both the government's theory and Mr. Paracha's defense – distinguishes this case from the vast majority of unsuccessful Rule 33 motions that present newly discovered evidence.   As a canvass

---

at 52.  Therefore, the Second Circuit oredered a hearing on those issues.

[12] Rule 33 also states that "[i]f an appeal is pending, the court may not grant a motion for a new trial until the appellate court remands the case."  Thus, while a case is on appeal, the district court "retains the jurisdiction to deny a Rule 33 motion, but it may not grant such a motion unless the Court of Appeals first remands the case."  *United States v. Brodwin*, 292 F.Supp.2d 484 (S.D.N.Y. 2003) (citing *United States v. Camacho*, 302 F.3d 35, 36 (2d Cir. 2002) (*per curiam*)).  Here, the Second Circuit affirmed Mr. Paracha's convictions June 19, 2008.  *See United States v. Paracha*, 2008 WL 2477392 (2d Cir. 2008) (summary order).  Mr. Paracha filed a Petition for Rehearing *En Banc*, which was denied November 10, 2008.  Therefore, Mr. Paracha's appeal is no longer pending before the Second Circuit, and there is no obstacle to this Court granting Mr. Paracha's motion for a new trial.

of the case law reveals, the newly discovered evidence in many of those cases falls prey to the principle that "new evidence 'which is merely cumulative or impeaching' is not, according to the often-repeated statement of the courts, an adequate basis for the grant of a new trial." *Mesarosh v. United States*, 352 U.S. 1, 9 n.4 (1956).

In that context, Rule 33 motions have been denied because the newly discovered evidence has represented  "merely additional evidence tending to undermine the credibility of [the witness] for reasons already before the jury," *United States v. Petrillo*, 821 F.2d 85, 89 (2d Cir. 1987); "the sort of cumulative impeachment material that is routinely held insufficient to warrant a new trial," *United States v. White*, 972 F.2d 16, 22 (2d Cir. 1992); "somewhat redundant since [the witness'] credibility had in fact been attacked repeatedly," *United States v. Diaz*, 922 F.2d 998, 1007 (2d Cir. 1990);  and "merely *'additional* evidence tending *further* to impeach the credibility of a witness whose character had already been shown to be questionable,'" *United States v. Gilbert*, 668 F.2d 94, 96 (2d Cir. 1981) (quoting *United States v. Rosner*, 516 F.2d 269, 273-74 (2d Cir. 1975) (emphasis in original).

Thus, "nondisclosure of cumulative evidence tending only to further impeach a witness' general credibility is not grounds for granting a Rule 33 motion." *United States v. Gambino*, 59 F.3d 353, 366 (2d Cir. 1995) (citations omitted). *See also Spencer*, 4 F.3d at 118-19 (new evidence that chemist witness was a drug user was ultimately evidence which merely discredited the witness and "not so material that a new trial was required").

However, evidence that "directly contradict[s] the government's case" is not evidence that "merely discredits a government witness." *Aguillar*, 387 F.2d 625, 626 (2d Cir. 1967).  That is the nature of the newly discovered statements at issue herein, which, as the pertinent case law

demonstrates, warrants a new trial for Mr. Paracha.

In *United States v. Fulcher*, 250 F.3d 244 (4th Cir. 2001), for example, the Fourth Circuit affirmed the district court's granting of a Rule 33 motion when following trial a witness wrote a letter to the judge that potentially exculpated the defendant. 250 F.3d at 246. A government agent wrote an *ex parte* letter to the district court explaining that he may have led the defendants to believe that they were authorized to conduct the entire operation on behalf of the government. *Id.* The Fourth Circuit affirmed the district court's holding that the newly discovered evidence was material "because it was directly related to the [trial] defense and to whether the defendants possessed the requisite *mens rea* for their crimes." *Id.* at 248.

