UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA               :        ~~TO BE FILED UNDER SEAL~~

    - v. -                                      :        03 Cr. 1197 (SHS)

UZAIR PARACHA,                           :

          **Defendant.**          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC# _____
DATE FILED: __3/18/2020__

## GOVERNMENT'S MEMORANDUM IN OPPOSITION TO
## <u>DEFENDANT UZAIR PARACHA'S MOTION FOR A NEW TRIAL</u>

LEV L. DASSIN
**Acting United States Attorney for the**
**Southern District of New York**
**Attorney for the United States**
    **of America**

KARL METZNER
ERIC B. BRUCE
**Assistant United States Attorneys**
   **- Of Counsel -**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | <u>**TO BE FILED UNDER SEAL**</u> |
| - v. - | : | **03 Cr. 1197 (SHS)** |
| UZAIR PARACHA, | : | |
| Defendant. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## GOVERNMENT'S MEMORANDUM IN OPPOSITION TO <br> <u>DEFENDANT UZAIR PARACHA'S MOTION FOR A NEW TRIAL</u>

By sealed motion dated November 21, 2008, defendant Uzair Paracha asks this Court

to throw out his convictions on five counts related to the provision of material support to the

al Qaeda foreign terrorist organization, on the grounds that certain post-trial statements made

by al Qaeda terrorists Khalid Sheikh Mohammed, Ali Abdul Aziz Ali (a/k/a Ammar al-

Baluchi), and Majid Khan, so fundamentally altered the evidence against him that, had they

been presented to the jury, Paracha would have been acquitted. To the contrary, a review of

the statements reveals that most of the statements are entirely consistent with the Govern-

ment's evidence at trial, and others are merely cumulative of other statements by Khan and

Ali that were offered by the defense at trial. As a result, Paracha's motion should be denied.

## I.     Factual and Procedural Background

Uzair Paracha tried to help an al Qaeda operative enter the United States to carry out a terrorist attack. Paracha did so knowing that the operative, Majid Khan, was a member of al Qaeda, and believing that, once inside the United States, Khan intended to carry out a significant attack involving chemical weapons. Paracha and his father agreed to help Khan because Paracha's father, Saifullah, had been closely associated with al Qaeda for some time, and wanted to help them in whatever way he could. In addition, another al Qaeda member, Ali Abdul Aziz Ali, had agreed to give Paracha and Saifullah $200,000 to hold for al Qaeda, which Paracha and Saifullah hoped to invest in their businesses, and they agreed to help Khan in part to ensure the delivery of those funds.

Uzair Paracha's role in these crimes was to help Khan obtain a travel document from the United States immigration authorities that would enable Khan to re-enter the United States from Pakistan. To do this, Paracha planned to pose as Khan, aided by several forms of Khan's identification and a handwritten set of instructions from Khan. Khan also gave Paracha his debit card, which Paracha was to use in various commercial transactions, and his post office box key, for Paracha to use to check for delivery of the travel document, which, once obtained, Paracha was to then send back to Khan in Pakistan.

Paracha tried to get that travel document by, among other things, contacting the immigration authorities, checking web sites, and calling Khan's bank to verify his account

status. But Paracha was located and arrested by the New York Joint Terrorism Task Force ("JTTF") before he could further assist Khan.

Paracha admitted his criminal conduct in a series of consensual interviews with JTTF agents over the course of three days, from Friday, March 28, 2003, through Sunday, March 30, 2003. After Paracha's arrest, he then reiterated and expanded on his conduct in a series of eight voluntary meetings with prosecutors and agents, accompanied each time by his attorney. Paracha's admissions were corroborated by, among other things, identification documents belonging to Khan found in Paracha's belongings, a detailed set of instructions from Khan, evidence found on a computer used by Paracha detailing his Internet activity, and a key to a post office box in Maryland rented in Khan's name that Paracha had in his pocket.

## A.      Paracha's History And Interactions With Al Qaeda

Paracha was born and raised in Pakistan, but held permanent resident status in the United States, and had traveled to the United States frequently throughout his life. (Tr. 649, 651; GX 122, 123). Several of Paracha's family members lived in various parts of the United States, including a number in the New York area. (Tr. 219, 649). He earned a bachelor's degree with honors in business from a college in Karachi, Pakistan, and later graduated *magna cum laude* with a master's in business administration from the same school. (Tr. 1076-77). Paracha was the Chief Executive Officer of two companies that he operated with Saifullah, International Merchandise Group Pakistan and S.S. Associates. (Tr. 657, 1078).

As this Court found in a pretrial ruling, he speaks and understands English fluently. (*United States v. Paracha*, 2004 WL 1900336, at \*6 (Aug. 24, 2004); Tr. 212, 649).

In the summer of 2002 in Pakistan, Saifullah met with representatives of al Qaeda who were looking for financial support. (Tr. 279-80, 693-94). They asked Saifullah for 2.5 million rupees to use to buy weapons. Later, Paracha saw Saifullah carrying a bag containing $200,000 in U.S. currency. (Tr. 288-89). Although Saifullah told Paracha that he had received the money from a "friend," Paracha later learned that Saifullah had deposited and subsequently withdrawn a large sum of money from Paracha's bank account. (Tr. 289). Saifullah told Paracha later that these funds had come from al Qaeda, to whom Saifullah later returned them. (Tr. 289-90). Pakistani bank records for an account used by Saifullah reflect cash deposits of over $500,000 during one week in July 2002, followed by withdrawals of nearly the entire balance within a few months. (GX 502; Tr. 302-06).

Later, in early 2003, Saifullah introduced Paracha to a Pakistani scientist who, according to Saifullah, developed chemical weapons for al Qaeda. (Tr. 280, 695). It was through these various discussions and interactions that Paracha learned about Saifullah's association with al Qaeda. (Tr. 238, 279-80, 673-74). Indeed, Paracha knew that Saifullah had previous met both Osama bin Laden, whom Saifullah admired and described as "humble," and Mullah Omar, the leader of the Taliban in Afghanistan. (Tr. 237, 264, 673, 680).

