UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
                                                       :
UNITED STATES OF AMERICA,                              :
                                                       :
        -- against --                                 :
                                                       :
UZAIR PARACHA,                                         :
                    Defendant.                         :
                                                       :
                                                       :
-------------------------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC# _____
DATE FILED: _3/18/2020_

03 Cr. 1197 (SHS)

**FILED UNDER SEAL**  (AS 3/17/2020

## REPLY MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR A NEW TRIAL PURSUANT TO RULE 33, FED.R.CRIM.P.

-- Of Counsel --

Joshua L. Dratel
Aaron J. Mysliwiec

Joshua L. Dratel, Esq.
Aaron J. Mysliwiec
Law Offices of Joshua L. Dratel, P.C.
2 Wall Street - 3rd Floor
New York, New York 10005
Tel: (212) 732-0707
Fax: (212) 571-3792
jdratel@joshuadratel.com
amysliwiec@joshuadratel.com

*Attorneys for Defendant*
*Uzair Paracha*

## TABLE OF CONTENTS

Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT

POINT I

THE NEW STATEMENTS BY KSM,
KHAN, AND AL-BALUCHI MATERIALLY
UNDERMINE MR. PARACHA'S CONVICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

A.   *The New Statements by KSM, al-Baluchi, and Khan Are Not Consistent*
*With the Government's Evidence and Theory, and Are Not Cumulative* . . . . . . . . . . . . . 3

    1.   *The New Statements Contradict the Government's Theory and Evidence* . . . . . . 4

    2.   *The New Statements Are Not Cumulative* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

B.   *The New Statements Support Mr. Paracha's Testimony That His Statements*
*to Law Enforcement Were Fabrications Designed to Satisfy His Interrogators* . . . . . . . 9

POINT II

IN LIGHT OF PUBLIC REVELATIONS OF
GOVERNMENT AGENCIES' DELIBERATE
DESTRUCTION OF CERTAIN EVIDENCE
OF DETAINEE INTERROGATIONS, A
HEARING SHOULD BE CONDUCTED TO
DETERMINE WHETHER THE GOVERNMENT
POSSESSES OR POSSESSED ANY ADDITIONAL
EXCULPATORY STATEMENTS OR INFORMATION . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

## INTRODUCTION

This Reply Memorandum of Law is submitted under seal in support of Defendant Uzair Paracha's motion for a new trial pursuant to Rule 33, Fed.R.Crim.P.[1]  Contrary to the government's arguments, the newly discovered statements by Khalid Sheikh Mohammed (herinafter "KSM"), Majid Khan, and Ammar al-Baluchi (a/k/a Ali Abdul Aziz Ali) do indeed sufficiently undermine Mr. Paracha's conviction and warrant grant of a new trial.

In its opposition to Mr. Paracha's motion, the government fails to confront the essential exculpatory character of the newly discovered statements.  Instead, the government merely repeats its evidence and parses out parts of the new statements that are consistent with that evidence, and with the government's theory.  Yet the government refuses to place the *entirety* of the new statements in context, ignoring the vast exculpatory portions that contradict the government's evidence and theory at trial.

The government also argues that the new statements are cumulative.  As set forth in detail in Mr. Paracha's initial Memo of Law in support of this motion, and summarized below, that claim is unavailing.  As a threshold matter, and as noted in Mr. Paracha's initial Memo of Law, many of the new statements are not even from Khan and al-Baluchi, but are from KSM, the high-level *al Qaeda* operative in charge of global terrorism operations, for whom there were no substitutions admitted at trial.  Nor are Messrs. Khan and al-Baluchi's new statements cumulative of their previously disclosed statements that were the basis for the stipulated substitutions for their live testimony at the trial.

---

[1] Counsel will endeavor with the government to prepare redacted versions of the papers filed in connection with this motion that can be placed on the public docket.

1

Unlike with Messrs. Khan and al-Baluchi, before Mr. Paracha's trial the government provided very little in the form of statements from KSM. In fact, the statements the government provided from KSM were so limited that the Court denied Mr. Paracha's motion to compel discovery or testimony from KSM because Mr. Paracha could not demonstrate that KSM possessed any information material and favorable to the defense.

Yet the new information from KSM alone seriously undermines the government's contention that Mr. Paracha *knowingly* or *intentionally* provided material support to *al Qaeda* [as opposed to Mr. Khan personally – the crucial issue in the case, as implicitly recognized in the Court's jury instructions, *see United States v. Paracha*, 2006 WL 12768, at *24-25 (S.D.N.Y. January 3, 2006)].

The government also opposes Mr. Paracha's request for discovery and an evidentiary hearing, refusing to recognize the unique circumstances of this case, and the fact that events – some revealed after the government filed its Memo of Law herein – have established that other U.S. government agencies have repeatedly lied to prosecutors and the courts with respect to the record of the interrogations of detainees such as KSM and others.

In light of those developments, which even now may well not provide the complete record, the only mechanism to determine the extent of the violation of Mr. Paracha's Sixth Amendment rights (and perhaps his Fifth Amendment right to Due Process as well) is to order discovery and conduct an evidentiary hearing. This issue is not only important factually, in terms of the full scope of exculpatory information provided by the three detainees, but it also determines the legal standard by which the Court reviews the motion (namely, whether the new statements would probably have led to an acquittal, or merely a "different" result at trial).

2

Accordingly, it is respectfully requested that the Court grant Mr. Paracha's Rule 33 motion for a new trial and/or an evidentiary hearing.

## ARGUMENT

## POINT I

### THE NEW STATEMENTS BY KSM, KHAN, AND AL-BALUCHI MATERIALLY UNDERMINE MR. PARACHA'S CONVICTION

In its Memorandum of Law in Opposition to Mr. Paracha's motion (hereinafter "Govt. Memo"), the government offers three main contentions:

(1)     that "most of the statements" are "entirely consistent" with the government's evidence at trial.  Govt. Memo, at 1;

(2)     that the other statements are "merely cumulative" of other statements by Khan and al-Baluchi that the defense offered at trial.  *Id.*;  and

(3)     that Mr. Paracha's statements to law enforcement were sufficiently incriminating to sustain his conviction.  *Id.*, at 10, 25-26.

However, as detailed below, none of those arguments has merit.

**A.**     *The New Statements by KSM, al-Baluchi, and Khan Are Not Consistent With the Government's Evidence and Theory, and Are Not Cumulative*

Contrary to the government's contentions, the new statements by KSM, al-Baluchi, and Khan are clearly *in*consistent with the government's evidence and theory presented at trial.  As demonstrated below, and in Mr. Paracha's initial Memo of Law, at 29-41, the new statements squarely contradict the government's case at trial.   For example, the statements are completely at odds with the first paragraph of the government's description of the case.  *See* Govt. Memo, at 2.