In reaching its decision, the Fourth Circuit considered whether the new evidence was cumulative, stating: "for evidence to be cumulative under Rule 33, it must be 'additional evidence to that which was presented at trial as to a fact.'" *Id.* at 250 (quoting *United States v. White*, 972 F.2d 16, 20 (2d Cir. 1992)). In addition, "evidence is only cumulative 'when it adds very little to the probative force of the other evidence in the case so that if it were admitted its contribution to the determination of truth would be out-weighed by its contribution to the length of trial.'" *Fulcher*, 250 F.3d at 250 (quoting *United States v. Kizeart*, 102 F.3d 320, 325 (7th Cir. 1996); *see also Elwood v. Pina*, 815 F.2d 173, 178 (1st Cir. 1994) ("[e]vidence is cumulative if repetitive, *and* if the small increment of probability it adds may not warrant the time spent in introducing it.") (quoting 1 Weinstein's Evidence ¶ 401[07] (1985))(emphasis added).

In *Fulcher*, the Court concluded that the government agent's testimony would not be cumulative because the probative force of his testimony at a new trial would be, according to the district court, significantly greater than the testimony of the defendants alone. *Fulcher*, 250 F.3d

-31-

at 251.  Here, too, the expanded statements from Mr. al-Baluchi and Mr. Khan, as well as the

entirely new statements from KSM, would be significantly more convincing than was Mr.

Paracha's testimony alone (or than the slim substitution summaries of Mr. Khan's and Mr. al-

Baluchi's previously disclosed statements).

As the Court reasoned in *Fulcher*, the agent's testimony would be more persuasive "not

only because he is a disinterested witness, but also because of his status as a DEA agent who was

involved to some extent in the prosecution of this case." *Id.*  Consequently, the Court pointed

out that "[s]ince the jury would then be entitled to acquit the defendants if it concluded that

defendants' activities were legitimately authorized, . . . the district court did not abuse its

discretion in concluding that the newly discovered evidence is 'material to the issues involved.'"

*Id.* at 255.  As a result, the district court did not abuse its discretion in concluding that the newly

discovered evidence would probably have produced an acquittal.  *Id.*

The Second Circuit's analysis in *United States v. Siddiqi*, 959 F.2d 1167 (2d Cir. 1992),

is also instructive here.  *Siddiqi* involved an appeal from a district court's denial of a motion for a

new trial that was based on a newly discovered document which corroborated the defendant's

trial testimony.  The Second Circuit concluded that because the document was "evidence of a

different kind and came from an impartial source," in comparison to defendant's testimony, the

document would have been non-cumulative and probably would have led to the defendant's

acquittal at trial.  *Id.* at 1173.  As a result, the Second Circuit remanded the case for a

determination whether the evidence could have been discovered before or during trial with the

exercise of due diligence, and whether it would have constituted admissible evidence.

Another case relevant to considering Mr. Paracha's motion is *United States v. Camacho*,

188 F. Supp.2d 429 (S.D.N.Y. 2002).[13]  Defendants in that case moved for a new trial based on

newly discovered exculpatory evidence that consisted of testimony from a prison inmate who

said that a formerly indicted co-defendant in the case claimed responsibility for murders for

which the defendants were convicted.  Judge Haight granted the motion after a hearing and

determining that: (1) the prison inmate's testimony was sufficiently credible to permit the jury to

hear it at a new trial; (2) a jury would have ample reasons for believing that the former co-

defendant's statement was true, including that it was a statement against interest admissible

under Fed.R.Evid. 804(b)(3); and, (3) if a jury believed the statement it would probably lead to

defendants' acquittal at a retrial.  *Id.* at 451-54.

As this Court previously stated, "testimony tending to undermine the government's

assertion that Paracha knew or had reason to believe that his alleged co-conspirators were al

Qaeda associates is *vital* to Paracha's defense."  *Paracha*, 2006 WL 12768, at *11 (emphasis

added).

In that specific context, this case is analogous to cases such as *Fulcher*, *Siddiqi*, and

*Camacho,* in which Rule 33 motions have been granted (or discussed favorably) due to newly

discovered material, non-cumulative evidence because the newly discovered evidence in this case

is directly related to Paracha's trial defense and to whether he knowingly supported *al Qaeda*.