**B.      Paracha's Meetings With Khan And Ali In Pakistan**

In early 2003, Paracha was in Karachi, Pakistan with his family. He planned to return to the United States in February 2003 to begin marketing a real estate venture on behalf of S.S. Associates, a business operated by Paracha and Saifullah. (Tr. 211, 220, 658).

Before he left Pakistan, Paracha met Majid Khan and Ali Abdul Aziz Ali (a/k/a Ammar al-Baluchi) through Saifullah. (Tr. 225; GX 204). Both Khan and Ali are members of the al Qaeda terrorist organization. (GX 10-S). Khan and Ali came to Saifullah's offices in Karachi, where Saifullah introduced them to Paracha. (Tr. 293). During that first meeting, Khan told Paracha that he needed help trying to get back into the United States, because he had a problem with his "passport." (Tr. 293).

Paracha and Saifullah arranged a second meeting with Khan and Ali at an ice cream shop in Karachi. (Tr. 228, 665). Khan brought several types of his identification to the meeting, and asked Paracha to help him. Khan had political asylum in the United States, and had applied for a Refugee Travel Document, which allows asylees to travel outside the United States and then return. (Tr. 561). But he had not received the travel document before he left the United States, and he needed it to get back into the country. (Tr. 561). Further, Khan did not want the immigration authorities to know that he gone back to Pakistan, because it could jeopardize his asylum status. (Tr. 564-65).

So Khan gave Paracha four tasks to perform once Paracha returned to the United States. First, Paracha was to look into the status of Khan's immigration paperwork, posing

as Khan. Second, Paracha was to deposit money into Khan's bank account. Third, Paracha was to use Khan's credit cards, so it would appear that Khan had not left the country. Fourth, Paracha was to close Khan's post office box in Maryland. (Tr. 236, 273-74, 293-94, 685-86). Khan instructed Paracha to use a pay phone when calling the then-Immigration and Naturalization Service. (Tr. 293).

Khan gave Paracha several items of identification for Paracha to use in impersonating Khan, including a social security card, Maryland driver's license, high school identification card, and bank debit card. (GX 102, 103, 105, 107, 109; Tr. 224, 661). Khan also gave Paracha the key to the post-office box in Gaithersburg, Maryland, that had been rented in Khan's name. (Tr. 236; GX 128). Paracha was to go to Gaithersburg, check the box to see if Khan's refugee travel document had been delivered there, and then close the post office box account. (Tr. 275, 688). Khan gave Paracha several receipts and other paperwork associated with the box. (Tr. 236; GX 113-119).

In addition, Khan gave Paracha a handwritten set of instructions. (GX 121; Tr. 252-58). That document included a "receipt number" and "case type" that matched the number and case type of Khan's then-pending application for a Refugee Travel Document, as well as details regarding the date of the applications, Khan's unique alien registration number, and INS telephone contact numbers. It also included the phrases "My Status - Asylee or Refugee," "The Document or Passport: Refugee Travel Document," and "Yahoo Search: INS PROCESSING TIME." The document included a list of six starred items:

&#9733;    always call from pay phone

&#9733;    put some money in my account

&#9733;    use it any gas station

&#9733;    good practice of my sign

&#9733;    Mother name = Kafiya Khan

&#9733;    Father name = Shoukat Khan

(GX 121). Several signatures in the name "Majid Khan" appear in different places on the document; Paracha admitted that he had practiced signing Khan's name on the instruction sheet. (Tr. 293-94, 506-07). Finally, crossed out but still legible on the document was the statement "there is a guy traveling 2 days do u need anything from him?" (GX 121).

The same day as the meeting at the ice cream store, Khan gave Paracha a ride on his motorcycle to a passport photo studio in Karachi. (Tr. 228, 666). During the ride, Khan told Paracha "we need brothers like you to help us out." (Tr. 272-73, 686). Paracha took that as an effort to recruit him into al Qaeda. (Tr. 273). Khan further said that Paracha would need to be "recruited into the organization," and that "different people provide different levels of assistance." (Tr. 273, 686). At some point during the ride, Khan told Paracha that Paracha should not tell Khan any of Paracha's personal information, so that, if Khan were ever captured and tortured, he would not be able to give Paracha's personal information to his interrogators. (Tr. 272, 687).

C.   **Paracha's Financial Incentive For Assisting Khan**

Ali and Khan had informed the Parachas that they wanted Saifullah to hold between $180,000 and $200,000 in al Qaeda funds for about four months. (Tr. 270-71, 683). Saifullah was to keep the funds liquid, so that al Qaeda could get it back "at a moment's notice." (Tr. 271). Paracha and Saifullah wanted to invest the funds in their businesses, notwithstanding the directive to keep the money liquid. (Tr. 271). Paracha knew that this money belonged to al Qaeda. (Tr. 271, 683). When Paracha tried to ask Saifullah why these al Qaeda operatives were giving them money, Saifullah told him not to ask questions because the men were supporters of Osama bin Laden. (Tr. 271). Paracha believed that he needed to help Khan with his immigration paperwork in return for al Qaeda giving the Parachas that money, whose businesses had suffered since 2001. (Tr. 276).

Pakistani bank records for an account used by Saifullah reflect a deposit in early May 2003 in the amount of approximately $270,000. (GX 502; Tr. 306).

D.   **Paracha's Understanding Of The Plot**

During his interviews with the FBI, Paracha initially admitted believing only that Khan was trying to get back into the United States to do "something," but that he did not know what that "something" was. (Tr. 266, 681). Later, however, Paracha acknowledged that, knowing that Khan had a degree in computers, and having met the al Qaeda scientist, Paracha believed that Khan intended to participate in a plot to detonate chemical weapons

inside the United States. (Tr. 280-81, 695-96). Paracha knew that some type of terrorist plot was being planned, although he claimed not to know the specifics of the plan. (Tr. 282).