The new statements further directly undermine the government's theory that Mr. Paracha knew that Khan and/or al-Baluchi were *al Qaeda* members. The new statements are also exculpatory, material, and non-cumulative to Mr. Paracha's defense that any actions he may have taken to assist Khan were not performed with the intent to support *al Qaeda*, but rather were undertaken to aid Mr. Khan personally.

### 1. The New Statements Contradict the Government's Theory and Evidence

In its opposition, the government asserts that the new statements by KSM, Khan, and al-Baluchi are consistent with the government's theory and evidence. *See* Govt. Memo at 24-27. Yet that presents an exceedingly narrow and therefore distorted assessment of the impact of the new statements *in their entirety*.[2] In that broader context, the new statements are dramatically exculpatory, and meet the standard required of newly discovered evidence under Rule 33. Indeed, the government's very production of the new statements after trial constitutes a tacit recognition of their exculpatory character.

While the new statements do confirm certain uncontested facts underlying the government's trial theory (such as KSM's admission of the existence of a gas station plot), that pales in comparison to how the new statements conflict with the essence of the government's

---

[2] Also, as the Court recognized at trial, and memorialized in its post-trial opinion, the government's refusal to permit the defense access to KSM and Messrs. Khan and al-Baluchi precluded the government from introducing any portions of their statements that incriminated Mr. Paracha. *United States v. Paracha*, 2006 WL 12768, at *15 (S.D.N.Y. January 3, 2006), *citing United States v. Moussoui*, 382 F.3d 453, 482 (4th Cir. 2004). Since the government continues to deny access to the three detainees, it should similarly be precluded from relying, in opposition to this motion, upon any parts of the new statements that might incriminate Mr. Paracha. Likewise, analysis of the impact of those new statements should be limited to the exculpatory portions (as the jury would never hear the incriminating passages).

theory with respect to Mr. Paracha's knowledge and intent. Similarly, the government's

recitation of uncontested facts regarding the interaction between Mr. Khan and Mr. Paracha, *see*

Govt. Memo, at 5-6,[3] does not answer the critical question in the case: whether Mr. Paracha

knowingly or intentionally provided material support to *al Qaeda*, and not to Mr. Khan

personally.[4]

Viewed in their entirety, the new statements provide a clear answer: Mr. Paracha did not

provide material support to *al Qaeda*. In fact, KSM's statements alone justify granting Mr.

Paracha's Rule 33 motion. KSM was the self-described "Military Operational Commander for

*all* foreign operations around the world under the direction of Sheikh Usama Bin Laden and Dr.

Ayman Al-Zawahiri." *See* KSM CSRT Transcript at 17-20 [attached as Exhibit 8 to the

November 21, 2008 Declaration of Joshua L. Dratel (hereinafter "Dratel Decl.")]. Therefore,

KSM would have known if Mr. Khan was, in fact, an *al Qaeda* operative, and the extent of Mr.

Khan's terrorist activities and plans on *al Qaeda*'s behalf.

However, as the new statements reveal, KSM determined that Mr. Khan was "somewhat

useless" and had even failed to accomplish the relatively minor task of renewing his United

States visa. KSM Interview Reports at 19 (attached as Exhibit 9, Dratel Decl.). While KSM

describes specific meetings with Mr. Khan about a gas station plot, and knowledge of Mr.

_____

[3] Some facts discussed in the government's Memo of Law – such as that KSM and al-Baluchi were high-ranking members of al Qaeda, *see* Govt. Memo, at 24 – were even the subject of a stipulation at trial.

[4] Likewise, the instructions from Mr. Khan to Mr. Paracha, listed by the government in its Memo of Law, at 7, do not distinguish between conduct undertaken personally for Mr. Khan or for *al Qaeda*. Indeed, the list of precautions would be attendant to any ordinary immigration fraud.

Khan's failure to renew his visa, none of KSM's statements about *al Qaeda*'s operations or Khan's activities even reference Mr. Paracha. *See generally,* KSM's Interview Reports (attached as Exhibit 9, Dratel Decl.).

In response to the glaring absence of Mr. Paracha from KSM's statements about Mr. Khan's activities, the government, in its Memo of Law, at 27, constructs a straw man. Mr. Paracha does not claim that the government's theory was that Mr. Paracha was an *al Qaeda* operative. Rather, Mr. Paracha's point is that KSM's specific knowledge about Khan, the gas station plot, and Khan's failed efforts at renewing his visa, without any allegation from KSM that Mr. Paracha was involved in that plot, would have cast doubt on the government's theory sufficient to have probably led to Mr. Paracha's acquittal.[5]

Such doubt would also have been fostered as a result of the alleged close connections between KSM, al-Baluchi and Saifullah Paracha (Mr. Paracha's father), as it would have been extremely unlikely for Mr. Paracha to have supported Mr. Khan in an *al Qaeda* plot without KSM's knowledge and even approval. That KSM does not identify Mr. Paracha as being involved, therefore, contradicts the government's allegations as well as Mr. Paracha's statements that he had conspiratorial conversations with Mr. Khan, or knew from Saifullah Paracha that Mr. Khan was an *al Qaeda* member. In fact, KSM's statements support Mr. Paracha's testimony that he (Mr. Paracha) had invented such knowledge out of fear, and in order to ingratiate himself to the agents questioning him.

Al-Baluchi's and Khan's new statements reinforce the conclusion that Mr. Paracha's

---

[5] As discussed **post**, at 12, and in Mr. Paracha's initial Memo of Law, at 44-46, if exculpatory material was not produced in timely fashion, all that the new statements need establish is that the result at trial would have been different, *i.e.*, a deadlocked jury.

motion for a new trial should be granted. According to al-Baluchi's new statements, KSM "had a strict rule *to never consider* [Saifullah] Paracha or his family for an operation." Al-Baluchi Interview Reports, at 40 (attached as Exhibit 12, Dratel Decl.) (emphasis added). Thus, any decision by Messrs. al-Baluchi or Khan to involve Mr. Paracha in any phase of the gas station plot would have been in direct violation of KSM's explicit order.

Independently, Mr. Khan's newly discovered statements also directly exculpate Mr. Paracha. Mr. Khan was the alleged originator and instigator of the gas station plot. Despite being the plot's mastermind, he explicitly stated that he "thought [Paracha] was innocent[.]" Khan Interview Reports, at 4 (attached as Exhibit 7, Dratel Decl.).

Thus, the new statements' consistency with the government's case is at best superficial, and cannot withstand scrutiny of the new statements as a whole as the affect the critical issue in the case: Mr. Paracha's knowledge and intent with respect to *al Qaeda*. Only by ignoring the vast exculpatory portions can the government argue otherwise.[6]

### 2. *The New Statements Are Not Cumulative*

As noted **ante**, and in Mr. Paracha's initial Memo of Law, at 33-38, the new statements are not cumulative. KSM's statements are in effect entirely new, since the jury did not receive any substitutions relating to his statements. As the government acknowledges in its Memo of Law, at 12-13, it successfully "objected to any further proceedings regarding Khalid Sheikh Mohammed on materiality grounds" -- a claim it could not have made had these new statements been available (or, of course, if KSM himself had been available to the defense, a lack of access

---

[6] In its Memo of Law, at 14, the government notes its arguments during summation, but fails to confront the fact that the new statements would have precluded many of those arguments, and blunted others substantially. *See, e.g.,* Mr. Paracha's initial Memo of Law, at 38-40.

attributable solely to the government).