The newly discovered evidence contradicts the government's theory that Mr. Paracha

---

[13]  The District Court, Senior District Judge Charles S. Haight, subsequently vacated this opinion because the government later presented additional evidence that impeached the credibility of the evidence (admissions against penal interest testified to by a third party) the court had relied upon in granting the motion.  353 F. Supp.2d 524 (2005).  Here, the statements come from government interviews of the witnesses themselves and there is no argument that they resulted from a third party providing the witnesses with information to use in creating false statements.

assisted Mr. Khan with the intent to support *al Qaeda*, or with the knowledge that Mr. Khan and

Mr. al-Baluchi were *al Qaeda* members.  The newly discovered evidence from KSM, Mr. al-

Baluchi, and Mr. Khan both directly and indirectly undermines the government's principal

assertions at trial.  Thus, the newly discovered statements do not represent evidence that "merely

discredits a witness," impeaches a witness on some other grounds, or that lacks materiality.

Therefore, such evidence would have been *vital* to Mr. Paracha and now requires that he be

granted a new trial.

In fact, KSM's statements alone are grounds for granting Mr. Paracha a new trial.  They

clearly support Mr. Paracha's defense and directly contradict the government's case.  They also

are not cumulative because no information from KSM was available at the trial, and he was a

high-level *al Qaeda* operative who was aware of the terrorist group's operations and knew Mr.

al-Baluchi and Mr. Khan.  Thus, KSM's subsequent statements provide significant evidence that

neither Mr. Khan nor Mr. al-Baluchi was involved in an *al Qaeda* operation with Mr. Paracha.

Specifically, in his statements, KSM identifies himself as a high-level *al Qaeda* leader

with intimate knowledge of the organization and its global operations, including the fact that he

was the Military Operational Commander for "*all*" foreign operations around the world under the

direction of Bin Laden and Al-Zawahiri.  *See* KSM CSRT Hearing Transcript at 17-20 (attached

as Exhibit 8, Dratel Decl.).  KSM also admits involvement with numerous, high-profile terrorist

attacks (*id.* at 17-18) and that he knew Mr. Khan and Mr. al-Baluchi (KSM Interview Reports, at

18-19 (attached as Exhibit 9, Dratel Decl.)), yet does not include Mr. Paracha as part of any *al

Qaeda* operation.

Based on his personal involvement with Mr. Khan, KSM characterizes Mr. Khan as a

-34-

"somewhat useless" person who, instead of working on any terrorism plot, "spent all of his time dealing with his family issues and never did any of the required research" relating to blowing up gas stations. *Id.* Further, despite KSM's role as Military Operational Commander, it appears from KSM's statements that Mr. Khan did not complete any *al Qaeda* tasks, was not a member of *al Qaeda*, and was not authorized to speak on behalf of *al Qaeda* or recruit others to join *al Qaeda* plots.

In addition, while KSM met with Mr. Khan, such meetings and discussions could have related to the Mujahadeen instead of to *al Qaeda*. *See* **ante**, at 15 & n. 7.  Considering that Mr. Paracha was charged with providing material support to (and engaging in prohibited transactions with) *al Qaeda* and not the Mujahadeen, even if the jury were to disregard KSM's statements and conclude that Mr. Khan did attempt to recruit Mr. Paracha to assist him with respect to *some* organization, the jury could still conclude that any knowing assistance by Mr. Paracha was for a different organization than *al Qaeda*.  Moreover, despite the fact that KSM met with Mr. Khan after Mr. Khan allegedly had been working on a gas station plot, Mr. Khan did not identify Mr. Paracha to KSM or inform him that Mr. Paracha was in any way assisting *al Qaeda* by assisting Mr. Khan with his immigration status or other issues.

Therefore, KSM's newly discovered statements by themselves justify granting a new trial. Based on the single statement from KSM disclosed pretrial – only that he could not recognize Mr. Paracha's father from an old photograph – this Court concluded that such statement was "simply too remote and isolated to support a claim that Mohammad would provide material or favorable testimony in Paracha's defense." *Paracha*, 2006 WL 12768 (S.D.N.Y.), at *12.