Paracha believed that Khan and Ali were associated with al Qaeda, (Tr. 270, 282, 682, 723), and stipulated at trial that, in fact, both Khan and Ali are members of the al Qaeda terrorist organization. (Tr. 227; GX 10-S). And Paracha knew that, by helping Khan, he would be helping al Qaeda. (Tr. 276, 282, 689, 695). Paracha also knew that al Qaeda was a terrorist organization that tried to harm westerners, through attacks such at the September 11, 2001, plane hijackings and crashes, and the nightclub bombing in Bali, Indonesia. (Tr. 298, 720).

**E.      Paracha's Efforts To Assist Khan In The United States**

After Paracha got to the United States, he called the INS twice posing as Khan. (Tr. 286, 416). On the first occasion, he said, he was unable to get through. (Tr. 535). The second time Paracha called the INS, he was only able to get general information, rather than details about Khan's pending applications, because he did not have Khan's INS number. (Tr. 535). Paracha also called Khan's bank, and verified that Khan's bank account was still open. (Tr. 728, 932).

Paracha used the computer at his office space to search the Internet as Khan had requested him to do. An examination of the hard drive of the computer used by Paracha revealed Internet history information corresponding to the searches that Khan had directed Paracha to perform. On February 21, 2003, Paracha conducted a "Yahoo!" search for "ins

processing time." (GX 603, 604; Tr. 62). The handwritten instructions that Paracha received from Khan included the directive "Yahoo Search: INS PROCESSING TIME." (GX 121). Similarly, Paracha conducted searches at a website called VisaPro.com for "receipt number" and "case type" that correspond precisely to notations for "receipt number" and "case type" on the handwritten instruction sheet. (GX 121, 603, 604; Tr. 63-65).

After Paracha had returned to the United States, Khan called Paracha twice. (Tr. 228, 666). In the first call, Khan asked Paracha whether Paracha had accomplished any of the tasks relating to Khan's immigration documents. Paracha told Khan that he had tried to call the INS, but had not been able to get through. (Tr. 229, 666). In the second call, Khan asked Paracha the same question; this time, Paracha told Khan that he had spoken to someone at INS, but had received only general information, rather than specifics related to Khan's request. (Tr. 229, 666). In addition, Saifullah called Paracha to check on whether Paracha had called the INS on Khan's behalf. (Tr. 229).

**F.     Paracha's Admissions To The JTTF And To The Government**

Paracha was located by JTTF agents on the afternoon of Friday, March 28, and was interviewed that evening and over the course of the following weekend. In addition to admitting the conduct described above, Paracha consented to a search of his belongings. JTTF agents went to the house in Brooklyn where Paracha was staying, located his suitcase, and found the various items of Khan's identification that Paracha had admitted were in his

possession, as well as the handwritten instructions and receipts for Khan's post office box in Gaithersburg, Maryland. (Tr. 230-33, 549).

Paracha also acknowledged his culpability during those interviews. At one point during a break in the interviews, after Paracha had admitted most of his conduct and guilty knowledge, Paracha asked a nearby agent, "What do you think God will think of me when I come before him? Do you think he will be unhappy with me that I turned my back on my fellow Muslim brothers, or will he look favorably upon me that I saved human life?" (Tr. 573). Later he asked the same agent, "How much jail time do you think I'll get for what I've told [the investigating agents] so far?" (Tr. 574).

## G.    Paracha's Arrest and Indictment

On Monday, March 31, Paracha was arrested on a material witness warrant pursuant to 18 U.S.C. § 3144. (Tr. 284). Thereafter, Paracha participated in eight different voluntary meetings with the Government. Paracha was accompanied by his attorney at each session. During those meetings, Paracha discussed his interactions with Khan and Ali, his knowledge of their affiliation with al Qaeda, his belief as to what Khan intended to do upon his return to the United States, and his understanding that his efforts to help Khan made him part of that plot. (Tr. 284-99, 713-31).

Indictment 03 Cr. 1197 was returned on October 8, 2003, in five counts. Count One charged Paracha with conspiring to provide material support or resources to the al Qaeda foreign terrorist organization, in violation of Title 18, United States Code, Section 2339B.

- 11 -

Count Two charged Paracha with providing or attempting to provide material support or resources to al Qaeda, in violation of 18 U.S.C. §§ 2339B and 2. Count Three charged Paracha with conspiring to make a contribution of funds, goods, or services to or for the benefit of al Qaeda, in violation of 50 U.S.C. § 1705(b) and 31 C.F.R. §§ 595.204 & 595.205. Count Four charged Paracha with making or attempting to make a contribution of funds, goods, or services to or for the benefit of al Qaeda, in violation of 50 U.S.C. § 1705(b), 31 C.F.R. §§ 595.204 & 595.205, and 18 U.S.C. § 2. Finally, Count Five charged Paracha with identification document fraud committed to facilitate an act of international terrorism, in violation of 18 U.S.C. §§ 1028(a)(7), 1028(b)(4), and 2.

## H.   The Government's Disclosures And Paracha's Motions

In an opinion issued shortly after Paracha's conviction, this Court recounted the history of Paracha's motions for access to Khalid Sheikh Mohammed, Majid Khan, Ali Abdul Aziz Ali, and Saifullah Paracha. *See United States v. Paracha*, 2006 WL 12768, at *3-*5 (S.D.N.Y. Jan. 3, 2006). In summary, after Paracha's indictment, Paracha moved for access to those four witnesses, alleging that they possessed material exculpatory information that would assist Paracha at trial. To satisfy its obligations for pretrial disclosure under *Brady* v. *Maryland*, 373 U.S. 83 (1963), the prosecution team did a thorough and exhaustive review of all relevant information available from other United States Government agencies. After that review, the Government consented to a deposition of Saifullah (which Paracha subsequently unilaterally cancelled), objected to any further proceedings regarding Khalid

Sheikh Mohammed on materiality grounds, and, as to Khan and Ali, invoked the provisions of the Classified Information Procedures Act, 18 U.S.C. App. III, and provided to this Court *ex parte* certain classified information, along with proposed unclassified substitutions for that information to be disclosed to the defense. This Court reviewed the classified information and the proposed substitutions, instructed the Government to make changes to the substitutions, and then approved their disclosure to the defense in lieu of the classified information. *See Paracha*, 2006 WL 12768, at *4.