Also, in light of the government's refusal to grant the defense access to the three detainee witnesses, the Court denied Mr. Paracha's motion to compel their appearance, opting instead for substitutions based on materials provided by the government. However, in light of the witnesses' newly disclosed statements, it is clear that the government violated Mr. Paracha's Sixth Amendment compulsory process rights by denying him access to the witnesses themselves. Instead of their full exculpatory testimony, Mr. Paracha was limited to sterile and narrow substitutions that failed to capture the detail and power their complete testimony (or even their complete accounts as reflected in the new statements) would have provided.

Thus, while at trial the Court, and even the prosecutors, operated under a set of assumptions about the scope of the detainees' exculpatory statements, in fact those assumptions were mistaken, and the detainees were capable of offering far broader and more specific testimony on Mr. Paracha's behalf. Mr. Paracha's inability, through no fault of his own (but due entirely to the government's refusal to produce the detainees as witnesses), to present that testimony in full constituted a violation of his Sixth Amendment rights.

Nor are Mr. Khan's new statements cumulative. His new statement that Mr. Paracha is "innocent" is far more declarative and specific than his prior statements that Mr. Paracha was "a good person who was willing to help," or Mr. Khan "assessed Uzair Paracha as being willing to help a fellow muslim at his father's request." *See* Govt. Memo at 28-29. Those prior statements do not preclude the possibility that a "good person" or a "fellow muslim" would knowingly and intentionally support a member of *al Qaeda* in achieving a terrorist objective. Mr. Khan's explicit characterization of Mr. Paracha as "innocent," however, does preclude that possibility.

*See also* Mr. Paracha's initial Memo of Law, at 36-38 (demonstrating that the new statements are not cumulative).

In reviewing the applicable law, the government, in its Memo of Law, at 23, relies on cases with inapposite facts. For instance, this motion does not involve "weighing the evidence and credibility of witnesses," as the government did not present any witnesses whose credibility is at issue. Rather, it is the evidence that the government prevented Mr. Paracha from obtaining and presenting at trial, but which has now been disclosed in the form of the new statements, that is at issue.

Consequently, the post-trial statements of KSM, al-Baluchi, and Khan break new ground. Each would likely have provided jurors with independent bases to conclude that Mr. Paracha was not guilty of knowingly or intentionally supporting *al Qaeda*. Taken together, they would compel that verdict.

**B.**     *The New Statements Support Mr. Paracha's Testimony That His Statements to Law Enforcement Were Fabrications Designed to Satisfy His Interrogators*

In its Memo of Law, at 8, the government relies on Mr. Paracha's statements to law enforcement agents as a basis for opposing Mr. Paracha's Rule 33 motion. Yet certain parts of Mr. Paracha's statements were disputed by Mr. Paracha in his trial testimony. As he explained, those disputed statements were the product of fear and an effort by Mr. Paracha to ingratiate himself to the agents in the hope they would release him.

The statements that linked Mr. Paracha to a knowing and intentional plot to aid *al Qaeda* were not made until Mr. Paracha had been with the FBI for nearly an entire weekend in a hotel and at the FBI's offices. Their repetition in proffer sessions, as Mr. Paracha testified, reflected

simply his desire to provide the government what it wanted to hear.

The new statements by KSM, Khan, and al-Baluchi, because they provide objective facts in conflict with Mr. Paracha's statements, buttress Mr. Paracha's testimony that his statements were in significant part untrue, and rendering plausible his explanation therefor. Mr. Paracha's reasons for giving such incriminating statements are exactly those that produce false confessions: Mr. Paracha knew enough information for him to invent the rest and harm himself in a rational, but invented and ultimately misguided, attempt to confess falsely to crimes he did not commit. It is from kernels of truth that reasonable and believable false confessions are born.[7]

Here, there were several facts Mr. Paracha did not deny. Mr. Paracha met with Mr. Khan. Mr. Paracha also possessed identifications and property, seized by the government from Mr. Paracha's residence, belonging to Mr. Khan. In addition, Mr. Paracha attempted to assist Mr. Khan with Mr. Khan's U.S. immigration problems. What the government pressured Mr. Paracha to admit, and which he eventually stated after succumbing to a weekend of pressure, but later disputed at trial, is that he engaged in such actions with knowledge that Mr. Khan was a member of *al Qaeda* or with any intent to materially support *al Qaeda*. The new statements provide powerful support to Mr. Paracha's trial testimony that those critical statements were untrue.

Also, the new statements would also probably have generated a reasonable doubt with respect to the lack of sufficient corroboration of Mr. Paracha's statements as required by the

---

[7] According to The Innocence Project, "[i]n about 25% of DNA exoneration cases, innocent defendants made incriminating statements, delivered outright confessions or pled guilty." *See* http://www.innocenceproject.org/understand/False-Confessions.php. In addition, the common factor that these people "have in common is a decision – at some point during the interrogation process – that confessing will be more beneficial to them than continuing to maintain their innocence." *Id.*

*corpus delicti* rule. *See, e.g., Opper v. United States*, 348 U.S. 84, 93 (1954) (the *corpus delicti* rule "require[s] the Government to introduce substantial independent evidence which would tend to establish the trustworthiness of the [defendant's] statement"); *United States v. Irving*, 452 F.3d 110, 118 (2d Cir. 2006); *United States v. Bryce,* 208 F.3d 346, 354 (2d Cir. 2000).

In any event, analysis of the impact of newly discovered evidence is not a sufficiency test. *See United States v. Ferguson*, 49 F. Supp.2d 321, 323 (S.D.N.Y. 1999) ("[t]he Court is not required to view the evidence in the light most favorable to the Government") (citing *United States v. Lincoln*, 630 F.2d 1313, 1319 (8th Cir. 1980)), *aff'd,* 246 F.3d 129 (2d Cir. 2001). *See also* Mr. Paracha's initial Memo of Law, at 25.

Rather, the focus should be on whether KSM's, Khan's and al-Baluchi's newly discovered statements materially undermine the government's contention that Mr. Paracha assisted Mr. Khan with the knowledge and intent to provide material support to *al Qaeda.* For the reasons set forth above, and in Mr. Paracha's initial Memo of Law, it is respectfully submitted that the new statements would have been relevant, material and non-cumulative to Mr. Paracha's defense, and satisfy the standard for a new trial under Rule 33: that they would probably have led to Mr. Paracha's acquittal.