Now, with the benefit of KSM's newly discovered statements, it is clear that KSM could

-35-

have been a dispositive witness for the defense, and that even his statements, coming from the former *al Qaeda* Military Operational Commander, in the form of a substitution, would have been sufficiently material to have probably resulted in an acquittal. KSM's statements would have offered the most authoritative insider's view of *al Qaeda*, and would not only have supported Mr. Paracha's testimony (and the statements of Mr. Khan and Mr. al-Baluchi), but also would have negated the testimony of the government's expert with respect to *al Qaeda*'s organizational and operational structure (and how Mr. Khan and in turn Mr. Paracha, fit into them).

Adding Mr. al-Baluchi's and Mr. Khan's statements to the equation only reinforces that conclusion immeasurably. At a minimum, Mr. al-Baluchi's newly discovered statements provide critical new evidence that any meetings involving Mr. Khan and/or Mr. Paracha had nothing to do with supporting *al Qaeda*. According to Mr. al-Baluchi, KSM "had a strict rule *to never consider* [Saifullah] Paracha or his family for an operation[]" and that the reason for this rule was that Mohammad "had money with [Saifullah] Paracha and it was important to keep money and operations separated." (Al-Baluchi Interview Reports, at 40 (attached as Exhibit 12, Dratel Decl.))(emphasis added). The combination of this rule and the reason for it are eminently credible, and directly contradict the government's theory of prosecution. In addition, if jurors credited Mr. al-Baluchi's statements at his CSRT Hearing, they would also conclude that neither Mr. al-Baluchi nor Mr. Khan were involved with *al Qaeda* in any capacity.

Mr. Khan's post-trial statements also provide additional material, exculpatory evidence on Paracha's behalf. The February 5, 2007, Interview Reports include discussion of Mr. Khan's intention to travel to the United States and his involvement in a gas station plot, yet he makes no

mention of Mr. Paracha being involved in any way.  Khan Interview Reports, 2/5/2007, at 6, 10 (attached as Exhibit 13, Dratel Decl.).

Even during Mr. Khan's CSRT Hearing when he mentioned Mr. Paracha, he specifically stated that Mr. Paracha agreed to help with the travel documents "as a fellow Pakistani" and as "one ordinary citizen helping another ordinary citizen," *not* as a person who was knowingly supporting *al Qaeda* or a person operating on behalf of *al Qaeda*.  Khan CSRT Hearing Transcript, at 1 (attached as Exhibit 14, Dratel Decl.).  Mr. Khan also explicitly stated during a separate interview that he "thought [Paracha] was innocent[.]"  Khan Interview Reports, 6/20/2007, at 4 (attached as Exhibit 7, Dratel Decl.).

Again, the unique circumstances here demonstrate that such amplification of the bare summary substitutions introduced at trial is not cumulative.  There is a vast difference between reading only a few pages of general statements and the substantial detail and narrative provided in the newly discovered statements.  The newly discovered statements lend credence to each other, and to Mr. Paracha's testimony as well.

Mr. Paracha testified that (1)  he did not know that Mr. al-Baluchi or Mr. Khan were part of *al Qaeda*;  (2)  any action he undertook on either man's behalf was not done with the intent to support *al Qaeda*;  and (3)  he provided false information to law enforcement officers because he was frightened, he thought law enforcement wanted to hear him confirm such information, and, consequently, he thought it would lead to his eventual release.  The newly discovered statements corroborate the first and second points of Mr. Paracha's testimony noted above.

Accordingly, the newly discovered statements by KSM, Mr. al-Baluchi, and Mr. Khan are "*vital*" evidence that Mr. Paracha did not knowingly or intentionally support *al Qaeda*.  *See*

-37-

*Paracha*, 2006 WL 12768, at * 11 (emphasis added) (explaining what evidence would be "vital"

to Mr. Paracha's defense). While Mr. Paracha had extremely limited information from Mr. al-

Baluchi and Mr. Khan for use in his defense at trial, it was not nearly as material and significant

as the information provided in their numerous post-trial statements.