In light of these disclosures, and the national security implications of Paracha's request that these individuals be brought into the United States, this Court ruled that Paracha's rights under the Compulsory Process Clause would be adequately protected by permitting the defense to introduce the unclassified substitutions of Khan's and Ali's statements, along with protective jury instructions and a prohibition on the Government's use of other, more inculpatory statements that may have been made by Khan or Ali. The Court therefore denied Paracha's motion to have those witnesses brought to his trial in person. *See id.* at *5-*18.

At trial, the defense introduced the entirety of the unclassified substitutions relating to statements made by Ali and Khan. Those statements were offered by the defense in the form of two stipulations, Defense Exhibits I and J. (Tr. 1043-49). Defense Exhibit I contained the following statements attributed to Ali (referred to as al-Baluchi):

- 13 -

- Al-Baluchi met with Saifullah Paracha's son, Uzair Paracha, a total of four times, all while visiting Saifullah Paracha at Saifullah Paracha's house.

- Uzair Paracha was totally unwitting of al-Baluchi's al-Qaeda affiliation, or of al-Baluchi's intention to use Saifullah Paracha for the broader operational plan involving Majid Khan.

- Uzair Paracha knows nothing about operations.

- Neither al-Baluchi nor Majid Khan indicated to Uzair Paracha at any time that they were mujahideen or al-Qaeda.

- Uzair Paracha did not complete the task involving Majid Khan.

- Saifullah Paracha was unwittingly being used to assist in al-Baluchi's broader plans with al Qaeda operative, Majid Kahn.

- Saifullah Paracha was someone that al-Baluchi used for information, but from whom he kept his al Qaeda connections hidden.

- There were no operations discussed between al-Baluchi and Saifullah Paracha.

- Al-Baluchi intentionally used cover stories and distorted truths to mask his particular interests with Saifullah Paracha during their discussions.

- Although Saifullah Paracha had a long-standing relationship with Khalid Sheikh Mohammed, Saifullah Paracha did not know KSM's true identity, or any other name for KSM.

- 14 -

- Al-Baluchi did not believe that Saifullah was aware that he and KSM were al Qaeda, but al-Baluchi believed that Saifullah Paracha likely knew that al-Baluchi and KSM were associated with mujahideen and could be associated with the Taliban or al Qaeda.

- Saifullah Paracha did not know that KSM was affiliated with al Qaeda until the world-wide publicity of KSM's arrest.

- Al-Baluchi showed Saifullah Paracha the famous picture of KSM after KSM's capture, and Saifullah Paracha was surprised to learn that KSM was as important a man as he was.

- At the time of KSM's arrest, Saifullah Paracha probably knew of al-Baluchi's al Qaeda affiliation.

- Because Saifullah Paracha had never been properly vetted, he was never tasked by al Qaeda (that is KSM or al-Baluchi) to do anything for them.

- Saifullah Paracha was only a businessmen who was sympathetic to the mujahideen.

- Saifullah Paracha has no relation to this business, that is al Qaeda.

- Al-Baluchi was not aware of how KSM knew Saifullah Paracha or if Saifullah Paracha had ever met Usama bin Laden.

(Tr. 1044-46).

Defense Exhibit J contained the following statements attributed to Majid Khan:

- Majid Khan did not know of any funding or investment al-Baluchi gave to Saifullah Paracha.

- Majid Khan had no knowledge of Saifullah Paracha's company, the plan to smuggle chemicals or explosives via the Parachas, or other resources that might be attractive to al Qaeda.

- No compensation was given to Saifullah Paracha in return for Saifullah Paracha arranging for Uzair Paracha to assist Majid Khan with Majid Khan's immigration matters.

- Majid Khan had no al Qaeda contacts in the United States.

- None of Majid Khan's contacts were aware of his gas station attack plan, or any other actions he may have taken on behalf of al Qaeda.

- Majid Khan assessed Uzair Paracha as being willing to help a fellow muslim at his father's request.

- Majid Khan knew of no other motivation for Uzair Paracha's assistance.

- Majid Khan did not assess Uzair Paracha as being suitable for any other assistance to al Qaeda, besides helping with Majid Khan's documents at the time.

- Uzair Paracha volunteered to Majid Khan that he (Uzair Paracha) wanted to spread Islam through the media.

- Majid Khan thought Uzair Paracha was a good person who was willing to help.

- Majid Khan might have been interested in recruiting Uzair Paracha once Majid Khan returned to the United States and had time to assess Uzair Paracha.

- Majid Khan would only give Uzair Paracha a 5 to 10 percent suitability assessment, citing the fact that Uzair Paracha had no extremist views and was not really a practicing muslim.

- Uzair Paracha was to go to the post office, pretend that he, Uzair Paracha, was Majid Khan, and give the office a change of address for Khan.

- Uzair Paracha was to deposit money in Majid Khan's account, and later call the INS to inquire about the travel document. All of this was to be done to lead U.S. authorities to believe that Majid Khan was in the United States when he was actually in Pakistan.

- To Majid Khan's knowledge, Uzair Paracha did none of these things.

- If Uzair Paracha claimed that Majid Khan sent something to Uzair Paracha, Uzair Paracha would be lying in making that statement.

- Ammar al Baluchi was known either as Habib, or Moin, to the Parachas.