## POINT II

### IN LIGHT OF PUBLIC REVELATIONS OF GOVERNMENT AGENCIES' DELIBERATE DESTRUCTION OF CERTAIN EVIDENCE OF DETAINEE INTERROGATIONS, A HEARING SHOULD BE CONDUCTED TO DETERMINE WHETHER THE GOVERNMENT POSSESSES OR POSSESSED ANY ADDITIONAL EXCULPATORY STATEMENTS OR INFORMATION

Several published reports, and admissions by the government in other litigation, strongly indicate that the statements the government produced, both before and since trial, are not the only statements by KSM, Mr. Khan, and Mr. al-Baluchi that exculpate Mr. Paracha. As a result, Mr. Paracha respectfully requests discovery and a hearing to determine whether agencies of the U.S. government have provided to the prosecutors in this case the full range of such statements that qualify for disclosure under *Brady v. Maryland*, 373 U.S. 83 (1963), and/or whether those agencies destroyed evidence or records, including videotapes, of such interrogations.

The issue of whether *Brady* material existed prior to trial but was not produced to the defense in timely fashion has legal implications regarding the Court's standard of review of this motion. As detailed in Mr. Paracha's initial Memo of Law, at 44-46, if *Brady* material was not disclosed, Mr. Paracha need not establish that the newly discovered evidence would probably have led to an acquittal, but only that the result would have been different.[8]

The initial disclosures regarding the Central Intelligence Agency's (hereinafter "CIA") destruction of a very limited number of videotapes of interrogations are discussed in Mr.

---

[8] The latter standard would require only that the new statements could have resulted in a single juror harboring a single reasonable doubt. The notion that the new statements would not have been capable of persuading one juror that a reasonable doubt existed defies reality and the record.

Paracha's initial Memo of Law, at 42-44. *See also* Mark Mazzetti, *C.I.A. Destroyed 2 Tapes Showing Interrogations*, N.Y. Times, December 7, 2007 (attached as Exhibit 18, Dratel Decl.). While the government nevertheless resisted Mr. Paracha's request for a hearing, Govt. Memo, at 30, it did so before it was revealed, in early March 2009, that the CIA destroyed *92 videotapes* of interrogations of two *al Qaeda* detainees at a time when it knew federal courts and Congress were seeking them.

Indeed, it was the United States Attorney's Office for the Southern District of New York that reported the destruction of the videotapes to the Court in *ACLU v. Department of Defense, et al.*, 04 Civ. 4151 (AKH), in a March 2, 2009, letter (a copy of which is attached hereto as Exhibit 19).[9] *See also* Mark Mazzetti, "U.S. Says C.I.A. Destroyed 92 Tapes of Interrogations," *The New York Times*, March 2, 2009 (a copy of which is attached hereto as Exhibit 20).

In that letter, the government also acknowledged that the Court in that case would order discovery of a variety of material relating to the contents of such tapes, including "[a] list of any summaries, transcripts, or memoranda regarding the records, and of any reconstruction of the records' contents; and [ ] [i]dentification of any witnesses who may have viewed the videotapes or retained custody of the videotapes before their destruction." *Id.*.

A subsequent, March 6, 2009, letter (attached hereto as Exhibit 21) in the same case provided a highly redacted inventory of the destroyed videotapes.[10] The March 6, 2009, letter also informed the Court that the "list of any summaries, transcripts, or memoranda regarding the

---

[9] In the interest of clarity and continuity, the numbering of the Exhibits to this Reply begins with the next number after the last Exhibit to Mr. Paracha's initial papers. Thus, the first Exhibit to this Reply is Exhibit 19.

[10] A copy of that redacted inventory is attached hereto as Exhibit 22.

records, and of any reconstruction of the records' contents" and the list of potential witnesses "who may have viewed the videotapes or retained custody of the videotapes before their destruction" would be completed by March 20, 2009. Regarding the witnesses, the March 6, 2009, letter, adds that "[t]here is no existing list of the witnesses . . ." and that the CIA "is identifying individuals who had access to the tapes and is then determining whether those individuals in fact viewed the tapes or had custody of the tapes."

Thus, there is a considerable amount of potential information about the interrogations that may yet be learned and revealed. In that context, and given previous misrepresentations by the CIA that the tapes did not exist at all,[11] it is respectfully submitted that the Southern District of New York's good faith notwithstanding, just what the CIA knew about Mr. Paracha (from the interrogation of detainees), and when it knew it remains a very open issue that would benefit considerably from discovery and a hearing.

The government's March 2, 2009, and March 6, 2009, letters (Exhibits 19 & 21) also refer to a CIA Office of Inspector General's Special Review Report, redacted portions of which were provided to the plaintiffs in the *ACLU* litigation.[12] Surely if the CIA's misconduct warrants

---

[11]   In light of the CIA's prior misrepresentations to courts regarding the existence of videotapes at all, the government's March 6, 2009, letter (Exhibit 19), at 2, statement that "[t]o date, the CIA is not aware of any transcripts of the destroyed videotapes[,]" needs to be explored further before it can be accepted as accurate. *See* Mr. Paracha's Initial Memo of Law, at 41-44. *See also United States v. Wilson*, 289 F. Supp.2d 801 (S.D. Tex. 2003) (ordering a new trial nearly twenty years after a conviction was secured by an affidavit from the C.I.A. that, unbeknownst to the line prosecutor, was false).

[12]   The Report, and the previously mentioned inventory of videotapes, were redacted to remove classified information. At least the inventory was provided *ex parte* to the Court in *ACLU* in unredacted form (as will the lists to be produced March 20, 2009). *See* Exhibit 22. A copy of two heavily redacted pages of the CIA OIG's Special Review Report that were provided to plaintiffs in *ACLU*, along with the government's separate March 6, 2009, cover letter, are

an internal investigation for bureaucratic purposes, or in response to *civil* litigation, it compels a court hearing to determine whether that misconduct is responsible for Mr. Paracha's criminal conviction, and his 30-year prison sentence.

In its Memo of Law, the government asserts that Mr. Paracha seeks to impose upon the government an unprecedented obligation to search for exculpatory evidence:

> Paracha is essentially asking this Court to set a precedent which would require the prosecution team to constantly monitor the files of every United States Government agency to determine whether there is any new, arguably exculpatory information about him, even after he has been lawfully convicted by a jury. Paracha's new proposed 'rule,' of course, would apply not only to him, but to all terrorism defendants and possibly all defendants in general. Thus, the unworkable precedent he asks this Court to set would require prosecutors across the country to constantly monitor the files of all Government agencies to ensure that there is no new exculpatory information about long-convicted defendants.

Govt. Memo at 32.

That, too, of course, is a straw man. Mr. Paracha suggests no such duty. Rather, Mr. Paracha's request for discovery and a hearing is based on specific disclosures *by the government itself* with respect to the record of interrogations. In addition, the pattern of misrepresentation by the CIA regarding the interrogations and the videotapes more than justifies Mr. Paracha's request. Moreover, Mr. Paracha's request is in response to specific post-trial government disclosure of a significant volume of statements by persons whom the government has had in custody for years prior to trial, but to whom it has refused to permit the defense access.[13]

---

attached hereto as Exhibit 23.