Thus, the newly discovered statements provide several tangible reasonable doubts the jury

could have entertained had it heard such evidence: (1) the statements by KSM, a completely

new witness whose knowledge of *al Qaeda* and its operations is likely unsurpassed; (2) the

additional statements, including the detail, provided by Mr. Khan and Mr. al-Baluchi; (3) the

corroboration all of the statements would have provided Mr. Paracha's testimony; (4) the effect

the statements would have had in neutralizing the government's expert witness; and (5) the

impact the expanded statements would have had in blunting the government's summation, in

which it argued that Mr. al-Baluchi and Mr. Khan were not credible because they were terrorists.

T. 1413-1417.

As a result, the newly discovered evidence is exculpatory, material, and non-cumulative,

and, if presented at trial, would probably have led to Mr. Paracha's acquittal on all charges.

Indeed, in light of the newly discovered statements, and the procedural limitations that restricted

the manner and content of what Mr. Paracha was permitted to present of Mr. al-Baluchi's and

Mr. Khan's previously disclosed statements, allowing Mr. Paracha's convictions to stand would

constitute a "manifest injustice."[14]

---

[14] Nor would the principles and procedures attendant to the Classified Information
Procedures Act (hereinafter "CIPA") suggest a different result. Indeed, explicit in CIPA's
legislative history is the admonition that "the defendant should not stand in a worse position,
because of the fact that classified information is involved, than he would without this Act."
Senate Report No. 96-823, at 4302. *See also United States v. Lopez-Lima*, 738 F. Supp. 1404,

As Judge Haight stated in *Alvarez v. United States*, determining whether new evidence "would probably lead to an acquittal" requires a reviewing court to look "backwards and forwards." *Alvarez*, 808 F.Supp. at 1094 (S.D.N.Y. 1992). In applying this test:

> the court must evaluate the new evidence, not just in and of itself on a unit or cumulative basis, but in the light of the entire record made at the trial and on the motion. The strength of the evidence presented at the trial is an important consideration. If, measured by these criteria, the court thinks that there is a reasonable probability of an acquittal, and the other tests have been satisfied, a new trial will be ordered. Otherwise it will be denied.

*Id.* (quoting Wright, *Federal Practice and Procedure*, §557 at 323-34 (footnotes omitted)).

Of course, here that analysis must also be informed by the unusual nature of the manner in which Mr. Khan's and Mr. al-Baluchi's statements were presented at trial – not as live testimony, but as bland and limited substitutions that restricted Mr. Paracha's access to the witnesses and their testimony.

As Judge Haight noted, the "probability-of-acquittal prong is the most difficult for the defendant to meet, and the most difficult for a court to evaluate." *Alvarez*, 808 F.Supp at 1094. Despite this high bar, Judge Haight granted a motion for a new trial because newly discovered evidence of lies and conflicting testimony of a confidential informant and a corroborating government agent in other trials would have enabled significant cross-examination of the informant and agent.

The Court's jury instructions in this case also increase the likelihood that a jury would focus significantly on the newly discovered statements and acquit as a result. Specifically,

---

1407 (S.D. Fla. 1990); *United States v. Poindexter*, 698 F. Supp. 316, 320 (D.D.C. 1988). *See also United States v. Fernandez*, 913 F.2d 148, 154 (4th Cir. 1990).

regarding the limited statements from Mr. al-Baluchi and Mr. Khan introduced at the first trial,

the Court directed the jury as follows:

> The witnesses' statements were obtained under circumstances that
> were designed to elicit truthful and accurate information from the
> witnesses because the statements are relied upon by the United
> States officials responsible for making national security decisions.
> The failure to provide truthful information would be detrimental to
> any relationship to the United States government by the witnesses.
>
> Those who questioned the witnesses have a profound interest in
> obtaining accurate information from the witnesses and in reporting
> that information accurately to those who can use it to prevent acts
> of terrorism and to capture other *al Qaeda* operatives.

*Paracha*, 2006 WL 12768, at *15.