(Tr. 1047-49).

In its summation, the Government explained why the Khan and Ali statements did not undermine Paracha's guilt. For example, although Ali's statement claimed that Paracha did not know of Ali's affiliation with al Qaeda, Ali could not know what Paracha did or did not know, and, according to Paracha himself, it was his father, Saifullah, who had told him about

- 17 -

Khan's and Ali's al Qaeda connections. (Tr. 1414-15). Similarly, with respect to Khan's statement that none of his contacts, including Paracha, were aware of Khan's plan to attack gas stations, such limited dissemination of information was consistent with al Qaeda tradecraft, as the Government's expert, Evan Kohlmann, had testified. (Tr. 1416).

## I.     The Verdict, Sentencing, and Appeal

The jury deliberated for approximately four hours before convicting Paracha on all five counts in the Indictment on November 23, 2005. At sentencing on July 20, 2006, the parties agreed that the advisory Sentencing Guidelines range was 360 months to life. After considering the submissions of the parties and applying the factors in 18 U.S.C. § 3553(a), this Court sentenced Paracha to 360 months' imprisonment, five years' supervised release, and a $500 special assessment. Paracha's conviction and sentence were affirmed by the Second Circuit on June 19, 2008. *United States* v. *Paracha*, No. 06-3599-cr, 2008 WL 2477392 (2d Cir. 2008).

## J.     The Government's Additional Disclosures

After Paracha's conviction and sentencing and while he was still pursuing his direct appeal, members of the prosecution team — during the course of other Government responsibilities — learned of new detainee statements concerning Uzair Paracha by KSM, Majid Khan, and Ali Abdul Aziz Ali. Reports memorializing certain of these new statements were identified, appropriately redacted, submitted for a classification review, and then disclosed to Paracha's defense counsel, as set out in his motion. The prosecution team did

- 18 -

not, however, undertake an exhaustive review of the files of all United States Government agencies in an attempt to identify any additional relevant and discoverable statements concerning Uzair Paracha, as had been done prior to trial. Nor, as set forth more fully below, does the Government have an obligation to undertake such an endeavor.

By letter dated September 6, 2007, the Government transmitted three reports of interviews to Paracha's counsel, one each relating to Khalid Sheikh Mohammed (DX 9), Ali Abdul Aziz Ali (DX 12), and Majid Khan (DX 13). On April 21, 2008, the Government disclosed an additional report of statements made by Majid Khan. (DX 7). Those reports reflect statements attributed to those individuals made between January 12, 2007, and June 20, 2007.

### 1.    Khalid Sheikh Mohammed's Statements

In interviews with agents from the Federal Bureau of Investigation and the Department of Defense's Criminal Investigative Task Force in January 2007, Khalid Sheikh Mohammed ("KSM") discussed his plans for using Majid Khan in terrorist operations. KSM first tested Khan's dedication to jihad by informing Khan that Khan was to be a suicide bomber. KSM had Khan make a martyr's video, strapped an explosive vest to Khan's chest, and told Khan that he was to kill Pakistani President Pervez Musharraf at a mosque later that day. Khan went along willingly with that plan, which KSM told the interviewers he concocted simply to test Khan. (DX 9 at 3). KSM then tasked Khan with researching the operation and maintenance of gas stations in the United States, as part of a plan to blow them

up. (DX 9 at 3). When KSM learned that Khan had returned to Pakistan without the documents he needed to return to the United States, KSM then "described him as somewhat useless." (DX 9 at 3).

But KSM soon found a use for Khan. KSM tasked Khan with delivering $50,000 to Hambali, the mastermind of the bombing of Bali nightclubs on October 12, 2002, that killed 202 people. KSM heard from Ali that Khan had successfully delivered the money, but never saw Khan again. (DX 9 at 3-4).

## 2.    Ali Abdul Aziz Ali's Statements

In his interviews, Ali Abdul Aziz Ali, also known as Ammar al-Baluchi, provided substantial information regarding Majid Khan and Uzair Paracha. Ali reported that Khan was a "fresh guy" who was "thinking big" and "wanted to take part in an operation." (DX 12 at 2). It was Khan who suggested blowing up gas stations in the United States, to "cause chaos." (DX 12 at 2). But Ali was worried that Khan had "ruined himself" for operations when Khan was in the United States by talking openly about al Qaeda. (DX 12 at 2-3).

Ali asserted that Aafia Siddiqui and Uzair Paracha were not "involved with Majid Khan." (DX 12 at 3). Ali explained that, as far as he was concerned, "he did not task Paracha to help Khan, but thought of this as a favor from Paracha." (DX 12 at 3). Ali confirmed that he arranged a meeting between Khan and Paracha, that as Khan's "emir" Ali instructed Khan to tell Paracha what documents Khan needed, and that, in a second meeting between Khan

and Paracha, Khan "apparently talked to Uzair Paracha about his (Khan's) own plans," even though "Khan was not allowed to do this without the permission of Ali." (DX 12 at 3-4).

Ali said that KSM did not want the Paracha family used for "an operation," because KSM had money with the Parachas. (DX 12 at 4). Ali stated that, with respect to Majid Khan's travel problem, Aafia Siddiqui did one step to help Khan, while Uzair Paracha did another, and that although this assistance was not a specific tasking for al Qaeda, Khan "made a mistake and may have given information to Uzair Paracha." (DX 12 at 4). Although Ali and KSM were frustrated with Khan, they felt that if Khan could resolve his "passport issue they could then assess what Khan could do for them in the future." (DX 12 at 4). Specifically, Ali felt that if Khan could get to the United States, "he could be a facilitator for Ali and Khalid Sheikh Mohammed." (DX 12 at 4-5).

When asked specifically about Uzair Paracha, Ali confirmed that Paracha agreed to help Khan with what Ali called Khan's "passport" problem. (DX 12 at 8). Ali stated that Paracha "was not tasked by al Qaeda to help Khan, but agreed to do so voluntarily." (DX 12 at 9).