[13] The duty to disclose *Brady* material is ongoing and extends to all stages of the judicial process, including post-trial proceedings. *See Smith v. Roberts*, 115 F.3d 818, 820 (10th Cir. 1997), *citing Pennsylvania v. Ritchie,* 480 U.S. 39, 60 (1987). *See also Warner v. City of*

Nor would discovery and a hearing in this case open any floodgates. This is a unique case with unique circumstances, involving issues that are already the subject of discovery in a civil case.[14] In this context, the government's protestations regarding some purported new standard Mr. Paracha seeks to impose rings hollow. The same is true for the government's claim that precedent for the inquiry he seeks is absent – but so are the facts of this case, and the issue facing the Court: the government prevented access to key witnesses (succeeding in having one of them declared immaterial), provided only a narrow set of statements to the Court and defendant, later elicited and provided significantly expanded statements containing considerable exculpatory information, and concurrently deliberately (and perhaps in contempt of court, *see* Exhibit 20, reporting that the A.C.L.U. is considering asking the Court in that case to hold the CIA in contempt for destroying the tapes) destroyed a trove of unimpeachable evidence (the videotapes) that could have provided the Court with proof of what (some of) these witnesses said and when they first said it.

In light of those facts and considerations, it is respectfully submitted that the unprecedented situation present here requires, in order to avoid a miscarriage of justice, inquiry in the form of discovery and an evidentiary hearing regarding (1) whether government agencies other than the United States Attorney's Office for the Southern District of New York have

---

*Rochester*, 536 F. Supp.2d 285, 293-95 (W.D.N.Y. 2008) (defendant's Fifth Amendment fair trial rights, underlying *Brady* do not terminate until "the conclusion of trial *and/or* post-trial procedures[]" and that due process principles also require disclosure of exculpatory evidence that is learned about after trial) (emphasis added).

[14] Also, unlike in a civil case, the Classified Information Procedures Act provides in a criminal case a mechanism for defense counsel access to classified materials. Mr. Paracha's counsel possesses a Top Secret security clearance.

disclosed all *Brady* material to the prosecutors in this case;  (2)  whether government agencies destroyed any such materials;  and, if so, (3)  what information was contained in the materials that were destroyed.

### Conclusion

For the foregoing reasons, it is respectfully submitted that this Court should grant Mr. Paracha's Rule 33 motion in its entirety, vacate his convictions, and grant him a new trial, or, in the alternative, order discovery and conduct an evidentiary hearing.

Dated: March 17, 2009
         New York, New York

                                        Respectfully submitted,

                                        JOSHUA L. DRATEL
                                        JOSHUA L. DRATEL, P.C.
                                        2 Wall Street 3rd Floor
                                        New York, New York 10005
                                        (212) 732-0707

                                        *Attorneys for Defendant*
                                        *Uzair Paracha*

– Of Counsel –

Joshua L. Dratel
Aaron J. Mysliwiec

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
                       :     03 Cr. 1197 (SHS)

UNITED STATES OF AMERICA,    :

        – against –          :     CERTIFICATE OF SERVICE

                       :

UZAIR PARACHA,            :

              Defendant.    :
-------------------------------------------------------x

## CERTIFICATE OF SERVICE

      I hereby certify that on March 17, 2009, I personally served a Reply Memorandum of Law in Support of Motion For a New Trial Pursuant to Rule 33, Fed.R.Crim.P., on Assistant United States Attorney, Karl Metzner by leaving it in a sealed envelope addressed to him, as shown below, with the United States Marshals in the front lobby of the Office of the United States Attorney located at 1 St. Andrew's Plaza, New York, New York, 10007.

               Karl Metzner
               Assistant United States Attorney
               Southern District of New York
               1 St. Andrew's Plaza
               New York, New York 10007

                                                  ALEX MELNITZKY

Sworn to before me on March 17, 2009

STEVEN D. WRIGHT
NOTARY PUBLIC, State of New York
No. 01WR6018067
Qualified in New York County
Commission Expires Dec. 28, 20 _ _



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

86 Chambers Street
New York, New York 10007

March 2, 2009

BY FACSIMILE
Hon. Alvin K. Hellerstein
United States District Court
Southern District of New York
500 Pearl Street, Room 1050
New York, New York 10007-1312

Re:    ACLU, et al., v. Department of Defense, et al., No. 04 Civ. 4151 (AKH)

Dear Judge Hellerstein:

The Court's stay of its consideration of Plaintiffs' contempt motion expired on February 28, 2009. John Durham, the Acting United States Attorney for the Eastern District of Virginia who is conducting a criminal investigation into the destruction of certain videotaped interrogations of detainees by the Central Intelligence Agency, did not request a continuation of the stay. Accordingly, it is our expectation that the Court will enter an order requiring the production of the information contemplated in the August 20, 2008 Order Regulating Proceedings; namely:

1.    A list identifying and describing each of the destroyed records;

2.    A list of any summaries, transcripts, or memoranda regarding the records, and of any reconstruction of the records' contents; and

3.    Identification of any witnesses who may have viewed the videotapes or retained custody of the videotapes before their destruction.

Hon. Alvin K. Hellerstein
March 2, 2009

    With the termination of the stay, the CIA is now gathering information and records responsive to the Court's order. The CIA respectfully requests that it be permitted until Friday, March 6, 2009, to provide the Court with a proposed schedule under which it will respond to each of the three categories of information and records.

    In the meantime, the CIA can now identify the number of videotapes that were destroyed, which is information implicated by Point 1 of the August 20, 2008 Order. Ninety-two videotapes were destroyed. This information is included in the CIA Office of Inspector General's Special Review Report, a redacted version of which was previously produced to the Plaintiffs. The CIA will unredact this information from the report and produce it to the Plaintiffs.

    Finally, we note that certain of the information contemplated by the August 20, 2008 Order may be classified or statutorily protected from disclosure, such as the names of CIA employees who have reviewed the tapes. The CIA intends to produce all of the information requested to the Court and to produce as much information as possible on the public record to the Plaintiffs.

    We thank the Court for considering this submission.

                            Respectfully,

                            LEV L. DASSIN
                            Acting United States Attorney

            By: _____

                            SEAN H. LANE
                            PETER M. SKINNER
                            Assistant United States Attorneys
                            Telephone: (212) 637-2601
                            Facsimile: (212) 637-2930

cc:    Amrit Singh, Esq. (by facsimile)
       Jennifer B. Condon (by facsimile)

Welcome to TimesPeople    TimesPeople Lets You Share and Discover the Best of NYTimes.com    12:38 PM    Get Started  No, thanks
What's this?