These instructions would imbue the newly discovered statements with circumstantial

guarantees of trustworthiness that jurors would probably find compelling.  Equipped with the

benefit of hindsight, it is plain that Mr. Paracha's convictions are irreparably tainted.

As in *Alvarez*, the newly discovered evidence in this case would likely have a dramatic

impact on Mr. Paracha's retrial, probably leading to his acquittal.  While the government no

doubt will point to evidence that could sustain a conviction, again, a Rule 33 motion is not

determined by a sufficiency test.  Examining the newly discovered statements in the context of

the record, it is respectfully submitted that Mr. Paracha has more than satisfied the legal standard

that such evidence would probably result in an acquittal.  *See United States v. Figueroa*, 2008

WL 2945386, *4-*8 (E.D. Pa. July 31, 2008) (slip opinion) (granting motion for new trial where

new witness was "not incredible" and where if the jury believed that evidence it would probably

produce an acquittal).

-40-

## POINT II

**IN LIGHT OF PUBLIC REVELATIONS ABOUT
THE FAILURE OF GOVERNMENT AGENCIES
TO PRODUCE OR RETAIN CERTAIN
EVIDENCE OF DETAINEE INTERROGATIONS,
A HEARING SHOULD BE CONDUCTED TO
DETERMINE WHETHER ANY ADDITIONAL
EXCULPATORY STATEMENTS OR INFORMATION
EXISTS IN THE GOVERNMENT'S POSSESSION**

Based on published reports and developments in certain cases, there is reason to believe that the statements produced by the government, both before and since trial, are not the only statements by KSM, Mr. Khan, and Mr. al-Baluchi that exculpate Mr. Paracha. As a result, Mr. Paracha respectfully requests a hearing to determine whether agencies of the U.S. government have provided to the prosecutors in this case the full range of such statements that qualify for disclosure under *Brady v. Maryland*, 373 U.S. 83 (1963).

Such a hearing would explore the following issues: (1) whether government agencies other than the United States Attorney's Office for the Southern District of New York have disclosed all *Brady* material to the prosecutors in this case; (2) whether government agencies other than the United States Attorney's Office for the Southern District of New York have improperly destroyed any such materials; and, if so, (3) what information was contained in the materials that were destroyed.

This request for such a hearing is not a fishing expedition. Nor is it sheer speculation that government agencies, including the C.I.A. and other intelligence agencies, have destroyed evidence relating to the "high-value" detainees – which category includes KSM, Mr. Khan, and Mr. al-Baluchi – who were detained at "ghost" sites around the world (until 14, including the

-41-

three at issue in this case, were transferred to Guantanamo Bay in late 2006). That evidence had

been requested by courts and prosecutors as relevant and material to ongoing legal proceedings,

and had been sought by Congress as well.

For example, in December 2007, The New York Times reported that in 2005 the C.I.A.

"destroyed at least two videotapes documenting the interrogation of two Qaeda operatives in the

agency's custody, a step it took in the midst of Congressional and legal scrutiny about its secret

detention program, according to current and former government officials." Mark Mazzetti,

*C.I.A. Destroyed 2 Tapes Showing Interrogations*, N.Y. Times, December 7, 2007 (attached as

Exhibit 18, Dratel Decl.).

According to the *Times* article:

> [i]n both 2003 and 2005 C.I.A. lawyers told prosecutors in
> the [United States v.] Moussaoui case that the C.I.A. did
> not possess recordings of interrogations sought by the
> judge. Mr. Moussaoui's lawyers had hoped that records of
> the interrogations might provide exculpatory evidence for
> Mr. Moussaoui, showing that Qaeda detainees did not
> know Mr. Moussaoui and clearing him of involvement in
> the [September 11th, World Trade Center terrorist attack].