3.    **Majid Khan's Statements**

In an interview on February 5, 2007, Majid Khan discussed a scenario involving a "gas station plot" in the United States connected to KSM. (DX 13 at 7). Khan said that there was no proof of this plot, and that he might be prosecuted based on intentions rather than actions. (DX 13 at 7).

During Khan's Combatant Status Review Tribunal proceeding on April 15, 2007, Khan stated that, in his view, he was not "al Qaeda," because "[t]o be al Qaeda, a person needs to be trained in Afghanistan and needs to take an oath in front of Osama bin Laden. I have never been to Afghanistan and I have never met UBL. I can't possibly be a member of al Qaeda." (DX 14 at 18). Khan stated that the Parachas agreed to help him renew his expired travel documents "as a fellow Pakistani," that "Uzair Paracha is innocent; he is not a criminal," and that "[o]ne ordinary citizen helping another ordinary citizen does not make them terrorists." (DX 14 at 18). Khan also suggested that he may have been seeking the travel document not for himself, but to alter it and provide it to someone else. (DX 14 at 19, 31-32).

In another interview on June 20, 2007, Khan noted his awareness of this case, stating that "just because someone helps al Qaeda doesn't mean they are al Qaeda members." (DX 7 at 1-2). Later, Khan offered his opinion that "he thought Uzair Paracha was innocent, but got 30 years." (DX 7 at 4). Khan further stated that "Uzair Paracha did not do anything, went to trial and got 30 years." (DX 7 at 6).

Khan said that he had been "just sitting at a table with Uzair [Paracha]," and that "[Ali] was sitting at a different table with Sayf Paracha having another conversation." (DX 7 at 8). Khan then claimed again that he had not been trying to get travel documents for himself, but rather for someone else. (DX 7 at 8).

## II.    Applicable Law

Rule 33 of the Federal Rules of Criminal Procedure provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). Whether to grant such a motion is subject to the district court's discretion, *see United States* v. *Stewart*, 433 F.3d 273, 295 (2d Cir. 2006), but the Second Circuit has repeatedly instructed that "the standard for granting such a motion is strict." *United States* v. *Gonzalez*, 110 F.3d 936, 943 (2d Cir. 1997) (quotation omitted). Motions for a new trial are "disfavored in this Circuit," *United States* v. *Gambino*, 59 F.3d 353, 364 (2d Cir. 1995), and will be granted only in extraordinary circumstances. *See Romero* v. *United States*, 28 F.3d 267, 268 (2d Cir. 1994) (per curiam). Although the rule gives the trial court "broad discretion" to set aside a jury verdict where the court perceives a "miscarriage of justice," *United States* v. *Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992), the court "must strike a balance between weighing the evidence and credibility of witnesses," on the one hand, "and not 'wholly usurp[ing]' the role of the jury" on the other. It is well settled that motions for a new trial should not be granted unless, after evaluating all of the evidence, the district court is left with a "real concern that an innocent person may have been convicted." *Id.* at 1414. *See, e.g., United States* v. *Triumph Capital Group, Inc.*, 544 F.3d 149, 159 (2d Cir. 2008) ("Generally, a motion for a new trial should not be granted unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice.") (internal quotations omitted); *United States* v. *Zagari*,

111 F.3d 307, 322 (2d Cir. 1997) ("A district court must exercise great caution in determining whether to grant a retrial on the ground of newly discovered evidence, and may grant the motion only *in the most extraordinary circumstances*.") (quotation omitted).

Where a motion for a new trial is based on a claim of newly discovered evidence, the defendant bears the burden of establishing that: (1) the evidence is genuinely "new," *i.e.*, that it was "discovered after trial"; (2) the evidence could not, with the exercise of due diligence, have been discovered before or during trial; and (3) the evidence "is so material that it would probably produce a different verdict." *United States* v. *Zagari*, 111 F.3d at 322 (citing *United States* v. *Siddiqi*, 959 F.2d 1167, 1173 (2d Cir. 1992)). "Newly discovered evidence supports the grant of a new trial only if . . . the evidence is so material and noncumulative that its admission would probably lead to an acquittal." *United States* v. *Parkes*, 497 F.3d 220, 233 (2d Cir. 2007) (quotations omitted). The "'ultimate test' [in deciding a Rule 33 motion] is 'whether letting a guilty verdict stand would be a manifest injustice . . . There must be a real concern that an innocent person may have been convicted.'" *United States* v. *Canova*, 412 F.3d 331, 349 (2d Cir. 2005) (quoting *United States* v. *Ferguson*, 246 F.3d 129, 133 (2d Cir. 2001)); *United States* v. *Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992).

## III.  The Additional Statements From KSM, Ali, and Khan Do Not Justify A New Trial

The statements cited by Paracha do not undermine his conviction at all, and in fact bolster the jury's conclusion in numerous respects. The statements unequivocally demonstrate that KSM and Ali were high-ranking members of al Qaeda, and that Khan

shared their warped worldview and sought to assist their efforts, by, among other things, delivering money to the mastermind of the Bali nightclub bombings and agreeing to assassinate Pakistani President Musharaff by blowing himself up in a crowded mosque. The statements confirm that KSM, Ali, and Khan discussed a plot to bomb gas stations in the United States, and that Khan was to explore the logistics of doing so. They confirm Paracha's confessions and proffer statements that Paracha sought to help Khan obtain the refugee travel document that Khan needed to re-enter the United States. They shed no doubt whatsoever on Paracha's repeated admissions that he believed Khan to be associated with al Qaeda, that he knew that he was assisting the al Qaeda terrorist organization by helping Khan, and that he believed that Khan intended to perpetrate a terrorist attack once he returned to the United States. And any arguably exculpatory portions are cumulative of the Ali and Khan statements admitted at Paracha's trial. Far from rendering Paracha's conviction an injustice, these additional statements demonstrate that Paracha was properly convicted for conspiring and attempting to provide material support to the al Qaeda foreign terrorist organization.