My Account · Welcome, aaronmysliwiec · Log Out · Help

HOME PAGE | TODAY'S PAPER | VIDEO | MOST POPULAR | TIMES TOPICS

**The New York Times**    **Washington**    Search All NYTimes.com [ ] Go

WORLD | U.S. | N.Y. / REGION | BUSINESS | TECHNOLOGY | SCIENCE | HEALTH | SPORTS | OPINION | ARTS | STYLE | TRAVEL | JOBS | REAL ESTATE | AUTOS
POLITICS | WASHINGTON | EDUCATION



Bebe Neuwirth

*The New York Times*
**nytimes.com/conversations**

# U.S. Says C.I.A. Destroyed 92 Tapes of Interrogations

By MARK MAZZETTI
Published: March 2, 2009

E-MAIL
PRINT
REPRINTS
SHARE

WASHINGTON — The government on Monday revealed for the first time the extent of the destruction of videotapes in 2005 by the Central Intelligence Agency, saying that agency officers destroyed 92 videotapes documenting the harsh interrogations of two Qaeda suspects in C.I.A. detention.

ARTICLE TOOLS SPONSORED BY


JULY 17

**Related**

Letter (ACLU, et al. v. Dept. of Defense) (findlaw.com)

The disclosure came in a letter filed by federal prosecutors investigating the destruction of the tapes in November 2005.

It had been previously known that officials of the agency had destroyed hundreds of hours of videotaped interrogations, but the documents filed Monday reveal the number of tapes.

The tapes had been held in a safe at the C.I.A. station in Thailand, the country where two detainees — Abu Zubaydah and Abd al-Rahim al-Nashiri — were interrogated.

The filing of the documents, submitted to a court in New York as part of a Freedom of Information Act lawsuit brought by the American Civil Liberties Union, came as federal prosecutors were wrapping up the investigation into the matter.

The criminal investigation, begun in January 2008, is being led by John H. Durham, a career prosecutor from Connecticut with long experience trying organized-crime cases.

The order to destroy the tapes was given by Jose A. Rodriguez Jr., who at the time was the head of the spy agency's clandestine service. Prosecutors have spent months trying to piece together whether anyone besides Mr. Rodriguez authorized the destruction and to decide whether anyone should be indicted in the matter.

The tapes were destroyed as Congress and the courts were intensifying their scrutiny of the agency's detention and interrogation program.

The civil liberties union is asking a judge to hold the agency in contempt for destroying the tapes.

A Justice Department spokesman declined to comment on the matter on Monday.

The destroyed videotapes are thought to have depicted some of the harshest interrogation techniques used by the C.I.A. during the two years after the Sept. 11 terrorist attacks, including the simulated drowning technique called waterboarding.

More Articles in Washington »

**Your Money E-Mail**

Sign up for a preview of the week in finance, sent every Monday. See Sample

aaron.mysliwiec@gmail.com   Sign Up

Change E-mail Address | Privacy Policy

Ads by Acladde

**Teeth Whitening Exposed!**
The Secrets Dentists don't want you to know about Teeth Whitening!  Learn more



**Artery Clearing Secret**
Hugh Downs reports on breakthrough from Nobel Prize Winning Doctor. Drops high blood pressure by as much as 60 points...  Learn more

Advertise on NYTimes.com

**MOST POPULAR**

E-MAILED | BLOGGED | SEARCHED

1. Frank Rich: The Culture Warriors Get Laid Off
2. A.I.G. Planning Huge Bonuses After $170 Billion Bailout
3. Where Education and Assimilation Collide
4. Weary of Looking for Work, Some Create Their Own
5. Is It Time to Retrain B-Schools?
6. Your Money: Thoughts on Walking Away From Your Home Loan
7. The Pleasure Principle
8. Nicholas D. Kristof: Pathogens in Our Pork
9. Thomas L. Friedman: The Next Really Cool Thing
10. As Oil and Gas Prices Plunge, Drilling Frenzy Ends

Go to Complete List »



*The New York Times*    JOBS
nytimes.com/jobs

In a speech on Monday in Washington, Attorney General Eric H. Holder Jr. said that "waterboarding is torture" and that he would never authorize the technique, a position he first articulated in his confirmation hearings.

Mr. Holder is leading a review to determine which interrogation techniques should be authorized for C.I.A. use.

According to the letter that was filed, the agency has asked to have until Friday to produce a schedule for the court detailing when it will turn over a number of records associated with the destruction of the tapes, including a list of witnesses who might have viewed the videotapes before they were destroyed.

Mr. Durham has made no public statements about when he will conclude his investigation.

Last year, however, he asked that freedom-of-information requests directed at the agency be held in abeyance until he wrapped up the criminal inquiry. He asked at that time to have until the end of February to conclude his work, and he has not asked for another extension.

A version of this article appeared in print on March 3, 2009, on page A16 of the New York edition.

More Articles in Washington »

 **Click here to enjoy the convenience of home delivery of The Times for less than $1 a day.**

**How I became the C.E.O of Twitter**
Also in Jobs:
Online government career expo
From employer to employee
Search for jobs in finance

ADVERTISEMENTS

Get Times Reader Free. A Digital Newspaper That Reads Like The Real Thing.
Other papers leave you out of the conversation. Get The Weekender.

 Rediscover KENNEDY. Order now »


nytimes.com/business
Where the conversation begins
How will their business effect your business?

Ads by Google                          what's this?
**Luxury Seoul Hotel**
Stay at the Intercontinental Hotel & experience Seoul Korea in style.
ichotelsgroup.com/InterContinental

**Spa Condo Upper East Side**
Spacious Homes, Pool, Private Park, Cafe, Massage Center, Pilates, Yoga
www.515e72.com

**Did Jesus Christ Exist?**
"The God Who Wasn't There" View trailer for the acclaimed DVD
www.TheGodMovie.com

INSIDE NYTIMES.COM

Ads by Google                          what's this?
**Police Schools**
Request free Information from Police Training Schools Near You!
www.collegebound.net

**Join the Police Force**
Find online academies, schools, and universities. Free information.
www.EverestUniversity-Degrees.com

**Police Academy Training**
Briarcliffe College - Bethpage, NY Offers Criminal Justice Training.
CJ.bcbeth.com

**Past Coverage**
Tapes Not Part Of Court Order, C.I.A. Insists (April 18, 2008)
Judge Demands a Report on Destroyed C.I.A. Tapes (January 25, 2008)
Account of C.I.A. Tapes Is Challenged (January 17, 2008)
No Immediate Ruling on Judicial Inquiry (December 22, 2007)

**Related Searches**
Nashiri, Abd al-Rahim al-            Get E-Mail Alerts
Zubaydah, Abu                       Get E-Mail Alerts
Interrogations                      Get E-Mail Alerts
Recordings and Downloads (Video)    Get E-Mail Alerts

MOVIES »          OPINION »          STYLE »          OPINION »          REAL ESTATE »        THE CITY »

     

Op-Classic:
Bad Behavior
in the Mideast
Israelis and Palestinians both blocked a peace deal, Chas. W. Freeman Jr. wrote in 2000.