*Id.*

Thus, it is clear that in *Moussaoui* the C.I.A. failed to disclose information responsive to

prosecution and judicial requests, and also did so in response to a Congressional inquiry relating

to C.I.A. conduct. The District Judge presiding over the *Moussaoui* case expressed her

misgivings about those misrepresentations in the context of another case, *United States v. Al*

*Timimi*, 04 Cr. 385 (LMB) (E.D. Va. Nov. 20, 2007), in the context of a separate issue, namely

whether the government should be compelled to share with security-cleared defense counsel the

-42-

government's response to a motion to compel disclosure of information obtained pursuant to the

National Security Agency's Terrorist Surveillance Program (involving warrantless wiretapping).

Before issuing the Order compelling disclosure of the government's response to defense

counsel (*see* Order, dated Nov. 20, 2007 (attached as Exhibit 17, Dratel Decl.)), Judge Leonie M.

Brinkema, during a court proceeding on the issue, explained that

> I have lost a great deal of confidence in the representations
> made to me by folks in the intelligence world, and I'm
> responding, frankly, to something that happened not in this
> case but in the [*United States v.*] *Moussaoui* case [that the
> District Court handled].
>
> As you know because the letter in a redacted form has been
> made public, on October 25, 2007, I received a letter from
> one of the prosecuting attorneys in that case reflecting that
> although I had been sure that it was not reasonable that key
> witnesses in their interrogations had not been tape-recorded
> and/or videotaped, I was assured on numerous occasions
> that that had not happened and we went ahead with that
> case with that understanding, and, of course, as that letter
> reveals, that was not, in fact – the representations that were
> made to me were not, in fact, accurate.
>
> Now, this was not the line prosecutors; this was people
> back across the river; but because of the concept that
> lawyers who appear on a regular basis before a court are
> subject to the court's discipline, they know that their
> reputation rises or falls upon the accuracy of their
> representations, a court has no way of controlling or
> adequately policing what is said to it if it's made by
> attorneys whom we have no connection with, and given the
> mess that occurred in the *Moussaoui* case, it's not going to
> result, I don't think, in any change in the posture of that
> case, but this case is in a different situation.
>
> This defendant did not plead guilty.  He has insisted that he
> is innocent of the crimes.  The case is on appeal.

*Al-Timimi*, Transcript of Nov. 20, 2007 Hearing, at 3-5 (attached as Exhibit 16, Dratel Decl.).

C.I.A. misrepresentations to a federal court, made under oath, were also dispositive in

*United States v. Wilson*, 289 F. Supp.2d 801 (S.D. Tex. 2003), in which the District Court

ordered a new trial nearly twenty years after a conviction was secured by an affidavit from the

C.I.A. (denying contacts with the defendant that were crucial to his defense) that, unbeknownst to

the line prosecutor, was false.

The aforementioned examples provide reasonable cause for an inquiry into whether all

material and exculpatory statements have been turned over to the prosecutors in this case, so that

they may also be turned over to the defense. This case involves *three* "high-value" detainees,

including KSM, the most notorious among them. All were in U.S. custody for *years* prior to

their transfer to Guantanamo Bay, interrogated all the while (and reportedly subjected to

"extreme" interrogation methods) without counsel or contact with anyone from the outside

world.[15]

Given the statements that were obtained by FBI and NCIS/CITF personnel at their *first*

*meetings* with each of the three detainees in early 2007 (following their transfer to Guantanamo

Bay), it is inconceivable that some – if not all, or more – of those statements exculpating Mr.

Paracha were not made earlier, prior to trial, to the other agencies that were interrogating the

detainees.

The probable existence of additional *Brady* material that predated trial in this case

implicates two related issues that demand resolution:  (1) identifying the universe of *Brady*

---

[15] *See* Toobin, *Camp Justice*, The New Yorker, April 14, 2008 (attached as Exhibit 15, Dratel Decl., at 4) (noting that President George W. Bush announced on September 6, 2006, that KSM was being transferred to Guantanamo Bay, and also noting that before that date KSM had been held in a secret C.I.A. prison).

material to determine the full extent of the exculpatory information that was available from

KSM, Mr. Khan, and Mr. al-Baluchi before Mr. Paracha's trial (and now, for purposes of this

motion); and (2) determining the appropriate legal standard to apply in deciding this motion.