Paracha argues that the statements "directly and indirectly" contradict the Government's position that Paracha knew that Ali and Khan were affiliated with al Qaeda, and that Paracha acted with the intent to support al Qaeda. (Def.'s Mem. at 23-24). This is simply incorrect.

The Government never argued that Paracha learned of Ali or Khan's al Qaeda affiliations directly from those Ali or Khan themselves. Rather, as Paracha admitted to the

agents, it was his father, Saifullah Paracha, who told Uzair Paracha that these men were with al Qaeda, confirming the younger Paracha's suspicions. (Tr. 270, 282, 682, 723). Further, Paracha stipulated that, in fact, both Khan and Ali are members of the al Qaeda terrorist organization. (Tr. 227; GX 10-S). And Paracha admitted that knew that, by helping Khan, he would be helping al Qaeda. (Tr. 276, 282, 689, 695).

In his trial testimony, Paracha attempted to recant these admissions, and claims now that the additional statements would have supported his preposterous claims that he had repeatedly lied to the agents, through a long weekend of prearrest interviews and eight counselled proffer sessions, because he thought that he would be released by "telling them what they wanted to hear." But Paracha ignores key statements that would have fatally undermined any such argument. For example, KSM confirmed that he discussed a plot to blow up gas stations with Majid Khan. (DX 9 at 3). That the plan was still in its infancy makes no difference to Paracha's criminal liability; he agreed and attempted to support al Qaeda's terrorist efforts, which Majid Khan was continuing to pursue. And, although KSM described Khan as "somewhat useless," his subsequent decision to employ Khan as a courier to the Bali bomber Hambali belies that characterization.

The statements reveal that KSM and Ali were frustrated by Khan's inability to move the gas station plot forward, and by his apparently loose lips while at home in Maryland. But there is no indication from these statements that the gas station plot had been abandoned, or that al Qaeda had removed its support for Khan's efforts. To the contrary, as Ali stated, their

approach was to wait and see if Khan could re-enter the United States without getting arrested, then "decide how to use Khan." (DX 12 at 5). Far from deactivating Khan or scrubbing the gas station plot, these senior leaders of al Qaeda had every intention of making use of that invaluable resource — an al Qaeda operative inside the United States.[1]

With respect to the KSM statements, Paracha argues that KSM's failure to mention Paracha indicates his lack of participation in "any *al Qaeda* operation." (Def.'s Mem. at 34). This argument misapprehends the charges against Paracha. He was never charged with become an al Qaeda operative himself, or with personally committing or planning a terrorist act. Rather, Paracha was convicted of *supporting* the al Qaeda terrorist organization through his own personal assistance, he and his father's financial assistance, and the acquisition of the refugee travel document. It was KSM, Ali, and Khan who hatched the gas station plot, as the new statements confirm. Paracha agreed to help Khan get what he needed — entry into the United States — to carry it out. Whether KSM knew of Paracha's assistance to Khan has no bearing on Paracha's criminal culpability.

Paracha speculates that "while KSM met with Mr. Khan, such meetings and discussions could have related to the Mujahideen instead of to *al Qaeda*." (Def.'s Mem. at 35). Even accepting *arguendo* Paracha's proposed distinction between those entities, his

---

[1] These same senior al Qaeda leaders recently sought to plead guilty to perpetrating the September 11, 2001 attacks against the United States. *See 5 Charged in 9/11 Attacks Seek to Plead Guilty*, New York Times (Dec. 8, 2008), *available at* http://www.nytimes.com/2008/12/09/us/09gitmo.html

speculation has no foundation. KSM, Ali, and Khan were discussing a plot to blow up the gasoline storage tanks of gas stations inside the United States. Al Qaeda is the sworn enemy of the United States, and has attacked and killed Americans inside our borders. The mujahideen, by contrast, have in recent years been generally focused on Afghanistan. It is hard to conceive how the mujahideen would further their goals by attacking a gas station in Maryland.

Ali's statements likewise do not undermine Paracha's guilt. As discussed above, even if KSM and Ali did not intend to use the Parachas for an operation, Uzair Paracha's knowing provision of support to Khan's terrorist efforts rendered him criminally responsible. Further, Ali's statements confirm that KSM used Saifullah Paracha as an al Qaeda bank, keeping funds with the Parachas for al Qaeda's use. Uzair Paracha admitted that he was helping Khan in part because the Parachas were expecting to receive an additional $200,000 of al Qaeda money, and they needed that money to support their business. Thus, Ali's statements corroborate the Government's evidence that Paracha agreed to provide financial services to al Qaeda, as charged against him.

Khan's statements attempting to exonerate Paracha are cumulative of the statements admitted by the defense at trial. In the additional statements, Khan claims that Paracha was simply doing him a favor "as a fellow Pakistani," as "one ordinary citizen helping another ordinary citizen," and that Paracha was "innocent." (Def.'s Mem. at 37). But the Khan statements admitted at trial included Khan's claim that he "assessed Uzair Paracha as being

willing to help a fellow muslim at his father's request," that he "knew of no other motivation for Uzair Paracha's assistance," and that "Paracha was a good person who was willing to help." As a result, Paracha's theory that he was simply doing a favor for a "fellow Pakistani" was reflected in the statements from Khan admitted at his trial. In his summation, Paracha's defense attorney made precisely this argument, relying on the Khan and Ali statements for support. (Tr. 1456-66). Further additional statements along these lines, along with bare declarations of Paracha's innocence, are simply cumulative and do not support a request for a new trial. *See United States* v. *Owen*, 500 F.3d 83, 88 (2d Cir. 2007) (evidence supporting new trial motion must not be cumulative and must likely result in acquittal).