     

Paul Rudd: Isn't He Bromantic?     What I Remember About Bear Stearns     Weddings and Celebrations          The Reverse Mortgage        The Bubbly Flows On, Even in Hard Times

Home | World | U.S. | N.Y. / Region | Business | Technology | Science | Health | Sports | Opinion | Arts | Style | Travel | Jobs | Real Estate | Automobiles | Back to Top

Copyright 2009 The New York Times Company | Privacy Policy | Search | Corrections | RSS | First Look | Help | Contact Us | Work for Us | Site Map



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*86 Chambers Street*
*New York, New York 10007*

March 6, 2009

<u>BY HAND DELIVERY</u>
Hon. Alvin K. Hellerstein
United States District Court
Southern District of New York
500 Pearl Street, Room 1050
New York, New York 10007-1312

       Re:    <u>ACLU, et al., v. Department of Defense, et al.</u>, No. 04 Civ. 4151 (AKH)

Dear Judge Hellerstein:

        We write with the Central Intelligence Agency's proposed schedule for the production of the information contemplated in the August 20, 2008 Order Regulating Proceedings.

        Point 1 requires the production of a "list identifying and describing each of the destroyed records." We are enclosing a redacted version of an inventory of the destroyed videotapes. The redacted portions of the inventory are classified and protected from disclosure by statute. We have an unredacted version of the inventory available for the Court's <u>ex parte</u>, <u>in camera</u> review. This inventory identifies the tapes and includes any descriptions that were written on the spines of the tapes. Further descriptions of the contents of the tapes are included in the documents that are being gathered in connection with Point 2.

        Point 2 requires the production of a "list of any summaries, transcripts, or memoranda regarding the records, and of any reconstruction of the records' contents." The CIA will complete this list on or before March 20, 2009. On that same date, the CIA will provide a public version of the list to the Court and Plaintiffs and, if necessary to explain fully the records at issue, will make available a classified version for the Court's <u>ex parte</u>, <u>in camera</u> review.

Hon. Alvin K. Hellerstein
March 6, 2009

     To date, the CIA is not aware of any transcripts of the destroyed videotapes. Regarding summaries, memoranda, or any reconstruction of their contents, the CIA requests an additional two weeks, until March 20, 2009, to produce the list because it is still searching for and identifying the records at issue. Prior to the expiration of the stay on February 28, 2009, the CIA was unable to gather the records because it did not want to jeopardize the criminal investigation into the destruction of the tapes. John H. Durham, the prosecutor leading the criminal investigation, had expressed concern that the memories of potential witnesses might be affected were they to review any records covered by Points 1 and 2 of the August 20, 2008 Order. See e.g., Declaration of John H. Durham, dated December 22, 2008, paragraph 7. The CIA did not know who at the Agency might be considered a potential witness. Therefore, the CIA did not begin gathering the records at issue until after the stay had expired. Given that the search was just begun, covers a variety of different types of records (including cables, memoranda, notes and emails), is ongoing in multiple locations within the CIA, and covers records produced by individuals who have left the Agency, we respectfully submit that an additional two weeks is a reasonable amount of time for the completion of the list required by Point 2.

     Point 3 requires the "[i]dentification of any witnesses who may have viewed the videotapes or retained custody of the videotapes before their destruction." The CIA will complete this list on or before March 20, 2009. To protect classified information and information otherwise protected by statute, the CIA contemplates producing a redacted, public version of the list to the Court and the Plaintiffs. The CIA will make available an unredacted version of the list for the Court's ex parte, in camera review.

     There is no existing list of the witnesses covered by Point 3. The CIA is compiling the list through an ongoing investigation. It is identifying individuals who had access to the tapes and is then determining whether those individuals in fact viewed the tapes or had custody of the tapes. Given that the investigation was just begun and requires interviews with multiple CIA personnel, some of whom are overseas and some of whom have left the Agency, we respectfully submit that an additional two weeks is a reasonable amount of time for the completion of the list required by Point 3.

Hon. Alvin K. Hellerstein
March 6, 2009

       Finally, as promised in our February 27, 2009 letter, we have produced under separate cover to Plaintiffs pages from the CIA Office of Inspector General's Special Review Report that provide additional unredacted information.  The unredacted information concerns the number of videotapes that were destroyed.

                                                   Respectfully submitted,

                                                   LEV L. DASSIN
                                                 Acting United States Attorney

By:

                                                 SEAN H. LANE
                                                 PETER M. SKINNER
                                                 Assistant United States Attorneys
                                                 Telephone:  (212) 637-2601
                                                 Facsimile:  (212) 637-2930

cc:    Amrit Singh, Esq. (by electronic mail)
       Jennifer B. Condon (by electronic mail)

-3-

RECYCLED

TOP SECRET/  /NOFORN//X1
HANDLE VIA ████████████ CHANNELS

INVENTORY OF VIDEOTAPES

[all dates are 2002]

**1st Shipment** ████████████

*Box 1 of 4*

Detainee #1

| Tape | Label | Date/time | Description |
|------|-------|-----------|-------------|
| 1 | 1 | | ████████████ |
| | | | Do not tape over |
| 2 | 2 | | |
| 3 | 3 | | |
| 4 | 4 | | |
| 5 | 5 | | |
| 6 | 6 | | |
| 7 | 7 | | |
| 8 | 8 | | |
| 9 | 9 | | |
| 10 | 10 | | |



HANDLE VIA ████████████ CHANNELS
~~TOP SECRET~~/ ████████ /NOFORN//X1

TOP SECRET/███████/NOFORN//X1
HANDLE VIA ██████████████ CHANNELS

| Tape | Label | Date/time | Description |
|------|-------|-----------|-------------|
| 11 | 11 | | |
| 12 | 12 | | |
| 13 | 13 | | |
| 14 | 14 | | |
| 15 | 15 | | |
| 16 | 16 | | |
| 17 | 17 | | |

*End Box 1 of 4*

2

TOP SECRET/████████/NOFORN//X1
HANDLE VIA ████████████ CHANNELS

Box 2 of 4

| Tape | Label | Date/time | Description |
|------|-------|-----------|-------------|
| 18 | 18 | | |
| 19 | 19 | | |
| 20 | 20 | | |
| 21 | 21 | | |
| 22 | 22 | | |
| 23 | 23 | | |
| 24 | 24 | | |
| 25 | 25 | | |
| 26 | 26 | | |
| 27 | 27 | | |
| 28 | 28 | | |
| 29 | 29 | | |
| 30 | 30 | | |
| 31 | 31 | | |
| 32 | 32 | | |

3

HANDLE VIA ████████████ CHANNELS
TOP SECRET/████████/NOFORN//X1

TOP SECRET/ ██████ /NOFORN//X1
HANDLE VIA ████████████ CHANNELS



| Tape | Label | Date/time | Description |
|------|-------|-----------|-------------|
| 33 | 33 | | |
| 34 | 34 | | |
| 35 | 35 | | |
| 36 | 36 | | AZ |
| 37 | 37 | | Abu Z. |
| 38 | 38 | | |
| 39 | 39 | | |