The importance of the first issue is self-evident. Regarding the latter issue, if *Brady*

material (or Rule 16(E)(1), Fed.R.Crim.P., material) was not produced to the defense, the motion

should be granted if production of the material would have yielded a *different* result at trial,

rather than an outright acquittal. *See United States v. Bagley*, 473 U.S. 667, 682 (1985)

(evidence is material "if there is a reasonable probability that, had the evidence been disclosed to

the defense, the result of the proceeding would have been different"). *See also Kyles v. Whitley*,

514 U.S. 419, 433 (1995); *United States v. Quinn*, 537 F.Supp.2d 99, 107 (D.D.C. 2008) ("[t]o

prevail on a motion for a new trial on the basis of a *Brady* violation, a defendant must establish

the materiality of the suppressed evidence to demonstrate that prejudice ensued.") (citing *United

States v. Agurs*, 427 U.S. 97, 111 (1976)).[16]

A *Brady* violation is comprised of three components: "The evidence at issue must be

favorable to the accused, either because it is exculpatory, or because it is impeaching; that

evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice

must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

In Mr. Paracha's case, if the C.I.A. or another government agency was in possession of

any other statements that were favorable to Mr. Paracha before or during his trial, those

---

[16] The D.C. Circuit has styled the standard somewhat differently: "The Supreme Court has emphasized that the question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *United States v. Oruche*, 484 F.3d 590, 596-97 (D.C. Cir. 2007); *see also Bagley*, 473 U.S. at 678.

statements should have been disclosed to him.  The fact that the U.S. Attorney's Office itself may not have had such statements in its possession would not excuse their non-disclosure.

Federal Rule of Criminal Procedure 16(E) requires the government to produce in discovery items that are material to the defense and "within the government's possession, custody, or control."  Fed.R.Crim.P. 16(E)(1).  The Supreme Court has held that items in the custody of the police are discoverable just as if they were in the hands of the prosecutor.  *Kyles v. Whitley*, 514 U.S. 419, 438 (1995).

Also, this Court has stated that "[l]egal ownership of the requested documents or things is not determinative, nor is actual possession necessary if the party has control of the items. *Control* has been defined to include 'the legal right to obtain the documents requested upon demand.'  The term 'control' is broadly construed."  *United States v. Stein*, 488 F.Supp.2d 350, 361 (S.D.N.Y 2007), *quoting 7 Moore's Federal Practice § 34.14* (emphasis in original).  *See also United States v. Upton*, 856 F.Supp. 727, 750 (E.D.N.Y 1994) ("[t]he inquiry is not whether the United States Attorney's Office physically possesses the discovery material;  the inquiry is the extent to which there was a 'joint investigation' with another agency."), *and United States v. Bryant*, 439 F.2d 642, 650 (D.C. Cir. 1971) (overruled on other grounds) ("[t]he fact that it was the Bureau of Narcotics and Dangerous Drugs, and not the United States Attorney's office, which had possession of the tape in these cases does not render it any less discoverable. The duty of disclosure affects not only the prosecutor, but the Government as a whole, including its investigative agencies").

Therefore, if any other government agency had possession of evidence favorable to Mr. Paracha and did not disclose it, that would provide an additional basis for granting Mr. Paracha a

-46-

new trial.

Given the lingering and legitimate questions about the C.I.A.'s and other government agencies' conduct with respect to the high-value detainees, including KSM, and those agencies' failure to be candid with the court and Congress, Mr. Paracha respectfully requests that this Court conduct a hearing to explore the following issues:  (1) whether government agencies other than the United States Attorney's Office have disclosed all *Brady* material to the prosecutors in this case;  (2)  whether government agencies other than the United States Attorney's Office have improperly destroyed any such materials;  and, if so, (3)  what information was contained in the materials that were destroyed.

## **CONCLUSION**

For the foregoing reasons, it is respectfully submitted that this Court should grant Mr. Paracha's motion in its entirety, vacate his convictions, and grant him a new trial, or, in the alternative, conduct an evidentiary hearing on this motion.

Dated: November 21, 2008
New York, New York

-47-