In fact, an examination of the Ali and Khan statements admitted at trial demonstrates that the jury received substantial evidence supporting Paracha's position. Ali stated that "Uzair Paracha was totally unwitting of al-Baluchi's al-Qaeda affiliation, or of al-Baluchi's intention to use Saifullah Paracha for the broader operational plan involving Majid Khan," that "Uzair Paracha knows nothing about operations," that "[n]either al-Baluchi nor Majid Khan indicated to Uzair Paracha at any time that they were mujahideen or al-Qaeda," and that "[b]ecause Saifullah Paracha had never been properly vetted, he was never tasked by al Qaeda (that is KSM or al Baluchi) to do anything for them." Similarly, the jury heard Khan's statements that "[n]one of Majid Khan's contacts were aware of his gas station attack plan, or any other actions he may have taken on behalf of al Qaeda," that Khan knew of no sinister "motivation for Uzair Paracha's assistance," that "Uzair Paracha had no extremist views and

was not really a practicing muslim," and that Paracha ultimately did none of the favors that Khan had requested of him. To the extent that the additional KSM, Ali, or Khan statements could be considered exculpatory, they add nothing to those statements presented to the jury at trial, and consequently cannot support a new trial motion.

## IV.    No Hearing Is Required On Paracha's Motion

In his motion, Paracha also requests that this Court conduct a hearing to determine whether all available *Brady* information that came into existence both before *and after* his trial has been produced to him. Paracha likewise asks the Court to hold a hearing to determine whether any government agency other than the U.S. Attorney's Office has improperly destroyed such material. (*See* Def.'s Mem. at 47). Paracha's request, however, is completely devoid of any legal or factual support related to this case, and should therefore be denied.

Indeed, Paracha's first request – that the Court hold a hearing to determine whether he received all *Brady* information which existed at the time of his trial – is supported by nothing more than pure speculation. In his motion, Paracha theorizes that, because the allegedly exculpatory statements were made during sessions with FBI, NCIS, and CITF, there must have been additional statements he did not receive prior to trial. The best that Paracha can muster, therefore, is that the "probable existence," (Def.'s Mem. at 44), of these supposed statements justifies a full-fledged evidentiary hearing. Paracha cites no law for this remarkable argument, which falls woefully short of the general standards for granting an

evidentiary hearing. *See, e.g., United States* v. *Spinelli*, 2007 U.S. Dist. LEXIS 80328, *16 ("Because a new trial is not warranted even applying this standard, an evidentiary hearing to determine whether the government knew or should have known of Gioia's perjury is unnecessary.").

Moreover, in making this argument, Paracha completely ignores the fact, as set out above, that the prosecution team already reviewed all available pertinent materials from other U.S. Government agencies and provided him with the relevant, exculpatory information in the form of the unclassified substitutions. Indeed, as explained above, Paracha's so-called "newly discovered evidence" largely mirrors what was already produced to him pre-trial and was admitted as evidence during the course of his trial. Paracha's request to re-do this entire exercise, without any legal or factual support, should be denied. No further inquiry into what information existed at the time of Paracha's trial is necessary, appropriate, or justified.[2]

Likewise, Paracha's request for a hearing to identify any materials that came into existence *after* his conviction is without legal support. Paracha also cites no case as support for this request, and there is case law which undermines the very premise for Paracha's request. *See Gibson* v. *Superintendent of N.J. Dep't of Law and Public Safety–Division of State Police*, 411 F.3d 427, 444 (3d Cir. 2005) ("Gibson has pointed to no constitutional duty

---

[2] The absence of any legal or factual support for Paracha's requests is highlighted by his reliance on the facts of cases other than this one. Judge Brinkema's comments relating to the *Moussaoui* prosecution shed no light on what happened in this particular case and do not justify the fishing expedition Paracha requests.

to disclose potentially exculpatory evidence to a convicted criminal after the criminal proceedings have concluded and we decline to conclude that such a duty exists."). Nevertheless, in this case, Paracha does not dispute that the prosecution team has provided him with all arguably exculpatory information of which they are aware, even those items regarding events or statements which occurred after his conviction. It is clear, therefore, that the prosecution team has already satisfied any existing duty to disclose *Brady* information.

Paracha, however, seems to be arguing that an even stricter duty should be imposed on the prosecution team and the United States Government. Through his motion, Paracha is essentially asking this Court to set a precedent which would require the prosecution team to constantly monitor the files of every United States Government agency to determine whether there is any new, arguably exculpatory information about him, even after he has been lawfully convicted by a jury. Paracha's new proposed "rule," of course, would apply not only to him, but to all terrorism defendants and possibly all defendants in general. Thus, the unworkable precedent he asks this Court to set would require prosecutors across the country to constantly monitor the files of all Government agencies to ensure that there is no new exculpatory information about long-convicted defendants. Obviously, *Brady* and its progeny contain no such requirement and Paracha cites no law for this unprecedented request. *Compare Gibson*, 411 F.3d at 444. His request for a hearing on this score should also be denied.

## V.      Conclusion

Paracha received a fair trial in which his constitutional rights were protected, the evidence against him presented consistent with the rules and procedures governing federal trials, a jury of his peers empaneled to consider the case, and his right to appeal honored. The additional statements made by KSM, Ali, and Khan after Paracha's trial do not undermine the fairness of Paracha's trial or the correctness of the verdict, and so his motion for a new trial should be denied.

Dated:         February 6, 2009

Respectfully submitted,

LEV L. DASSIN
Acting United States Attorney

By:    _____
       KARL METZNER
       ERIC B. BRUCE
       Assistant United States Attorneys
       (212) 637-2476 / -2219

- 33 -

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing, along with its attachments, was served on the following by electronic mail and overnight courier delivery on February 6, 2009:

Joshua Dratel, Esq.
2 Wall Street, 3d Floor
New York, New York 10005


Karl Metzner