*End Box 2 of 4*

4

HANDLE VIA ████████████ CHANNELS
TOP SECRET/ ██████ /NOFORN//X1

TOP SECRET/ ███████ /NOFORN//X1
HANDLE VIA ███████ ███████ CHANNELS

*Box 3 of 4*

| Tape | Label | Date/time | Description |
|------|-------|-----------|-------------|
| 40 | 40 |  ███████ | ███████ |
| 41 | 41 | | |
| 42 | 42 | | AZ ███████ |
| 43 | 43 | | ███████ |
| 44 | 44 | | |
| 45 | 45 | | |
| 46 | 46 | | |
| 47 | 47 | | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| | | | |
|------|------|------|------|
| 48 | | ███████ | |
| 49 | | | |
| 50 | | | |
| 51 | | | |
| 52 | | | |
| 53 | | | |
| 54 | | | |

5

HANDLE VIA ███████ CHANNELS
TOP SECRET/ ███████ /NOFORN//X1

TOP SECRET/█████████/NOFORN//X1
HANDLE VIA ███████████████ CHANNELS



| Tape | Label | Date/time | Description | |
|------|-------|-----------|-------------|-----------|
| 55 | | | | interview |
| 56 | | | | interview |
| 57 | | | | |
| 58 | | | | |
| 59 | | | | |
| ---- | ----- | --------- | ----------- | --------- |
| 60 | | AZ ███████████ | | |
| 61 | | ███████████████ | | |

*End Box 3 of 4*

TOP SECRET/██████████/NOFORN//X1
HANDLE VIA ████████████████ CHANNELS

**2nd Shipment** ████████████████████████████

*Box 4 of 4*

Detainee #_

| Tape | Label | Date/time | Description |
|------|-------|-----------|-------------|
| 62 | 1 | | |
| 63 | 2 | | |
| 64 | 3 | | |
| 65 | 4 | | |
| 66 | 1 | | |
| 67 | 2 | | |
| 68 | 3 | | |
| 69 | | | |
| 70 | 4 | | |
| 71 | 5 | | |
| 72 | 6 | | |
| 73 | 7 | | |
| 74 | 8 | | |
| 75 | 9 | | |
| 76 | 10 | | |
| 77 | 11 | | |

7

HANDLE VIA ████████████████ CHANNELS
TOP SECRET/██████████/NOFORN//X1

TOP SECRET/ ▮▮▮▮▮ /NOFORN//X1
HANDLE VIA ▮▮▮▮▮▮▮▮ CHANNELS

| Tape | Label | Date/time | Description |
|------|-------|-----------|-------------|
| 78 | 12 | | |
| 79 | 13 | | |
| 80 | 14 | | ▮▮▮▮▮ |
| 81 | 15 | | |
| 82 | 16 | | |
| 83 | | | |
| 84 | | | |
| 85 | | | |
| 86 | | | |

--------------------------------------------

| 87 | | | |
| 88 | | | |

--------------------------------------------

| 89 | 1 | | Use and rewind #1 |
| 90 | 2 | | Use and rewind #2 |

--------------------------------------------

### Detainee #2

| Tape | Label | Date/time | Description |
|------|-------|-----------|-------------|
| 91 | | | Tape and rewind #2 |
| 92 | 3 | | Use and rewind #3 Final |

*End Box 4 of 4*



8

HANDLE VIA ▮▮▮▮▮▮▮ CHANNELS
TOP SECRET/ ▮▮▮▮▮ /NOFORN//X1



TOP SECRET/ █████████ /NOFORN//X1
HANDLE VIA ████████████████ CHANNELS



9

HANDLE VIA ████████████████ CHANNELS
TOP SECRET/ █████████ /NOFORN//X1



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*86 Chambers Street, 5th Floor*
*New York, New York 10007*

March 6, 2009

<u>BY ELECTRONIC MAIL</u>
Amrit Singh
Staff Counsel
American Civil Liberties Union
Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, N.Y. 10004

Jennifer B. Condon, Esq.
Gibbons, Del Deo, Dolan,
Griffinger & Vecchione, P.C.
One Riverfront Plaza
Newark, N.J. 07102

      Re:    <u>ACLU, et al., v. Department of Defense, et al.</u>, No. 04 Civ. 4151 (AKH)

Dear Ms. Singh and Ms. Condon:

      As promised in the Government's February 27, 2009 letter to the Court, we are enclosing pages from the Central Intelligence Agency Office of Inspector General's Special Review Report that provide additional unredacted information. The unredacted information concerns the number of interrogation videotapes that were destroyed by the CIA. Thank you for your attention to this matter.

                        Very truly yours,
                        LEV L. DASSIN
                        Acting United States Attorney

By:                                       

                        SEAN H. LANE
                        PETER M. SKINNER
                        Assistant United States Attorneys
                        Telephone: (212) 637-2737

Enclosures

TOP SECRET ███████████████████████████

████████████████████████████████████████
████████████████████████████████████████
,interrogators administered ██████████ the waterboard to
Al-Nashiri ██████████████████████████████████
████████████████████████

**Videotapes of Interrogations**

77. (TS ██████████████████████████████████
████████████████████████████████████████
████████████████████████████ decided to
videotape the interrogation sessions. ██████████████
████████████████████████████████████████
████████████████████████████████████████

There are 92 videotapes, 12 of which include EIT
applications.  An OGC attorney reviewed the videotapes ████
████████████████████████████████████████
████████████████████████████████████████

78. (TS ██████████ OIG reviewed the videotapes,
in May 2003. ████████████████████████
████████████████████████████████████████
████████████████████████████████████████

████████████████████████████████████████
████████████████████████████████████████

36

TOP SECRET ████████████████████████████

TOP SECRET ███████████████████

# PROCEDURES AND RESOURCES

1. (TS ██████████ A team, led by the Deputy Inspector General, and comprising the Assistant Inspector General for Investigations, the Counsel to the Inspector General, a senior Investigations Staff Manager, three Investigators, two Inspectors, an Auditor, a Research Assistant, and a Secretary participated in this Review.

2. (TS ██████████ OIG tasked relevant components for all information regarding the treatment and interrogation of all individuals detained by or on behalf of CIA after 9/11. Agency components provided OIG with over 38,000 pages of documents. OIG conducted over 100 interviews with individuals who possessed potentially relevant information. We interviewed senior Agency management officials, including the DCI, the Deputy Director of Central Intelligence, the Executive Director, the General Counsel, and the Deputy Director for Operations. As new information developed, OIG re-interviewed several individuals.

3. (TS ██████████ OIG personnel made site visits to the ████████████████████████ facilities. OIG personnel also visited ██████████████████ to review 92 videotapes of interrogations

TOP SECRET ███████████████████